1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

4

5   UNITED STATES OF AMERICA,            )
                                         )
6                   PLAINTIFF,           ) CASE NO.
                                         ) CR 13-0904-R
7           VS.                          )
                                         )
8   BILLY KHOUNTHAVONG, BENNY            )
    KHOUNTHAVONG, and JOHNNY             )
9   KHOUNTHAVONG,                        )
                                         )
10                  DEFENDANTS.          )
    _____)

11

12

13

14               REPORTER'S TRANSCRIPT OF
                  JURY TRIAL - DAY 4
15            TUESDAY, FEBRUARY 10, 2015
                      10:37 A.M.
16             LOS ANGELES, CALIFORNIA

17

18

19

20

21

22   _____

23        KHOWOONSUN CHONG, CSR 12907, CRR, RMR
           FEDERAL OFFICIAL COURT REPORTER
24         255 EAST TEMPLE STREET, ROOM 181-G
            LOS ANGELES, CALIFORNIA 90012
25              kchong12907@yahoo.com

UNITED STATES DISTRICT COURT

1                          **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4          STEPHANIE YONEKURA
           UNITED STATES ATTORNEY
5          BY:  MARGARET L. CARTER
                LAWRENCE S. MIDDLETON
6          Assistants United States Attorney
           United States Courthouse
7          312 North Spring Street
           Los Angeles, California 90012

8

9     FOR THE DEFENDANT BILLY KHOUNTHAVONG:

10         DOMINIC CANTALUPO LAW OFFICES
           BY:  DOMINIC CANTALUPO
11         Attorney at Law
           100 Wilshire Boulevard, Suite 940
12         Santa Monica, California 90401

13    FOR THE DEFENDANT BENNY KHOUNTHAVONG:

14         ADAM H. BRAUN LAW OFFICES
           BY:  ADAM H. BRAUN
15         Attorney at Law
           1880 Century Park East, Suite 710
16         Los Angeles, California 90067

17    FOR THE DEFENDANT JOHNNY KHOUNTHAVONG:

18         LAW OFFICES OF HUMBERTO DIAZ
           BY:  HUMBERTO DIAZ
19         Attorney at Law
           714 West Olympic Boulevard, Suite 450
20         Los Angeles, California 90015

21

22    ALSO PRESENT:

23         JASON DALTON, FBI SPECIAL AGENT

24

25

**UNITED STATES DISTRICT COURT**

1

**I N D E X**

2

**TUESDAY, FEBRUARY 10, 2015**

3

--------------------------------------------------------

**CHRONOLOGICAL INDEX OF WITNESSES**

4

5

GOVERNMENT'S WITNESSES                                    PAGE

6

ADAM HERSON
        DIRECT EXAMINATION BY MR. MIDDLETON          6
7       CROSS-EXAMINATION BY MR. CANTALUPO           18
        CROSS-EXAMINATION BY MR. BRAUN               26
8       CROSS-EXAMINATION BY MR. DIAZ                29
        REDIRECT EXAMINATION BY MR. MIDDLETON        37
9
KAJAY WILLIAMS
10      DIRECT EXAMINATION BY MR. MIDDLETON          42
        CROSS-EXAMINATION BY MR. CANTALUPO           47
11      CROSS-EXAMINATION BY MR. BRAUN               47
        CROSS-EXAMINATION BY MR. DIAZ                48
12      REDIRECT EXAMINATION BY MR. MIDDLETON        50

13
KATIE PHAN
        DIRECT EXAMINATION                           53
14      CROSS-EXAMINATION BY MR. CANTALUPO           63
        CROSS-EXAMINATION BY MR. BRAUN               69
15      CROSS-EXAMINATION BY MR. DIAZ                74

16
NATALIE TRAN
        DIRECT EXAMINATION BY MS. CARTER             76
17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1          **INDEX OF EXHIBITS**

2         MARKED FOR IDENTIFICATION

3

   Exhibit 62 Document                            58
4  Exhibit 63 Document                            58

5

6              RECEIVED INTO EVIDENCE

7

8     3, 4, 5, 11, 12, 13                          88
      38, 39, 40, 41, 42, 43, 44, and 75          18
9     46, 49, and 50                              47
      50, 51, 52, 60, 61, 62, 63, 64, 66, 68, 70, 73,    87
10    76, 77, 81, 82, 113, 114, and 115
      231                                         117
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, FEBRUARY 10, 2015

 2                              10:37 A.M.

 3                               -oOo-

 4              THE COURT:  Bring down the jury.

 5         Is your witness ready?

 6              MR. MIDDLETON:  Yes, Your Honor.  He's right here.

 7                  (Jury in at 10:37 a.m.)

 8                  (The following proceedings were held in the

 9                  presence of the jury:)

10              THE COURT:  Record will show the jurors are all

11    present in their proper places; the defendants are present with

12    their counsel.

13         Call your next witness.

14              MR. MIDDLETON:  Your Honor, the Government calls

15    Mr. Adam Herson.

16              THE CLERK:  Mr. Herson, please step forward.  Stop

17    right there.  Face me, please raise your right hand.  Do you

18    solemnly swear that the testimony you shall give in the cause

19    now pending before this court shall be the truth, the whole

20    truth, and nothing but the truth so help you God?

21              THE WITNESS:  I do.

22              THE CLERK:  Thank you.  Please take a seat and

23    please state your full and true name for the record and spell

24    your last name.

25              THE WITNESS:  Adam Herson, H-e-r-s-o-n.
```

```
 1              MR. MIDDLETON:  Thank you, Your Honor.  Your Honor,
 2    with this witness the Government will be using --
 3              THE COURT:  No.  Just ask questions of the witness.
 4                           ADAM HERSON,
 5    called as a witness by the Government, was sworn and testified
 6    as follows:
 7                       DIRECT EXAMINATION
 8    BY MR. MIDDLETON:
 9    Q    Mr. Herson, are you employed by the Bank of America?
10    A    I am.
11    Q    And how long have you worked for the Bank of America?
12    A    For eight years.
13    Q    And what's your current position?
14    A    My current position is vice president/unit manager.
15    Q    And as a vice president/unit manager, what are your duties
16    and responsibilities?
17    A    My duties and responsibilities are to -- I manage a group
18    of team managers who manage a group of short sale specialists.
19    My duty is to manage them and to review and approve short sale
20    files.
21    Q    And how long have you held that position?
22    A    I've held this position as a unit manager for four and a
23    half years.
24    Q    And before that were you also a short sale negotiator?
25    A    I was.
```

```
 1   Q     Exactly what is a short sale?

 2   A     A short sale is a request by the homeowner to sell the

 3   home for less than the mortgage owed.

 4   Q     And as a short sale negotiator, what did you do?

 5   A     As a short sale negotiator, I would review the

 6   documentation submitted by the real estate agent on behalf of

 7   the borrower.  I would review the appraisal and compare it to

 8   the offer presented.  If it met within certain standards, I

 9   would send it to my management to review and have them approve.

10   Q     And at some point were you also a short sale team manager?

11   A     I was.

12   Q     And what is that?

13   A     A team manager oversees the daily duties of the short sale

14   specialist negotiators.

15   Q     And that was also at the Bank of America?

16   A     Correct.

17   Q     Now, in your current position, is it part of your job to

18   be familiar with the -- with how Bank of America loan file

19   documents are maintained?

20   A     Yes.

21   Q     And was that also true when you were a short sale

22   negotiator?

23   A     When you say "loan documents," can you be a little more

24   specific.

25   Q     Loan documents related to a short sale.
```

UNITED STATES DISTRICT COURT

1    A      Yes.

2    Q      And, again, was that true -- well, let me ask you this:

3    How are the documents and records for a short sale collected

4    and maintained by the Bank of America?

5    A      We collect and maintain in a system called the Equator

6    system.

7    Q      And I'm going to place on the display what is marked for

8    identification as Exhibit No. 38, and I'm going to ask you if

9    you recognize this document.

10   A      I do.

11   Q      What is it?

12   A      This is a page from the Equator system.

13   Q      And exactly what is Equator?

14   A      Equator is a software program.  It's a two-way-facing

15   system that typically the real estate agents use and our

16   negotiators use as well to conduct a short sale.

17   Q      Now, this particular document, does it relate to a short

18   sale for a property at 7918 Garden Park Street in Chino,

19   California?

20   A      It does.

21   Q      Now, preparing for your testimony here today, did you have

22   an opportunity to review that file?

23   A      I did.

24   Q      Now, was the Bank of America the original lender for that

25   particular loan?

1    A     I don't believe it was, no.

2    Q     Do you know who was?

3    A     I believe it was a 1st Franklin Bank.

4    Q     And what was the original loan amount?

5    A     I believe it was $601,000.

6    Q     And with respect to this particular loan, what are Bank of

7    America's current responsibilities?  Well, let me rephrase

8    that.  In 2011 what was Bank of America's responsibility with

9    respect to this particular loan?

10   A     Bank of America's responsibility was as a servicer.  We

11   would collect payments on the -- on the loan.  If the loan were

12   to go into default or become distressed, we would basically

13   handle the loan until either some kind of solution was worked

14   out with it.

15   Q     Now, at some point was there a request to do a short sale

16   on this particular property?

17   A     There was.

18   Q     And who were the borrowers for this property?

19   A     There were three borrowers on this loan with a la- -- I

20   believe it was a Johnny, Billy, and Benny Khounthavong.  Am I

21   pronouncing that right?

22   Q     Now, at the time of the original loan or at the time that

23   the property was purchased, was there also a second loan for

24   this property?

25   A     Yes.

UNITED STATES DISTRICT COURT

```
 1   Q      And do you know, from your review of the files, how much
 2   that loan was?
 3   A      I believe it was approximately $150,000.
 4   Q      And so would the total purchase price have been somewhere
 5   in the neighborhood of $750,000?
 6   A      That sounds correct, yes.
 7   Q      And Bank of America was the servicer on the $601,000 loan?
 8   A      Yes, the first lien.
 9   Q      Now, when a request for a short sale is made by borrower,
10   what incentive does the Bank of America have to approve a short
11   sale?
12   A      The incentive is, I think first and foremost, is to assist
13   the customer get out of a property that they can no longer
14   afford.  It also benefits the bank because, rather than incur,
15   you know, foreclosure costs and have a nonperforming asset,
16   we're able to liquidate the asset much sooner.
17   Q      Would it be fair to say that for the bank a short sale is
18   better than a foreclosure?
19   A      Cost-wise, I would say yes.
20   Q      And would it also be fair to say that the bank's
21   preference would be to have the borrower pay the loan according
22   to its terms?
23   A      Certainly, ideally we would like the loan to not be in
24   default, sure.
25   Q      Now, in order to decide whether to approve a short sale,
```

**UNITED STATES DISTRICT COURT**

1    does the bank require certain documentation from the borrowers?

2    A     Yes.

3    Q     I'm going to place on the display what has been marked as

4    Government's Exhibit No. 40.  Mr. Herson, do you recognize

5    Government Exhibit 40?

6    A     I do.

7    Q     And what is it?

8    A     This is the hardship letter that was in the Equator file.

9    Q     And what is the purpose of a hardship letter?

10   A     The purpose of a hardship letter is to let the bank know

11   the reason for default.  It's the explanation by the borrower

12   to explain what's happening in their financial lives that makes

13   it -- that makes them unable to make the payments on the

14   property.

15   Q     Is that something that the bank requires?

16   A     Yes.

17   Q     Now, in the first line of Exhibit No. 40, it mentions

18   something called a HAFA short sale.  What's a HAFA short sale?

19   A     HAFA stands for Home Affordable Foreclosure Alternative.

20   It's an act that was -- it's a program put forward by the

21   federal government to work with the banks to assist distressed

22   homeowners do a short sale.

23   Q     And from your review of the -- well, let me ask you this:

24   In addition to a HAFA short sale, is there also some other kind

25   of short sale?

1   A     Be what we call a traditional short sale.

2   Q     What's the difference between a traditional short sale and

3   a HAFA short sale?

4   A     The HAFA short sale, it offers the borrower certain

5   advantages that a traditional short sale might not.  One is

6   there's a location -- a relocation fee that the borrowers get

7   upon completion of the short sale.  It also absolves them of

8   any deficiency.  In case there's a deficiency in a state where

9   we can collect a deficiency, that's waived.  Those are the two

10  main benefits of it.

11  Q     Are the eligibility requirements different for a HAFA

12  short sale as opposed to a traditional short sale?

13  A     Yes.  There are some certain requirements of HAFA, yes.

14  Q     And in this particular case, did defendants qualify for a

15  HAFA short sale?

16  A     It appeared, when I reviewed the file, that they probably

17  would have but --

18  Q     And, in fact, what kind of short sale did they ultimately

19  apply for?

20  A     This was a -- this was processed in a traditional manner.

21  Q     I'm going to show you the first page of Government

22  Exhibit 41.  It appears to be a bank statement for a Billy

23  Khounthavong.  Now, as part of the short sale process, does the

24  bank require the -- the borrowers to provide bank statements?

25  A     Yes.

1    Q     And why is that?

2    A     We require the -- usually, it's the last two months, the

3    most recent two months' bank statements.  We require that

4    because we want to have some kind of idea of what their

5    financial situation is as far as incoming versus outgoing,

6    gives a little idea of their budget on a monthly basis.

7    Q     And I'm now going to place on the display Exhibit No. 75.

8    Do you recognize Exhibit 75?

9    A     I do.

10   Q     What is it?

11   A     This is from the Equator.  It's from the messaging system

12   that's contained within Equator that works very much like an

13   e-mail.

14   Q     And in Exhibit 75, first of all, it indicates that it's to

15   an individual by the name of Katie.  From your review of the

16   file, who was Katie?

17   A     I believe that was referring to Katie Phan, the listing

18   agent.

19   Q     Is this the listing agent for the short sale?

20   A     Yes.

21   Q     And what does this particular message direct Katie to do,

22   if anything?

23   A     It's a request for her to send in, looks like, most of the

24   documentation required to begin a short sale review.

25   Q     And does that include the bank statements that you

1    previously mentioned?

2    A    Yes.

3    Q    And specifically does it ask for the last two-month bank

4    statements, no more than 60 days old, all pages of all

5    accounts?

6    A    Correct.

7    Q    And, Mr. Herson, did you have an opportunity to review the

8    file for all of the bank statements that were provided by the

9    defendants in this case?

10   A    Yes.

11   Q    And all of the bank statements that were provided, are

12   they included in Exhibit 1 -- I'm sorry -- Exhibit 41?

13   A    Was that the one with the bank statement that you

14   previously --

15   Q    That's correct.  In fact, do you have Exhibit 41 in front

16   of you?

17   A    I do not.

18        MR. MIDDLETON:  Your Honor, can I have Exhibit 41

19   placed before the witness.

20        THE CLERK:  Exhibit No. 41 is placed before the

21   witness.

22   Q    BY MR. MIDDLETON:  Mr. Herson, if you can take a moment to

23   review Exhibit 41.

24   A    Okay.

25   Q    And from your review, does that appear to be the bank

1   statements that were submitted by the defendants in response to

2   the bank's request for bank statements?

3   A     Yes.

4   Q     And is that all of the bank statements?

5   A     This is all that I saw in the file, yes.

6   Q     And from your review, did you find any bank statements

7   from Washington Mutual Bank?

8   A     No.

9   Q     Did you find any bank statements from JPMorgan Chase?

10  A     No.

11  Q     I'd like to place on the display what has previously been

12  admitted as Government's Exhibit 13.  Mr. Herson, from your

13  review of the file, did the defendants provide any information

14  of any kind that would have led the bank to conclude that they

15  could afford to pay the mortgage that they were trying to short

16  sale?

17  A     No.

18  Q     Did they provide any information that would have led the

19  bank to conclude that they could afford to pay the mortgage

20  that they were trying to short sale as well as an additional

21  mortgage?

22  A     No.

23  Q     Now, in this particular case, was the short sale approved?

24  A     Yes.

25  Q     And I'd like to place on the display Exhibit No. 42.  Do

```
 1    you recognize Exhibit No. 42?
 2    A     Yes.
 3    Q     What is it?
 4    A     This is an approval letter issued by Bank of America.
 5    Q     And that's an approval for the short sale?
 6    A     Correct.
 7    Q     Now, was that approval ultimately amended?
 8    A     Yes.  There was an amendment letter as well.
 9    Q     And I will place on the display Exhibit No. 43.  Is that
10    the amendment letter?
11    A     It is.
12    Q     And, finally, Mr. Herson, did the short sale actually go
13    through?
14    A     Yes.  It was completed.
15    Q     Now, Mr. Herson, as a result of the short sale, how much
16    did the borrowers avoid having to repay on the loan?
17    A     We forgave the loan at $240,000, approximately.
18    Q     So that would have been the amount that the defendants
19    avoided having to repay?
20    A     Well, that would be the -- subtracted from the principal
21    balance.  That's not including interest over the life of the
22    loan.  So the loss, we wrote it off at $240,000 approximately.
23    Q     Now, from your review of the file, what kind of loan did
24    the defendants have in this case?
25    A     Sorry, sir.  What do you mean what kind of loan?
```

UNITED STATES DISTRICT COURT

```
1    Q    Was it a fixed interest loan?

2    A    No.  I found it to be an adjustable rate.

3    Q    What's an adjustable rate loan?

4    A    Adjustable rate is -- it's -- the interest rate can change

5    at certain times during the loan as opposed to a fixed rate.

6    Q    And is that something that the borrower would know at the

7    time that they entered into an adjustable rate loan?

8    A    I would think so, yes.  It should be in their loan

9    documents.

10   Q    And in this particular case, at some point did the rate

11   adjust and did the loan amount go up?

12   A    It did adjust, and the payment went up, yes.

13   Q    And from your review, roughly when did the -- the loan

14   payments go up?

15   A    I'm sorry.  I can't recall.  I believe it was fairly early

16   when we acquired the loan.

17   Q    But it -- but from your review, it did in fact go up

18   because it was an adjustable rate loan?

19   A    Yes, it did.  I did see that their payment increased.

20              MR. MIDDLETON:  One moment, Your Honor.

21        Your Honor, at this time the Government would offer into

22   evidence what has been marked for identification as

23   Government's Exhibits 38, 39, 40, 41, 42, 43, 44, and 75.

24              THE COURT:  Any objection?

25              MR. CANTALUPO:  No objection.
```

```
 1                MR. DIAZ:  No, Your Honor.

 2                THE COURT:  38 --

 3                MR. MIDDLETON:  And no further questions.

 4                THE COURT:  -- 39, 40, 41, 42, 43, 44, and 75

 5     received in evidence.

 6                     (Exhibits 38, 39, 40, 41, 42, 43, 44, and 75

 7                     received into evidence.)

 8                THE COURT:  Defendant Billy.

 9                          CROSS-EXAMINATION

10     BY MR. CANTALUPO:

11     Q    Good morning, Mr. Herson.

12     A    Good morning.

13     Q    You talked about some of the benefits of a short sale to

14     the bank.  I'd like to ask you some questions about that issue.

15     A short sale to the bank benefits the bank by the subject

16     property not going into the bank's inventory; correct?

17     A    Yes.  That is a benefit, yes.

18     Q    And by not going into the bank's inventory, a short sale,

19     as was done in this case, would have required the borrowers, my

20     client Billy and his brothers, to actively go out and find a

21     buyer for the property; correct?

22     A    They -- yes.  They would market the property.

23     Q    And you understood that that's what happened in this case?

24     A    It appears so, yes.

25     Q    And by them actively marketing the property, the bank
```

1    saves costs involved in doing that; correct?

2    A    Yeah.  It can save foreclosure -- usually what we look at

3    is, you know, is it going to mitigate loss as opposed to

4    foreclosure rather than selling the property immediately.

5    Q    And it would be a fair statement that foreclosure on a

6    property usually costs the bank more than a short sale does?

7    A    It can, yes, absolutely.

8    Q    As a general statement, that's the general true

9    proposition?

10   A    That is correct.

11   Q    You saw Exhibit 40, which was the hardship letter, and

12   that discussed a request for a HAFA short sale.  You understood

13   that that's what Billy and the brothers were requesting, a HAFA

14   short sale?

15   A    That is what it stated in the letter, yes.

16   Q    But you testified that that's not what ultimately

17   happened.  This was a traditional short sale; correct?

18   A    Yeah.  I did not see that -- I didn't see a relocation fee

19   or the -- administered to them at the completion of the short

20   sale; so I assumed it was not a HAFA.

21   Q    So based on your review of the files, Billy and his

22   brothers didn't receive any financial assistance because of the

23   short sale.  Is that a true statement?

24   A    I didn't see that they received a relocation fee, no.

25   Q    And if they did, it would be in the file?

```
 1   A      It would be.  It would be on the final HUD-1.

 2   Q      In regards to a foreclosure, you had -- you had mentioned

 3   in a statement that allows the bank to collect on the

 4   difference in the mortgage that is still owed -- strike that.

 5          Let me ask it this way:  Do you understand California is a

 6   nonrecourse loan state?

 7   A      Yes.

 8   Q      And "nonrecourse" means that, in terms of real estate

 9   mortgages, the bank is only allowed to collect whatever it can

10   on the real estate, the real property; correct?

11   A      Yes.  I understand there were -- we do not proceed on

12   deficiency in California.

13   Q      So if a bank forecloses and the property is worth less

14   than the mortgage, that's the end of the story for the bank.

15   It can't go after the borrowers?

16   A      That is correct.

17   Q      Did you have -- in review of your loan file, does that

18   include the original documents when the loan was originally

19   generated?

20   A      I did find a deed of trust, and I found a payment history

21   with the previous servicer.

22   Q      And it would be true that that payment history showed that

23   the property, the mortgage was being paid on a timely basis?

24   A      Yes.  It was current when we received the loan.

25   Q      In addition to bank statements, it was important for you
```

```
 1    to understand what income my client and his brothers were --
 2    were earning; isn't that true?
 3    A    That is correct.
 4    Q    And you did know, based on your review of the loan file,
 5    that they were employed as L.A. County Sheriffs and receiving
 6    an income for that?
 7    A    I did.  I did see the pay stubs.
 8    Q    And that was the only source of income reported; is that
 9    correct?
10    A    Yes.
11    Q    Knowing the income that an individual borrower is earning,
12    it wouldn't be that important, then, to trace that income into
13    a specific bank account, would it?
14    A    I'm not sure I quite understand.
15    Q    Well, if you know how much a person is earning -- they
16    earn that money on a monthly basis; correct?
17    A    Correct.
18    Q    And you would assume that they would pay their living
19    expenses out of that income; correct?
20    A    Well, I -- yeah.  I mean, I assume that's what they're
21    being -- they're showing me what their salary is.  That's their
22    salary.  I have no other visibility to anything else.
23    Q    And assuming they -- they reported their salary accurately
24    and a hundred percent, the bank would be satisfied that it
25    understood what the income earned of my client and his brothers
```

1    were at the time?

2    A     Yes.  Correct, yes.

3    Q     The hardship letter is dated August 5th of 2011, and I

4    could show it to you if you'd like.  But is that approximately

5    the time that Bank of America was requested for this short

6    sale?

7    A     No.  I believe the -- the request for the short sale came

8    later.

9    Q     But the -- the letter is dated August 5th.  So that letter

10   would have been submitted to the bank at a later date when

11   the -- when the short sale was officially requested of the

12   bank; correct?

13   A     That's correct.

14   Q     Okay.  In regards to a foreclosure versus a short sale for

15   Bank of America, it's true that in this particular case, for

16   this loan on this Chino property, a short sale benefitted

17   Bank of America more than a foreclosure would have?

18   A     If it would have followed the typical route of

19   foreclosure, I would say yes.

20   Q     And did you have any indication in your review of the

21   documents that this would have been anything but a typical

22   foreclosure?

23   A     Typical foreclosure -- I mean, if it would have remained

24   in default, most likely, unless there was either a cure or

25   modification, it would have gone to foreclosure.

```
 1   Q     Speaking of modification, is there anything in your review

 2   of the Bank of America documents that discussed or indicated

 3   that a loan modification may have been requested?

 4   A     I did see that the -- one of the borrowers called in early

 5   part of 2011 and inquired about a modification.

 6   Q     Was there anything else in the file regarding the

 7   modification?

 8   A     Only that we had sent some applications for a modification

 9   to the borrowers.

10   Q     And that loan modification request, it would have gone to

11   a different department other than yours; correct?

12   A     That is correct.

13   Q     And you wouldn't have reviewed that loan modification file

14   prior to your testimony today, would you?

15   A     I could review if there was a loan modification, yes.  I

16   could do that.

17   Q     But not the particular loan modification file?

18   A     Well, there was never a loan modification file opened.

19   Q     And you know that because you reviewed the records?

20   A     That's correct.

21   Q     You knew that, at least according to Bank of America's

22   records, Katie Phan was the listing agent for the short sale

23   property; is that correct?

24   A     Yes.

25   Q     Were you aware that Katie Phan was a straw real estate
```

1    broker in this transaction?

2    A      I have not been -- no one has told me that.

3    Q      So you don't know or you haven't heard the name of

4    Natalie Tran?

5    A      I have not.

6    Q      You don't recall any correspondence or communications with

7    Natalie Tran?

8    A      Correspondence, no.

9    Q      E-mail?

10   A      E-mail, I don't recall, no.

11   Q      Any entries on the Equator system?

12   A      No.  I believe they were from Katie Phan, most of the ones

13   I saw.

14   Q      So as far as Bank of America understood, Katie Phan was

15   the listing agent on the short sale property?

16   A      That's what the record indicated, yes.

17   Q      And Katie Phan would have been the person that Bank of

18   America looked to, to obtain documentations and other forms of

19   information?

20   A      Yeah.  Typically, we -- the person that's listed as the

21   listing agent is the one that we would request most

22   documentation from and communicate with.

23   Q      And it's true that Bank of America would expect that a

24   real estate professional would understand the -- the mechanics

25   and the workings of a short sale; isn't that true?

1    A    We do.  And we do offer a Web site to give them assistance

2    as well.

3    Q    To give the real estate professional assistance?

4    A    Exactly.

5    Q    And it would be true that, generally speaking, Bank of

6    America wouldn't expect borrowers to understand the short sale

7    process and how to navigate through a request for short sale?

8    A    Not typically, no.  We usually work with real estate

9    agents.  Sometimes the borrowers are involved; sometimes

10   they're not.

11   Q    In this case there was no indication that Billy and his

12   brothers were involved, was there?

13   A    Not really.

14   Q    There was no direct communication in the form of e-mails

15   from Billy or his brothers?

16   A    I did not see any, no.

17   Q    If there was, those e-mails would have been in the file

18   somewhere, you would think; right?

19   A    If they communicated through the Equator system, yes, they

20   would be in there.

21   Q    You discussed adjustable rate mortgage, and that's what

22   this mortgage was; correct?

23   A    Yes.  That's what the records indicated.

24   Q    And it would be a fair statement to say that the

25   adjustable rate mortgage is a more onerous type of mortgage on

```
1    a borrower than a fixed rate; isn't that true?
2    A    It's difficult for me to say that.  I don't -- I'm not in
3    loan originations.  I mean, interest rates can go up, they can
4    go down.  So sometimes it benefits the borrower if it goes
5    down.  Sometimes it's bad, it could go up, so --
6    Q    Generally speaking, in terms of this loan, your review of
7    the record indicated that the interest rate was going up?
8    A    It did, because the payment increased.
9    Q    And when the interest rate goes up, the payment increases;
10   correct?
11   A    Correct.
12   Q    Do you recall the payment on this loan, what it was before
13   the short sale?
14   A    Before the short -- are you talking about before the rate
15   went up or after the rate went up?
16   Q    After the rate went up.
17   A    After the rate, I think it was approximately forty-two,
18   $4,300, somewhere around there.
19              MR. CANTALUPO:  Thank you.
20              THE COURT:  You're welcome.
21        Defendant Benny.
22              MR. BRAUN:  Just one moment, Your Honor.
23                         CROSS-EXAMINATION
24   BY MR. BRAUN:
25   Q    Good morning, sir.  Just a couple questions for you.
```

1        You indicated in your loan -- in the short sale file, that

2   you came across e-mails or communications between the bank and

3   an individual by the name of Katie Phan.  Do you recall that?

4   A     I do.

5   Q     Would you be disturbed to have learned that an individual

6   by the name of Tommy Le sent the e-mails out under the name of

7   Katie Phan?

8             MR. MIDDLETON:  Objection, Your Honor.  Foundation.

9   And relevance.

10            THE COURT:  Objection is overruled.

11            THE WITNESS:  If they're not connected and not an

12   assistant, yes, it would be disturbing, yes.

13   Q     BY MR. BRAUN:  You would expect, if an e-mail indicated it

14   was from Katie Phan, it was actually from Katie Phan and not an

15   individual by the name of Tommy Le or anyone else; is that

16   correct?

17   A     We expect the person that we're communicating with is that

18   person, yes.

19   Q     And I just wanted to clarify something.  You indicated

20   that, in your review of the short sale file, that you came

21   across bank documents and other financial documents that were

22   submitted on the brothers' behalf.

23        Do you recall that?

24   A     Which documents are you referring to?

25   Q     Whether they're Bank of America statements or other pay

1    stubs, income information related to the brothers?

2    A     Yes.

3    Q     They submitted tax returns; is that correct?

4    A     They did.

5    Q     All to document their income; is that correct?

6    A     Correct.

7    Q     And just to clarify, the communication with the bank was

8    between the bank and either escrow, or the bank and Katie Phan;

9    is that correct?

10   A     That is correct.  Other than the customer service call

11   that I mentioned that one of the borrowers did in the early

12   part of 2011.

13   Q     Requesting a loan modification package?

14   A     Yes, correct.

15   Q     Now, so the bank statements that are in the short sale

16   file are the bank statements that Katie Phan or someone

17   pretending to be Katie Phan sent in to Bank of America; is that

18   correct?

19   A     That's correct.

20   Q     You don't actually know, then, what the brothers submitted

21   to Natalie Tran or Katie Phan; is that correct?

22   A     No, I don't.

23   Q     Just to clarify one last point, you indicated through the

24   short sale that the brothers avoided paying approximately

25   240,000 on the outstanding mortgage; is that correct?

```
1    A     That is correct.
2    Q     And one of the other attorneys asked you, given the fact
3    that California is a nonrecourse state, the brothers -- it
4    would have been within their legal right at any point to simply
5    drop the keys on the kitchen counter and walk away from the
6    home; is that correct?
7    A     They can choose not to make payments if they wish.
8    Q     And they can let the home go into foreclosure whether they
9    can afford the payments or not; isn't that correct?
10   A     That is their choice, yes.
11   Q     And if the brothers had simply, as was their legal right,
12   dropped the keys on the kitchen counter and walked away from
13   the home, they would have avoided 240,000 in outstanding --
14   outstanding loan balance; isn't that correct?
15   A     That's correct.
16             MR. BRAUN:  Nothing further.  Thank you.
17             THE COURT:  Defendant Johnny.
18             MR. DIAZ:  Thank you, Your Honor.
19                        CROSS-EXAMINATION
20   BY MR. DIAZ:
21   Q     Mr. Herson, by today's standard, that loan that we've been
22   talking about is kind of a bad loan?
23   A     What do you mean, sir, by "bad loan"?
24   Q     A loan where you end up having high monthly payments.
25   A     It's -- I mean, it -- the payments are what the payments
```

```
 1   are.
 2   Q    At the time that this loan was taken, it wasn't unusual to
 3   enter into this type of loans; correct?
 4   A    I can't say, sir.  I mean, I don't know that it was
 5   unusual.
 6   Q    Now, we're talking about the first loan on the property;
 7   correct?
 8   A    Okay.
 9   Q    There was just another loan, a second loan on this
10   property?
11   A    Correct.
12   Q    And would it be fair for you to tell us that the terms of
13   the second loan might have been more onerous than the first
14   loan?
15   A    I don't recall what the -- I don't recall what the
16   interest rate was on the second loan.
17   Q    Typically, the second loan has higher interest rates than
18   the first loan?
19   A    It can be with a HELOC, yes.  It can be -- it's hard to
20   say.  They range.  Some are introductory rates.  Sometimes they
21   can be a couple percent, and then they raise.  It's very
22   difficult to say, sir.
23   Q    And it has not been unusual for people to essentially walk
24   away from these bad loans?
25   A    It's not unusual for people to default on their loans, no.
```

```
1   Q    Or to simply walk away?
2   A    However you want to phrase it, sir.  They can walk away,
3   default.
4   Q    Now, you were shown a hardship letter.  Do you recall
5   that?
6   A    Yes.
7   Q    The hardship letter essentially says I, Billy
8   Khounthavong, I cannot afford this mortgage.  Will you say
9   that's basically what he said?
10  A    He stated something to the effect of his co-borrowers were
11  not going to assist him with making the payment anymore and he
12  could not make the payment on his own.
13  Q    And he was telling you, I cannot make this payment by
14  myself?
15  A    That is what the letter stated, yes.
16  Q    And in order for the -- have a confirmation of that
17  letter, you were provided with a number of financial records;
18  correct?
19  A    We were, yes.
20  Q    Tax returns?
21  A    Correct.
22  Q    Pay stubs?
23  A    Yes.
24  Q    And detailed bank statements?
25  A    Bank statements, yes.
```

1    Q     Now, you have looked at all of those records in

2    preparation for today's testimony; correct?

3    A     Correct.

4    Q     Looking at the records for -- specifically for Billy

5    Khounthavong, there was no way that he could have made payment

6    for the Chino house with his income alone?

7    A     I -- I believe that as well, yes.

8    Q     And so if Billy Khounthavong says I cannot make these

9    payments by myself, that was a true statement?

10   A     Based on what I reviewed, there was originally three

11   borrowers.  Based on the information that I had, I would not

12   believe that one of them could make the payment on their own,

13   no.

14   Q     And if two of the brothers had moved out, did you inquire

15   as to whether they moved into a rental place or did they

16   purchase another place?

17   A     I didn't see that there was any inquiries made, no.

18   Q     And would that inquiry be made by somebody at your bank,

19   or it was an inquiry that was simply not necessary to have been

20   made?

21   A     I don't believe that we would -- we typically aren't going

22   to ask that, no.

23   Q     Now, would it be true to say that essentially you don't

24   need to worry about that because the borrowers, the brothers,

25   one or three of them, can simply walk away from this mortgage?

```
 1   A     It's any borrower's choice if they want to pay their
 2   mortgage or not.
 3   Q     They don't need to provide you detailed information about
 4   their finances?
 5   A     They do need to provide us detailed information or at
 6   least give us some idea of their financial picture so we can
 7   verify their hardship, yes.
 8   Q     What if they simply walk away?
 9   A     If they choose no workout solution and simply -- yeah, I
10   mean, no, there's nothing we can request.
11   Q     You cannot force them to -- to provide you with any sort
12   of document if they choose to simply walk away?
13   A     Yeah.  We would just proceed with foreclosure.
14   Q     And you can proceed with foreclosure as to the property
15   itself; correct?
16   A     Yes.
17   Q     You're not going to proceed to trying to get any money
18   from the brothers individually as borrowers?
19   A     No.
20   Q     Your only recourse is the property?
21   A     Correct.
22   Q     Now, you testified that you were looking at those
23   documents.  You understand that the brothers received
24   essentially what I would call a -- just a steady income from
25   the County; correct?
```

```
1   A    That was what it appeared from the documents I saw.
2   Q    And would you agree that it may be particularly difficult
3   to hide that income?
4   A    I'm sorry.  I don't quite -- hide which income?
5   Q    The income you are making from a County paycheck, would it
6   be particularly difficult for a borrower if he wanted to
7   conceal something about his income?
8   A    If they have other accounts, then -- I don't know what
9   other income, what other businesses.  I only have the financial
10  picture that they're showing me, that they work as deputies,
11  and that's it.  That's all I have, is what they send me.
12  Q    And they actually had -- at least at the beginning, the
13  accounts that they had was with Bank of America; correct?
14  A    That is correct.
15  Q    You were asked about Exhibit 41, regarding the Bank of
16  America -- the records of financial information from the
17  brothers.  Do you recall that?
18  A    Yes.
19  Q    Now, this is the first page of that exhibit, and it is
20  essentially -- you're familiar with this type of statement;
21  correct?
22  A    Yes.  The bank statement, yes.
23  Q    Now, it just happens that the brothers also had their own
24  personal account with Bank of America; correct?
25  A    It appears so, yes.
```

```
 1   Q     And they also had a mortgage that was being serviced by
 2   Bank of America --
 3   A     That is correct.
 4   Q     -- right?
 5         Now, the statement for July of 2011 indicates that, at
 6   least as to Billy Khounthavong, it's got some substantial
 7   deposits going into that particular account.
 8         Do you see that?
 9   A     I do.
10   Q     And one of those deposits is the -- shall we call it a
11   paycheck from the County?
12   A     Yes.
13   Q     So by looking at this document, you are aware that this
14   particular borrower has his income going into -- to Bank of
15   America; correct?
16   A     I see that his salary, his pay as a Sheriff's deputy, goes
17   into this account, yes.
18   Q     Well, if we follow later on the page, same exhibit,
19   farther down there's another statement also for Billy
20   Khounthavong.  Do you see that?
21   A     I do.
22   Q     Now, we are having very, very few deposits coming in.  Do
23   you notice that?
24   A     Yes.
25   Q     Very substantial from the prior record that we saw of --
```

**UNITED STATES DISTRICT COURT**

1  this is the second page of that September statement.  Do you

2  see that?

3  A    I do.

4  Q    There is no indication here that a payroll is being any

5  longer deposited automatically into that account; correct?

6  A    That's what it appears to me, yes.

7  Q    Now, if that person is still employed, looking at this

8  record from your expert point of view, you would be aware that

9  this payroll must be now being deposited somewhere else;

10 correct?

11 A    It's possible, yes.

12 Q    It's not an attempt by anybody to be hiding where that

13 payroll is going to; correct?

14 A    It's just -- all I see is a bank statement that is no

15 longer receiving the direct deposit.

16 Q    So if you wanted to find out why the deposit is no longer

17 reflected in there, you could have made that inquiry --

18 right? -- to provide -- be provided with information as to

19 where that direct deposit is now going?

20 A    That's correct.  We could ask.

21 Q    You did not make any such inquiry?

22 A    I did not see any such inquiry, no.

23 Q    Would it be fair to say that you did not make that inquiry

24 because it was essentially not needed?

25 A    Well, I can't really speak for why the negotiator didn't

1    make the inquiry, but it's possible at that point we felt we

2    had enough information to base our decision.

3              MR. DIAZ:  Nothing further, Your Honor.

4              THE COURT:  Redirect.

5              MR. MIDDLETON:  Yes, Your Honor.  Thank you.

6                       REDIRECT EXAMINATION

7    BY MR. MIDDLETON:

8    Q    Mr. Herson, when the bank asks for the bank statements for

9    all accounts, is it the expectation of the bank that the

10   borrower will provide the bank statements for all of the

11   accounts?

12   A    I'd say the expectation is the primary banking account,

13   mainly the main one they would use as sort of their incoming

14   and outgoing on a monthly basis.

15   Q    When you say the primary, would that be the account that

16   you would expect to give the bank the best picture of what the

17   borrower's financial condition is?

18   A    I would say that's a fair statement.

19   Q    And so if at that time the borrower was doing most of his

20   banking business through a different account from the Bank of

21   America account, would you expect to get the statements for

22   those accounts?

23   A    Again, it would go into what is really considered the

24   primary.  If that's -- if the majority is going through another

25   account, then yes we'd probably like to see that.

```
1    Q     Well, let me ask you this --
2    A     The one that is basically going to give us the best
3    picture, the most realistic picture of what their financial
4    situation is.
5    Q     If a borrower moved all of his money from one account and
6    put it in -- and opened a new account and put the money into
7    the new account, would you expect the statements from the new
8    account?
9    A     Yes.
10   Q     And defense asked you some questions about adjustable rate
11   mortgages.  Are there advantages to a borrower to an adjustable
12   rate mortgage?
13   A     I think the advantage would be if -- it all depends on the
14   interest rates.  Sometimes they can have an adjustable rate
15   that stays at a certain introductory rate for a while and
16   then -- then if the interest rates are higher when it changes
17   over, then, you know, obviously their payments will increase.
18   But if the interest rate is lower, they could actually have a
19   lower payment.  So it's all relative.
20   Q     And is it also true that often you can get an adjustable
21   rate mortgage at a lower interest rate at least for the initial
22   term of the loan?
23   A     I'm sorry, sir.  Can you repeat that.
24   Q     Is it often true that you can get a lower interest rate
25   with an adjustable rate mortgage, at least for the initial term
```

**UNITED STATES DISTRICT COURT**

```
 1    of the loan?
 2    A     Yeah.  That would be the introductory rate I was
 3    referencing.
 4    Q     So depending on how long the introductory rate lasts, you
 5    could have a much lower interest rate with an adjustable rate
 6    mortgage?
 7              THE COURT:  Let's get to this case, Counsel, please.
 8    Q     BY MR. MIDDLETON:  Are there downsides to the borrower to
 9    a foreclosure?
10    A     Yes.
11    Q     And what are some of those downsides?
12    A     Well, it's -- it affects their credit much more severely
13    than a short sale.  I mean, it's -- they have to answer the
14    question, have they ever been foreclosed upon, when they
15    reapply for credit in a credit situation.
16    Q     And that would be a reason why a borrower wouldn't want to
17    just drop the keys and walk away?
18    A     Yes.  It's definitely -- has that advantage, yes.
19    Q     Now, defense also talked about the fact that the bank knew
20    that the individual was getting -- was still getting a salary;
21    is that right?  Do you recall that?
22    A     Yes.  That's what the pay stubs and bank statements said.
23    Q     But in determining the defendant's financial hardship,
24    does the bank rely on what is said in the hardship letter?
25    A     Yes, absolutely.
```

1    Q    And in the hardship letter in this case, the borrower

2    didn't suggest that he was no longer getting a salary, did he?

3    A    No.

4    Q    In fact, what he said was, I have exhausted all of my

5    income and resources.  Did he say that?

6    A    Yes.  That's what the letter says.

7    Q    And did he also indicate that his brothers, who had been

8    assisting him in the mortgage, had moved out and were no longer

9    assisting him?

10   A    Correct.

11   Q    And that has nothing to do with whether he's still getting

12   his salary; is that right?

13   A    No.  My understanding is they are all still -- all

14   borrowers were still employed.

15   Q    Now, just to be clear on one other thing, defense again

16   mentioned a loan modification.  From your review of the

17   records, is it true that they never applied for a loan

18   modification?

19   A    They did not return the documentation requested, no.  We

20   did not receive it.

21              MR. MIDDLETON:  Nothing further, Your Honor.

22              THE COURT:  All right.

23              MR. CANTALUPO:  No questions.

24              THE COURT:  Mr. Herson, who at the bank was in

25   charge of this file?

```
 1              THE WITNESS:  The manager or --
 2              THE COURT:  Whoever -- who was in charge of the
 3    file?  Who did all of the work between the person who was
 4    making the -- giving the bank information, who was the person
 5    who was receiving that information at the bank?
 6              THE WITNESS:  It was a -- Jeff Simon was the --
 7              THE COURT:  Who?
 8              THE WITNESS:  Jeff Simon.
 9              THE COURT:  Jeff Simon?
10              THE WITNESS:  Yes.  He was the negotiator assigned
11    to the file.
12              THE COURT:  This was his file?
13              THE WITNESS:  Correct.
14              THE COURT:  Thank you.
15              THE WITNESS:  You're welcome.
16              THE COURT:  You may step down.
17         Call your next witness.
18              MR. MIDDLETON:  Your Honor, the Government calls
19    Mr. Kajay Williams.
20                        KAJAY WILLIAMS,
21    called as a witness by the Government, was sworn and testified
22    as follows:
23              THE CLERK:  Please raise your right hand.  Do you
24    solemnly swear that the testimony you shall give in the cause
25    now pending before this court shall be the truth, the whole
```

```
 1   truth, and nothing but the truth so help you God?
 2              THE WITNESS:  Yes.
 3              THE CLERK:  Thank you.  Please take a seat.  Please
 4   state your full and true name for the record and spell your
 5   last name.
 6              THE WITNESS:  Kajay Williams.  First name is spelled
 7   K-a-j-a-y.  Last name W-i-l-l-i-a-m-s.
 8                         DIRECT EXAMINATION
 9   BY MR. MIDDLETON:
10   Q     Mr. Williams, by whom are you employed?
11   A     Select Portfolio Servicing, Inc.
12   Q     And what's your current position?
13   A     I'm a mediation specialist, and some of my duties are
14   document control officer and corporate witness.
15   Q     And in that position are you -- is it part of your job to
16   be familiar with the loan files and records maintained by
17   Select Portfolio Servicing?
18   A     Yes.
19   Q     Exactly what is Select Portfolio Servicing?
20   A     We're a servicing agent.  So we handle the servicing, the
21   loans for the investor.  So we handle collecting payments,
22   working out loan modifications, short sales, the in lieus,
23   foreclosures -- any aspect to the servicing of the loan.
24   Q     Now, in the year 2011 -- and I'll refer to Select
25   Portfolio Servicing as "SPS" -- was SPS the servicer for a loan
```

```
 1    for a property at 7918 Garden Park Street in Chino, California?

 2    A     Yes.

 3    Q     Prior to your testimony here today, did you review that

 4    file?

 5    A     Yes.

 6    Q     And when did SPS begin servicing that loan?

 7    A     I don't remember the exact date but it was --

 8    Q     Just roughly.

 9    A     I believe it was in 2010.

10    Q     And who was the original lender on that loan?

11    A     I don't remember without looking at the original note,

12    mortgage.

13    Q     Now, do you know if the original lender and the -- and the

14    loan that was being serviced by SPS was the primary loan on

15    that property or if it was a second -- second lien?

16    A     It was the second lien.  It was the junior lien.

17    Q     What does it mean to be the second lien?

18    A     We're in second lien position; so when it comes to having

19    rights to the property, we're subject to any liens that are

20    above ours, which would be the first lien.

21    Q     And how much was the loan amount that SPS was servicing?

22    A     I don't remember the exact amount without looking at the

23    original note, roughly --

24    Q     What was it roughly?

25    A     I believe it was around 155,000 or so.
```

1  Q    Now, at some point did the borrowers on that loan seek
2  approval for a short sale?
3  A    Yes.
4  Q    And from your review of the file, roughly when did they
5  start that process of seeking approval for short sale?
6  A    I believe it was around October of 2011.
7  Q    And as part of the process, did SPS obtain documentation
8  from the borrowers to support the short sale?
9  A    Yes.
10 Q    I'm going to place on the display Exhibit No. 46.  Do you
11 recognize Exhibit No. 46?
12 A    Yes, I do.
13 Q    What is Exhibit 46?
14 A    It's a hardship letter we got with the initial short sale
15 package, explaining the customer's hardship and the request for
16 the short sale.
17 Q    In evaluating whether or not to approve a short sale, how
18 does SPS use a hardship letter?
19 A    We use that, combined with the current loan status of our
20 liens and any other liens, to determine that the customer
21 doesn't have the financial ability to continue making those
22 payments.
23 Q    I'm going to show you also Exhibit No. 49.  Tell me if you
24 recognize Exhibit No. 49.
25 A    Yes, I do.

1    Q     What is Exhibit 49?

2    A     This is our initial short sale letter that goes out,

3    asking for certain documents in order for us to evaluate the

4    customer's financial situation more in depth.

5    Q     Now, it indicates on this letter that one of the things

6    that you asked for are recent bank statements; is that right?

7    A     Yes.

8    Q     Now, did SPS receive any bank statements from the

9    defendant -- from the borrowers in this case?

10   A     No, we didn't.  No.

11   Q     And did that affect SPS's ability to make a decision on

12   the short sale?

13   A     No.  We were still able to make a decision using the other

14   information that we had received.

15   Q     And what was some of the other information that SPS had

16   that led them to approve the short sale?

17   A     The hardship letter and, like I said, the loan status of

18   our loan, which was in delinquency, as well as the senior lien,

19   or first lien.

20   Q     I'm sorry.  Did you say it was in delinquency?

21   A     Correct.

22   Q     And because it was in delinquency and because you had the

23   hardship letter, it was approved?

24   A     Yeah.  And the offer amount, we basically compare what we

25   would get out of the short sale and what was being offered,

1    compared to if we had to take the property all the way through

2    foreclosure.

3    Q    Now, ultimately was the short sale in this case -- was it

4    approved?

5    A    Yes, it was.

6    Q    And was SPS able to recover anything from the loan as a

7    result of the short sale?

8    A    We got $12,100 from the short sale.

9    Q    I'm going to place on the display Exhibit No. 50.  And can

10   you tell us what Exhibit No. 50 is.

11   A    Yes.  It's our payoff statement that we had sent to the

12   customer on August 1st, 2011, stating the outstanding balances

13   or what was owed on the loan.

14   Q    And at that time the amount due on the loan was what?

15   A    $150,349.03.

16   Q    And as a result of the short sale, roughly how much did

17   SPS recover on that loan?

18   A    We recovered $12,100 of that.

19           MR. MIDDLETON:  Your Honor, at this time the

20   Government would seek to move in Exhibit Nos. 46, 49, and 50.

21           THE COURT:  Any objection?

22           MR. DIAZ:  No objection, Your Honor.

23           MR. BRAUN:  We believe there was a stipulation.  And

24   no objection, Your Honor.

25           THE COURT:  46, 49, and 50 in evidence.

UNITED STATES DISTRICT COURT

```
 1                 (Exhibits 46, 49, and 50 received into evidence.)
 2            MR. MIDDLETON:  And the Government has no further
 3   questions, Your Honor.
 4            THE COURT:  Defendant Billy.
 5                       CROSS-EXAMINATION
 6   BY MR. CANTALUPO:
 7   Q    Good morning.  Would it be fair to say that SPS fared
 8   better with a short sale than it would have if there would have
 9   been a foreclosure on the property; isn't that correct?
10   A    Correct.
11   Q    In other words, you recovered more money by agreeing to
12   the short sale than if the property would have just been
13   defaulted on and gone to foreclosure; correct?
14   A    Correct.
15            MR. CANTALUPO:  Thank you.
16            THE COURT:  Defendant Benny.
17            MR. BRAUN:  Just briefly, Your Honor.
18                       CROSS-EXAMINATION
19   BY MR. BRAUN:
20   Q    The request that you made for documents and other things,
21   that would have been to a representative of the borrowers such
22   as Katie Phan or someone pretending to be Katie Phan; is that
23   correct?
24   A    Are you saying the document that we sent?  Who was --
25   Q    Any request that you made for information, that would have
```

```
1    been to an intermediary or someone acting on behalf of the
2    borrower; is that correct?
3    A     Yeah.  It would go to the real estate agent or to the
4    homeowners, or both.
5    Q     And to the extent that you recall the interest rate on the
6    second mortgage, it was about 10 percent -- is that correct? --
7    at the time?
8    A     I believe so, but I don't know the exact number without
9    looking at it.
10              MR. BRAUN:  Nothing further.  Thank you.
11              THE COURT:  Defendant Johnny.
12              MR. DIAZ:  Thank you, Your Honor.
13                        CROSS-EXAMINATION
14   BY MR. DIAZ:
15   Q     As the holder of the second mortgage, your position is
16   much weaker than the first mortgage; correct?
17   A     I don't know what you mean by "weaker."
18   Q     If there's a problem with the loans, if there's any money
19   to be recovered, the first mortgage gets the first bite;
20   correct?
21   A     Correct.
22   Q     And you, as the bank that you serviced -- may get little
23   or nothing?
24   A     It would depend on the value of the home.
25   Q     And what I'm trying to get at is the person who recovers
```

1    first is the first -- the holder of the first mortgage?

2    A     Yes.

3    Q     And is that one of the reasons why you had no interest in

4    requesting financial information from the borrower -- from the

5    borrowers in this case?

6    A     We -- we did request financial information from the

7    borrower.

8    Q     Did you get the financial information that you requested?

9    A     Not all of it, but we got it sufficient to make our

10   decision.

11   Q     And you knew that your recovery, if any, was going to be

12   unusually limited; correct?

13   A     As far as recovery of the loan balance?

14   Q     Yes.

15   A     Compared to if it went to foreclosure, yes.

16   Q     And this is the document that you were shown regarding

17   monies owed.  There's nothing in there that indicates that this

18   loan was in any way defaulting or the payments had not been

19   made, are there?

20   A     This is a payoff statement; so it only shows what's

21   currently owing.

22   Q     You don't have any documents that indicate that the

23   borrowers were in any way late making payments on the second

24   loan, do you?

25   A     I don't have any documents, but I have reviewed our loan

```
 1    records, and they were delinquent at the time of their request

 2    for a short sale.

 3              MR. DIAZ:  Nothing further, Your Honor.

 4              THE COURT:  Redirect.

 5              MR. MIDDLETON:  Yes, Your Honor.  Thank you.

 6                        REDIRECT EXAMINATION

 7    BY MR. MIDDLETON:

 8    Q    Now, Mr. Williams, one of the documents that I showed you

 9    previously was Exhibit No. 49.  Just to be clear, that document

10    went directly to the borrower; is that correct?

11    A    Yeah.  Could you slide it down just a little bit.

12    Q    I'm sorry.

13    A    It was sent directly to the address at the top there, the

14    7918 Garden Park Street in Chino, California, 91708.

15    Q    It wasn't sent to an intermediary?

16    A    No.  It was sent to them.

17    Q    As far as the loan file is concerned, you've had an

18    opportunity to thoroughly review that; is that correct?

19    A    Yes.

20    Q    Is it clear from your review that the defendants were

21    delinquent on the loan in this case?

22    A    Yes.

23    Q    No doubt?

24    A    No doubt.

25              MR. MIDDLETON:  Thank you.
```

**UNITED STATES DISTRICT COURT**

1          No further questions.

2                    MR. DIAZ:  May I have --

3                    THE COURT:  Who at SPS handled the loan, that loan?

4     Did you?

5                    THE WITNESS:  I'm not sure.  We have multiple --

6                    THE COURT:  Were you the one who was handling the

7     documentation of the loan --

8                    THE WITNESS:  The --

9                    THE COURT:  -- we're talking about?

10                   THE WITNESS:  The documentation is handled by many

11    different people in many different departments within the

12    company that have access to the full records.

13                   THE COURT:  Who was in charge of the information?

14                   THE WITNESS:  There's not a -- there's not a single

15    person that's in charge.

16                   THE COURT:  There's not a single person?

17                   THE WITNESS:  No.  It's multiple departments and

18    multiple people.

19                   THE COURT:  Who were the persons, then, in charge of

20    the documentation?  Did you have any part of the documentation?

21                   THE WITNESS:  Of collecting the documentation, no.

22                   THE COURT:  Who were -- who were the persons who had

23    charge of the documentation?

24                   THE WITNESS:  Multiple departments, multiple people.

25    I don't have exact names of specific --

1          THE COURT:  You don't know who it was?

2          THE WITNESS:  No.  All the documents are logged and

3    connected into our system and accessed to any employee who has

4    a reason to review and research that loan.

5          THE COURT:  So you don't know who had any meetings

6    or any information directly with these defendants?

7          THE WITNESS:  Specific names of employees?

8          THE COURT:  Do you know who had any direct

9    information from --

10          THE WITNESS:  I reviewed our call records, and there

11    was several telephone communications.  I don't remember the

12    specific person's name.

13          THE COURT:  You don't know who was on the telephone

14    from SPS; is that right?

15          THE WITNESS:  I did not memorize their name, no.

16          THE COURT:  All right.  You may step down.

17       Call your next witness.

18          MR. MIDDLETON:  Your Honor, the Government calls

19    Ms. Katie Phan.

20                         KATIE PHAN,

21    called as a witness by the Government, was sworn and testified

22    as follows:

23          THE CLERK:  Raise your right hand.  Do you solemnly

24    swear that the testimony you shall give in the cause now

25    pending before this court shall be the truth, the whole truth,

```
 1   and nothing but the truth so help you God?
 2              THE WITNESS:  Yes.
 3              THE CLERK:  Okay.  Thank you.  Please take a seat.
 4   Please state your full and true name for the record and spell
 5   your last name.
 6              THE WITNESS:  Katie Quynh Phan.  Last name is
 7   spelled P-h-a-n.
 8                        DIRECT EXAMINATION
 9   BY MR. MIDDLETON:
10   Q    Ms. Phan, good morning.  Are you employed?
11   A    Yes.
12   Q    And how?
13   A    Self-employed.
14   Q    And what do you do?
15   A    I'm a real estate agent.
16   Q    And how long have you been a real estate agent?
17   A    Since 2001.
18   Q    And I'm going to ask if you could raise your voice just a
19   little so we can all hear you.
20   A    Since 2001.
21   Q    And as a real estate agent, are you required to obtain
22   certain licenses?
23   A    Yes.  Real estate -- California real estate license.
24   Q    Now, I'd like to direct your attention to the summer of
25   2011.  During that time were you working as a real estate
```

1    agent?

2    A    Yes.

3    Q    And did you become involved in the sale of a property at

4    7913 [sic] Garden Park Street in Chino, California?

5    A    Yes.

6    Q    And how did you become involved in that sale?

7    A    I was a listing agent for that property.

8    Q    And how is it that you became the listing agent?

9    A    It was a referral from a colleague.

10   Q    Who was the colleague that referred it to you?

11   A    Natalie Tran.

12   Q    When this matter was referred to you by Ms. Tran, what is

13   it exactly that you were asked to do?

14   A    To represent the seller, to list the property for sale.

15   Q    Exactly what is a listing agent?

16   A    Listing agent is when you represent the seller to list a

17   property for sale.

18   Q    I'm going to place on the display Exhibit No. 60.

19        Your Honor, may I have Exhibit No. 60 placed before the

20   witness.

21            THE CLERK:  Exhibit No. 60 is placed before the

22   witness.

23   Q    BY MR. MIDDLETON:  And, Ms. Phan, before I place it on the

24   display, if you could, take a moment to look at Exhibit 60.

25        Do you recognize it?

```
 1   A     The e-mail?

 2   Q     The complete document, is there an attachment to the

 3   e-mail as well?

 4         What is Exhibit 60?

 5   A     It's the listing contract.

 6   Q     And is that a document that you -- that you prepared?

 7   A     Yes.

 8   Q     And who directed you to prepare that document?

 9   A     I didn't understand the question.

10   Q     Who asked you to prepare that?

11   A     Oh, it's Natalie.

12   Q     And in addition to the listing agreement, are there some

13   e-mails that are attached to that document?

14   A     Yes.

15   Q     And in those e-mails, there is communication between

16   yourself and whom?

17   A     It's Natalie and Tommy.

18   Q     And what is the nature of those communications?

19   A     It's a listing contract that they asked me to prepare to

20   e-mail to them for the seller to sign.

21   Q     And I'm going to put on the display part of Exhibit 61,

22   starting at a page that's -- has a number at the bottom, it's

23   A124838.  And, Ms. Phan, is this the listing agreement that you

24   prepared?

25   A     Yes.
```

1    Q    And from the e-mails from Natalie Tran and Tommy, roughly

2    when did you prepare this document?

3    A    It was in July 2011.

4    Q    I'm going to place on the display the first page of

5    Exhibit No. 60.  Now, the top of this e-mail, is that an e-mail

6    from yourself back to Tommy and Natalie, telling them that you

7    prepared the listing agreement?

8    A    Yes.

9    Q    And is this e-mail dated July 18 of 2011?

10   A    Yes.

11   Q    So would it be fair to say that, by July 18 of 2011, you

12   had prepared the listing agreement for this property?

13   A    Yes.

14   Q    Now, after you prepared the initial listing agreement,

15   were you asked to make some amendments to the agreement?

16        Do you recall that?

17   A    No.

18   Q    I'm going to place on the display the first page of

19   Exhibit No. 61, and I want to direct you to --

20        THE COURT:  Counsel, she says she has no memory of

21   that.

22   Q    BY MR. MIDDLETON:  Ms. Phan, would it refresh your

23   recollection to see your e-mail correspondence at that time?

24   A    Yes.  The e-mail does indicate that they asked me to make

25   some changes.

```
 1   Q     Does that refresh your recollection?

 2   A     Yes.

 3   Q     I'm going to place on the display the first page of

 4   Exhibit No. 61.  And directing your attention to the bottom of

 5   the e-mail chain, is that where you're asked to make some

 6   changes to the prior listing agreement?

 7   A     Yes.

 8   Q     And I'm going to show you a page of Exhibit 61, starting

 9   at A124623.  Is that the corrected listing agreement that you

10   prepared?

11         Your Honor, may I have Exhibit 61 placed before the

12   witness.

13            THE CLERK:  Exhibit No. 61 is placed before the

14   witness.

15   Q     BY MR. MIDDLETON:  Ms. Phan, if you could, take a look at

16   61.

17   A     Yes.

18   Q     Have you had a chance to look at that?

19   A     Yes.

20   Q     Is Exhibit 61 the corrected listing agreement that you

21   prepared?

22   A     Yes.

23   Q     And at some point was the listing agreement that you

24   prepared signed by the -- by the sellers?

25   A     Yes.  It was an e-mail copy that sent back to me.
```

1          MR. MIDDLETON:  Your Honor, if I can have Exhibit 63

2     placed before the witness.

3          THE CLERK:  Exhibit 63 is identified and placed

4     before the witness.

5               (Exhibit marked for identification.)

6     Q    BY MR. MIDDLETON:  If you could, take a look at

7     Exhibit 63.

8          And also, Your Honor, Exhibit 62.

9          THE CLERK:  Exhibit No. 62 is identified and placed

10    before the witness.

11              (Exhibit marked for identification.)

12         THE WITNESS:  Yeah.  I reviewed the six -- number

13    63.

14    Q    BY MR. MIDDLETON:  And take a look at Exhibit 62 as well,

15    if you could.

16         Have you had a chance to look at 62?

17    A    Yes.

18    Q    And do you recognize Exhibit 62?

19    A    Yes.

20    Q    What is Exhibit 62?

21    A    It's a complete signed contract, listing contract.

22    Q    And is that a document that was sent to you as the listing

23    agent?

24    A    Yes.

25    Q    And when it was sent to you, was it -- was it signed at

1     that time?

2     A     Yes.

3     Q     And who sent it to you?

4     A     It's either Natalie or her assistant.

5     Q     And once you received that listing agreement with the --

6     with the signatures, what did you do with it?

7     A     I then put the property on the Multiple Listing.

8     Q     And what is the Multiple Listing?

9     A     It's the -- it's the Web site for a real estate agent to

10    list the property for sale.

11    Q     And, now, who were the sellers on that listing?

12    A     It was the Khounthavong.

13    Q     Now, during your work on this particular listing, as the

14    listing agent, did you ever meet the sellers?

15    A     No.

16    Q     Did you ever talk to the sellers over the telephone?

17    A     No.

18    Q     Who did you deal with in creating this listing?

19    A     Natalie and Tommy.

20    Q     Now, I want you to take a look at Exhibit 63.  Do you

21    recognize Exhibit 63?

22    A     Yes.  It's the photo of the property.

23    Q     And did you receive those photos in order to prepare the

24    listing as well?

25    A     Yes.

```
1    Q    And from whom did you obtain the photos?

2    A    I believe it was Natalie and her assistant.

3    Q    And were they used as part of the listing?

4    A    Yes.

5    Q    You -- and that was so that prospective sellers could see

6    what the property looked like?

7    A    Yes.

8    Q    Now, during the time that you were the listing agent for

9    this particular property, did you have any contact with the

10   bank?

11   A    No.

12   Q    And why was that?

13   A    Because I'm just representing -- I'm just a listing agent.

14   I don't -- I don't have any contact with the short sale lender.

15   Q    Did you receive e-mails from the bank?

16   A    The initial e-mail, yes.

17   Q    Now, Ms. Phan, was this property eventually sold?

18   A    Yes.

19   Q    And when the property was sold, were you paid?

20   A    Yes.

21   Q    I'm going to place on the display Exhibit No. 81.  Do you

22   recognize Exhibit No. 81?

23   A    Yes.

24   Q    What is it?

25   A    It's the escrow instructions to pay commissions.
```

1    Q    And as part of those instructions, does that include a

2    commission to you?

3    A    Yes.

4    Q    And -- and where is that?

5    A    It's to the Mortgage & Realty 2000.

6    Q    That would be here?

7    A    Yes.

8    Q    Okay.  Now, did you actually receive that amount?

9    A    No.

10   Q    I'm going to place on the display Exhibit No. 82.  Do you

11   recognize Exhibit No. 82?

12   A    Yes.

13   Q    What is Exhibit 82?

14   A    It's the amended escrow instructions to -- to disburse the

15   commissions for Mortgage & Realty 2000.

16   Q    And in this amended instruction, is the amount of

17   commission that you were to receive -- is that reduced?

18   A    Yes.

19   Q    And does it also indicate a payment to an individual by

20   the name of Thai Le?

21   A    Yes.

22   Q    Do you know who Thai Le is?

23   A    No.

24   Q    Who asked you to amend the instructions in this way?

25   A    It was Natalie.

```
 1    Q    When you say Natalie, are you referring to a lady by the
 2    name of Natalie Tran?
 3    A    Natalie Tran, yes.
 4    Q    Now, other than -- let me withdraw that and ask you a
 5    different question.
 6         I'm going to place on the display Exhibit No. 75.  Do you
 7    recognize Exhibit No. 75?
 8    A    Yes.  This was the initial e-mail from the short sale
 9    agent.
10    Q    When you say the short sale agent, you're referring to the
11    short sale agent at the bank?
12    A    Yes.
13    Q    And that's an e-mail from the bank to you because you're
14    the listing agent?
15    A    Yes.
16    Q    And it asked that you provide certain documents; is that
17    right?
18    A    Yes.
19    Q    Now, did you actually provide those documents?
20    A    No.  Because I don't do the negotiating part.
21    Q    What did you do when you got this e-mail?
22    A    I forwarded it to escrow and also the negotiating party.
23    Q    And who was that?
24    A    Pauline Pham.
25    Q    Now, other than create the listing document and list the
```

**UNITED STATES DISTRICT COURT**

```
 1   property for sale, did you do anything else with respect to
 2   this short sale?
 3   A    No.
 4   Q    And prior to this short sale, had you done short sales
 5   before that you recall?
 6   A    Not that I remember.
 7   Q    And after this particular transaction that you did at
 8   the -- as a referral from Natalie Tran, did you do any other
 9   transactions with Natalie Tran?
10   A    No.
11          MR. MIDDLETON:  Thank you, Your Honor.  I have no
12   further questions.
13          THE COURT:  Cross-examination, Defendant Billy.
14                    CROSS-EXAMINATION
15   BY MR. CANTALUPO:
16   Q    Hello.  You're a real estate broker; correct?
17   A    Yes.
18   Q    And in order to maintain your license, you have to take
19   continuing educational courses; correct?
20   A    Yes.
21   Q    And you do that; correct?
22   A    Yes.
23   Q    Prior to this transaction with the Khounthavong brothers
24   and Natalie Tran, had you ever dealt with Natalie Tran before?
25   A    Not that I remember.
```

1    Q    So it would be fair to say this was the first transaction

2    that you had with Natalie Tran?

3    A    Yes.

4    Q    And in dealing with this transaction, you understood that

5    Natalie Tran was the person you would communicate with

6    regarding any questions or other issues that came up with your

7    listing; isn't that correct?

8    A    Yes.

9    Q    In fact, you never met Billy Khounthavong or any of his

10   brothers; correct?

11   A    Yes.

12   Q    How is it that you came to list this property in Chino?

13   A    It was a referral.

14   Q    Referral from Natalie?

15   A    No.  From Pauline Pham.

16   Q    And what did Pauline Pham refer to you?

17   A    To Natalie, because at that time I was seeking for a --

18   for more work, and then Pauline said that, you know, she --

19   Natalie have -- may have some position open.  And that was how

20   I met Natalie.

21   Q    So prior to this transaction, you were working as a real

22   estate broker on your own; correct?

23   A    Prior to that I was working with other -- with my older

24   brothers.

25   Q    And this was the first time you ever dealt with Natalie

1  Tran?

2  A      Yes.

3  Q      Had you ever gone out to look at the property in Chino?

4  A      No.

5  Q      So from the time you listed it until the time the property

6  was sold, you never saw the property?

7  A      Never.

8  Q      Was it your understanding Natalie had seen the property?

9  A      Yeah, based on my understanding.

10 Q      And that was sufficient for you to act as a listing agent

11 for the sale of this property?

12 A      I believe so.

13 Q      Government counsel showed you an e-mail from the bank in

14 which it was discussed the short sale and some documentation

15 required.  Do you recall that exhibit?  It was just shown to

16 you.

17 A      What exhibit were you referring to?

18 Q      It was Exhibit No. 73, I believe.

19         MR. MIDDLETON:  75.

20         MR. CANTALUPO:  I can grab a copy.

21 Q      BY MR. CANTALUPO:  Do you have it up there?

22 A      Yeah.

23 Q      Take a look at it.  That's an e-mail to you from the bank,

24 and it discusses some documents required for the short sale.

25 Isn't that a fair summary of what that e-mail is?

```
 1   A     Yeah.  This is -- this is for the -- the person that's --
 2   that's handling the negotiating.
 3   Q     And when you refer to the person handling the negotiating,
 4   you're talking about negotiating for a short sale?
 5   A     Correct.
 6   Q     And that person who is handling the negotiation for the
 7   short sale is Natalie Tran?
 8   A     I believe it was Pauline Pham.
 9   Q     Do you know what Pauline Pham's connection to Natalie Tran
10   is, if any?
11   A     No.
12   Q     After you received that e-mail, you forwarded it over to
13   Pauline Pham; correct?
14   A     Yes.
15   Q     And that would be fair to say; that's the first time you
16   understood that the Chino property was the subject of a short
17   sale application; correct?
18   A     Yes.
19   Q     Prior to that, you didn't know anything about the short
20   sale?
21   A     Well, I -- when I list the property, I know it was -- it's
22   a short sale listing.
23   Q     And you know it's a short sale listing because you knew
24   that the mortgage on the property was greater than the sales
25   price; correct?
```

```
 1   A     Well, I cannot determine that.  Natalie told me this is a
 2   short sale listing, and we have to prepare a short sale
 3   listing.
 4   Q     That's how you knew it was a short sale, because Natalie
 5   told you?
 6   A     Uh-huh.
 7   Q     Other than receiving that e-mail from the bank, it is true
 8   you had no part in negotiating the short sale with the banks;
 9   correct?
10   A     Yes.
11   Q     And after that e-mail, you didn't receive any other
12   further communications from the bank; correct?
13   A     Yes.
14   Q     After this -- this transaction, did you ever work with
15   Natalie Tran again?
16   A     No.
17   Q     Did she ask you to work with her again?
18   A     Yes.
19   Q     And it's true you declined; correct?
20   A     Right.
21   Q     And you declined because you weren't comfortable with the
22   way she handled this transaction with you; correct?
23   A     Yes.
24   Q     It's true you felt you should have earned more of the
25   commission than you did?
```

```
1   A    I just -- I just didn't think that -- with my involvement,

2   I just don't feel comfortable doing more business with her.

3   Q    And that's because you would have preferred to meet the

4   sellers yourself; correct?

5   A    Correct.

6   Q    And it's true that Natalie wouldn't let you meet the

7   sellers; correct?

8   A    I cannot say she wouldn't let me.  It just -- the

9   situation, it didn't bring me to the meeting.

10  Q    She didn't invite you to any meetings with the sellers?

11  A    Right.

12  Q    And basically you believed she wasn't making the sellers

13  available to you?

14  A    Right.

15  Q    Did you ever personally show the Chino property?

16  A    No.  There was a lockbox on the property.

17  Q    That means you would just instruct the potential buyer,

18  just go out to the property themselves and open the lockbox

19  and --

20  A    Right.

21  Q    -- go in and look at themselves?

22  A    Right.

23  Q    So it wasn't necessary for you to go down there?

24  A    Right.

25  Q    It would be fair to say that you didn't conspire with
```

1    Natalie Tran to commit any crimes, did you?

2              MR. MIDDLETON:  Objection, Your Honor.

3              THE COURT:  Objection is sustained.

4    Q    BY MR. CANTALUPO:  You didn't believe you were committing

5    any crimes by handling this, this sale of this property, did

6    you?

7    A    No.

8    Q    And the Government has never accused you of committing any

9    crime, have they?

10   A    No.

11             MR. CANTALUPO:  Thank you.

12             THE COURT:  Defendant Benny.

13             MR. BRAUN:  Yes, Your Honor.

14                          CROSS-EXAMINATION

15   BY MR. BRAUN:

16   Q    Now, one of the reasons why you were uncomfortable is

17   because you realized Natalie was just using your name on this

18   transaction; isn't that correct?

19   A    At the end of the transaction, that's how I felt, yes.

20   Q    That she was really the one acting as the listing agent,

21   communicating with the clients, communicating with the banks,

22   and got the -- 70 percent of the commission; right?

23   A    Yes.

24   Q    Now, I want to show you -- you were shown two exhibits, 81

25   and 82, if you recall, earlier.  81 is the instructions to

1    escrow on the commissions that should be paid.

2         Do you recall this exhibit?

3    A    Yes.

4    Q    And you testified that Mortgage & Realty 2000 was the

5    commission -- would have been the commission directed to you --

6    right? -- as opposed to the buyers agent?

7    A    To the listing agent.

8    Q    Listing agent commission is that Mortgage & Realty 2000 in

9    the amount of $11,880; is that correct?

10   A    Yes.

11   Q    And these instructions, the instructions that showed the

12   commission was going to you, were signed by the clients; is

13   that correct?

14   A    Yes.

15   Q    And those instructions that were signed by the client,

16   December 21, 2011; is that correct?  You can look at the

17   screen.

18   A    Yes.

19   Q    And then on January 24, 2011 -- and I'm showing you

20   Exhibit 82 -- you indicated that shortly before then Natalie

21   came to you and asked that her 70 percent of the commission be

22   directed to Thai Le; is that correct?

23   A    Yes.

24   Q    And just for clarification, you indicated that you didn't

25   know who Thai Le is.  You knew who a Tommy Le was; is that

```
 1  right?
 2  A    Yes.
 3  Q    And, in fact, Tommy Le you had e-mailed with back in July
 4  of 2011; right?  We went over the e-mail exchange earlier.
 5  A    Yes.
 6  Q    And you knew Tommy Le was associated with Natalie Tran
 7  because you were addressing both of them in your e-mails; is
 8  that correct?
 9  A    Yes.
10  Q    And when Natalie Tran came to you and asked that her
11  70 percent commission, which would be roughly $9,000; right? --
12  $8,825.10 -- that it be made out to Thai Le's name, you didn't
13  obtain the client's signatures, did you, for that?
14  A    I believe escrow does have -- should have a copy.
15  Q    Okay.  Exhibit 82, there's no client signatures.  Unlike
16  the other instructions for the commission, this change-up on
17  the commission a month later, this amended instruction is not
18  signed by the clients; is that correct?
19  A    I'm not sure because that document should be coming from
20  escrow.
21  Q    Well, this document is entitled California Eagle Escrow;
22  is that correct?
23  A    Uh-huh.
24  Q    Does it contain client signatures on it?
25  A    Because this is the split commission for our companies; so
```

```
 1   I don't know if escrow required to have listing agent's
 2   signature -- I mean seller signatures.
 3   Q    Let me just ask you the question one more time.  Does this
 4   amended instruction, this one siphoning off and sending
 5   70 percent --
 6            THE COURT:  It's obvious, Counsel.  Please.
 7   Q    BY MR. BRAUN:  It does not contain the client signatures;
 8   is that correct?
 9   A    I'm not -- that is escrow handling that.  I don't know if
10   escrow required the seller signature on the split commission
11   for our office.
12   Q    You didn't do anything on your own to obtain client
13   consent to send 70 percent of the commission to Natalie Tran,
14   did you?
15   A    No.
16   Q    So when you were asked by the FBI in October of 2014
17   whether you knew Thai Le, you didn't realize they were
18   referring to Tommy Le?  Is that what you would indicate?
19   A    Yeah.  I don't -- I don't know if that's the same person.
20            MR. BRAUN:  Nothing further at this time,
21   Your Honor.  Thank you.
22            THE COURT:  We'll take our noon recess at this time.
23   I will remind you of your duty not to converse or otherwise
24   communicate among yourselves or with anyone upon any subject
25   touching the merits of the cause on trial.  And you are not to
```

UNITED STATES DISTRICT COURT

```
 1   form or express any opinion on the case until it is finally
 2   submitted to you for your verdict.
 3        The jurors are excused until two o'clock.  The court will
 4   remain in session.
 5                   (Jury out at 12:19 P.M.)
 6                   (The following proceedings were held out of the
 7                    presence of the jury:)
 8             THE COURT:  This testimony at this point is totally
 9   irrelevant.  Totally, totally irrelevant.  I suggest that you
10   don't do any more of to say that you are trying this case.
11   It's not happening that way.  You should not be embarrassed by
12   the result.
13        Two o'clock.
14             THE CLERK:  This court is in recess.
15                   (Noon recess at 12:20 P.M.)
16             THE CLERK:  All rise.  This Court is now in session.
17   Please be seated and come to order.
18             THE COURT:  Bring down the jury.
19                   (Jury in at 2:12 P.M.)
20                   (The following proceedings were held in the
21                    presence of the jury:)
22             THE CLERK:  All rise.
23             THE COURT:  Record will show the jurors are all
24   present in their proper places, the defendants are present with
25   their counsel.
```

1      Cross-examine, Johnny.

2                      CROSS-EXAMINATION

3  BY MR. DIAZ:

4  Q     Ms. Phan, you split your commission with a person by the

5  name of Thai Le; is that correct?

6  A     Yes.

7  Q     But you said you did not know who this person was?

8  A     Correct.

9  Q     And but you knew that the money was going to Natalie Tran;

10 correct?

11 A     Yes.

12 Q     So you knew that there was a connection between this

13 Thai Le person, whoever he may be, and Natalie Tran?

14 A     Yes.

15 Q     Did Natalie Tran tell you that she had helped the

16 Khounthavong brothers purchase a house?

17 A     No.

18 Q     Did the paperwork to you appear as if Natalie Tran was

19 trying to conceal her involvement in the sale of the Chino

20 house?

21 A     I didn't understand your question.

22 Q     When did you realize that Natalie Tran was trying to

23 conceal her involvement in the sale of the Chino house?

24           MR. MIDDLETON:  Objection, Your Honor.  Assumes

25 facts not in evidence.

```
 1             THE COURT:  Objection is sustained.
 2  Q    BY MR. DIAZ:  Did the paperwork that you helped prepare
 3  suggest, Ms. Phan, that Natalie Tran was trying to conceal her
 4  involvement in the sale of the Chino house?
 5             THE COURT:  That's not her problem, to do that.
 6  It's the jury's province to answer the questions that might be
 7  raised.
 8  Q    BY MR. DIAZ:  You felt uncomfortable doing any more
 9  dealings with Natalie Tran; correct?
10  A    Yes.  Not just particularly her.  I just don't have much
11  experience in short sale.
12  Q    And you -- did Natalie Tran ask you to essentially not
13  tell people that she was involved in the Chino sale; correct?
14  A    No.  She didn't mention anything to conceal anything.
15             MR. DIAZ:  Nothing further, Your Honor.
16             THE COURT:  Redirect?
17             MR. MIDDLETON:  No, Your Honor.
18             THE COURT:  You may step down.
19        Call your next witness.
20             MS. CARTER:  The Government calls Natalie Tran.
21                       NATALIE TRAN,
22  called as a witness by the Government, was sworn and testified
23  as follows:
24             MR. MIDDLETON:  Your Honor, while we're getting the
25  witness, can I move some exhibits into evidence at this point.
```

```
 1              THE COURT:  No.
 2              THE CLERK:  Ms. Tran, please step forward.  Please
 3    raise your right hand.  Do you solemnly swear that the
 4    testimony you shall give in the cause now pending before this
 5    court shall be the truth, the whole truth, and nothing but the
 6    truth so help you God?
 7              THE WITNESS:  Yes.
 8              THE CLERK:  Thank you.  Please take a seat and state
 9    your full and true name for the record and spell your last
10    name.
11              THE WITNESS:  Natalie Tran, T-r-a-n.
12                        DIRECT EXAMINATION
13    BY MS. CARTER:
14    Q    Ms. Tran, do you have an immunity agreement with the
15    Government for your testimony today?
16    A    Yes.
17    Q    What's your understanding of that agreement?
18    A    To speak and tell the truth.
19    Q    Do you understand that you cannot be prosecuted for the
20    things that you say in connection with your testimony today?
21    A    Yes.
22    Q    Did the Government make you any other promises in exchange
23    for your testimony?
24    A    No.
25    Q    Were you subpoenaed to testify here today?
```

```
 1   A     Yes.
 2   Q     The immunity agreement you reached with the Government,
 3   was that reached in your very last interview with the
 4   Government?
 5   A     Sometime between December or January, yes.
 6   Q     And you signed that agreement the -- the last time that
 7   you met with the Government; is that correct?
 8   A     Yes.
 9   Q     You haven't met with the Government since signing that
10   agreement; is that correct?
11   A     Yes.
12   Q     Were you first interviewed by federal agents back in 2013?
13   A     I'm sorry.  Can you say that again.
14   Q     When were you first interviewed by FBI agents in
15   connection with this case?
16   A     2013.
17   Q     When you were first interviewed by FBI agents in 2013, did
18   you lie to them about the extent of your involvement with the
19   short sale by Billy, Benny, and Johnny Khounthavong?
20   A     Can you ask that one more time.
21   Q     When you were first interviewed by FBI agents in 2013, did
22   you lie to them about whether you were involved in a short sale
23   of a property by Billy, Benny, and Johnny Khounthavong?
24   A     I told them that I didn't really get involved.
25   Q     Did you also tell the agents in your first interview that
```

**UNITED STATES DISTRICT COURT**

```
1    you didn't know a woman named Katie Phan?
2    A    Yes.
3    Q    Were those statements lies?
4    A    Yes.
5    Q    What do you do for a living, Ms. Tran?
6    A    I'm a real estate broker.
7    Q    How long have you had -- been a real estate broker?
8    A    Since 2005.
9    Q    Is that the year you got your license?
10   A    Yes.
11   Q    Do you also hold a license as a mortgage broker?
12   A    Yes.
13   Q    When did you get that license?
14   A    2009.
15   Q    Do you know Billy, Benny, or Johnny Khounthavong?
16   A    Yes.
17   Q    When did you first come into contact with them?
18   A    2011.
19   Q    Can you tell us approximately what month.
20   A    About April.
21   Q    In April 2011 were you doing business as a company called
22   Direct Lender, Inc.?
23   A    Yes.
24   Q    Were you also using the business name First Tree Realty?
25   A    First Realty Tree, yes.
```

```
 1   Q     At some point did you -- your company also use the name

 2   Direct Bank Rate?

 3   A     Yes.

 4   Q     In April 2011 where was your office located?

 5   A     It is on Hoover in Garden Grove.

 6   Q     What county is Garden Grove located in?

 7   A     Orange County.

 8   Q     Can you estimate approximately how far that is from Chino,

 9   California?

10   A     About 30 minute as an estimate.

11   Q     And about how far is Garden Grove from Corona, California?

12   A     I would estimate about 30 minutes.

13   Q     Tell us about the first -- who -- which of the -- of the

14   Khounthavong brothers did you first have contact with?  Billy,

15   Benny, or Johnny Khounthavong?

16   A     Billy.

17   Q     What -- when -- I'm sorry.

18         What was the first contact that you had with Billy

19   Khounthavong?

20   A     I'm sorry.  Can you repeat that question.

21   Q     Can you describe for us the first contact that you had

22   with Billy Khounthavong.

23   A     The first contact, I can't remember the exact.  It would

24   be about April when I pulled up their credit.

25   Q     Did you first have contact with him in person or over the
```

1   phone?

2   A      Over the phone.

3   Q      Did you call Billy Khounthavong when you first spoke to

4   him?

5   A      I don't remember exactly if I called him or he called me.

6   Q      Why did you speak to him that first time?

7   A      It was a lead that Tommy had given to me.

8   Q      When you say Tommy, who are you referring to?

9   A      My ex.

10  Q      Is this someone -- when you say ex, is this someone you

11  used to have a romantic relationship with?

12  A      Yes.

13  Q      Is his -- what's his last name?

14  A      Le.

15  Q      Does he also go by Thai Le?

16  A      Yes.

17  Q      Do the two of you have a child together?

18  A      Yes.

19  Q      What did -- when Tommy Le first put you in contact with

20  Billy Khounthavong, why was he putting you in contact with

21  Billy Khounthavong?

22  A      Like a new loan.

23  Q      When you say a new loan, what kind of loan did you

24  understand Billy Khounthavong to be interested in?

25  A      A purchase loan.

```
 1   Q    When you first spoke to Billy Khounthavong, what did he
 2   tell you, if anything, about whether or not he wanted to buy a
 3   house?
 4   A    He just told me that he was looking to purchase a
 5   property, and the last loan that he did -- or someone, that
 6   didn't -- didn't go through.
 7   Q    He said that he had tried to purchase a property --
 8             THE COURT:  Don't repeat the answer.
 9   Q    BY MS. CARTER:  When you -- when you testified that
10   something didn't go through, what did you understand him to be
11   referring to?
12   A    That he tried a loan elsewhere and it didn't -- it failed.
13   Q    Did he explain why it had failed?
14   A    No.
15   Q    Did he tell you who, if anyone, he would be purchasing the
16   new home with?
17   A    I'm sorry.  Can you repeat that question one more time.
18   Q    Did he tell you anything about who he wanted to purchase
19   the home -- a new home with?
20   A    With his brothers.
21   Q    Which brothers?
22   A    Benny.
23   Q    Was Benny the only brother that he mentioned?
24   A    And Johnny.
25   Q    Did he tell you anything about whether he already owned
```

```
 1    property with his brothers?
 2    A      Yes.
 3    Q      What did he tell you about that?
 4    A      That he has another home and they're looking to buy
 5    another home.
 6    Q      Did he tell you anything about why he wanted to buy a new
 7    home if he already owned a home with his brothers?
 8    A      No.
 9    Q      Did he tell you anything about whether the property he
10    already owned was underwater?
11    A      I found out, yes, later, yes.
12    Q      In that first conversation did he tell you anything about
13    whether the property he owned was underwater or slightly
14    underwater?
15             THE COURT:  Don't lead the witness.
16    Q    BY MS. CARTER:  What, if -- what, if anything, did he tell
17    you in that first conversation about whether the property he
18    owned was underwater or slightly underwater?
19             MR. BRAUN:  Same objection, Your Honor.
20             THE COURT:  The objection is sustained.
21    Q    BY MS. CARTER:  Were you interviewed by the government
22    agents in connection with this investigation on New Year's Eve
23    2014?
24    A      Yes.
25    Q      Did you have a lawyer present at that interview?
```

1    A     Yes.

2    Q     And were FBI agents also present at that interview?

3    A     Yes.

4    Q     Was that interview audio-recorded?

5    A     Yes.

6            MS. CARTER:  I'd now like to place before the

7    witness and hand to the Court's clerk what's been marked as

8    Exhibits 119, 129, and 130.  And I'm handing copies also to

9    defense counsel.

10            THE CLERK:  Exhibits 119, 129, and 130 are placed

11   before the witness.

12            MR. DIAZ:  We haven't seen this, Your Honor.  If we

13   may just take a look at them first.

14            THE COURT:  Yes.

15            MS. CARTER:  119, Exhibit 119 is the transcript.

16            MR. DIAZ:  Thank you, Your Honor.

17   Q    BY MS. CARTER:  Ms. Tran, is what's been marked for

18   identification as Exhibit 119 a transcript of your New Year's

19   Eve 2014 interview?  Ms. Tran?

20   A     Yes.

21   Q     Does Exhibit 119 appear to be a transcript of your New

22   Year's Eve 2014 interview?

23   A     You -- I don't understand what you were saying.  The

24   documents or the computer?

25   Q     Do you have Exhibit 119 in front of you, what's been

```
 1   marked as Exhibit 119?

 2   A     I have 129 and 130.

 3              THE CLERK:  That's 119 right here.  This one.

 4              THE WITNESS:  Oh, okay.  This here?

 5   Q     BY MS. CARTER:  Is that the transcript of your New Year's

 6   Eve 2014 interview?

 7   A     Yes.

 8   Q     I'm now going to play a clip from the audio recording

 9   marked --

10              THE COURT:  She said no.

11              MS. CARTER:  I'm sorry.  I may have misheard your

12   answer.

13   Q     BY MS. CARTER:  Ms. Tran, is this the transcript of your

14   interview?

15   A     This is the first time I've seen it, but if this is the

16   transcript, which is what I -- the recording that we did on

17   December 31st, is that what you mean?

18   Q     Does it appear to be the recording of your transcript?

19              MR. BRAUN:  Objection.  Lacks foundation.

20              THE COURT:  The objection is sustained.

21   Q     BY MS. CARTER:  I'm directing your attention to page 8,

22   lines 7 through 13.

23              MR. BRAUN:  Same objection.

24   Q     BY MS. CARTER:  Were you asked the questions, and did you

25   give the answers listed on page 8, lines 7 through 13?
```

```
 1   A    Yes.

 2   Q    Now publishing the portion of the audio recording,

 3   Exhibit 129, from minute 6 and 3 seconds, to minute 6 and 30

 4   seconds.

 5            THE COURT:  No.  It is not in evidence, Counsel.  It

 6   is not in evidence.  It is not to be shown.  She's here to

 7   testify, not to repeat what -- not to tell us what she said on

 8   a different day.  She's here to testify.

 9            MS. CARTER:  Your Honor, I'd seek to move this in

10   under Rule 608.

11            THE COURT:  That's overruled.

12   Q    BY MS. CARTER:  Were you asked on that date, what, if

13   anything --

14            THE COURT:  No.  She can't answer that question.

15   That is not in evidence, Counsel.

16   Q    BY MS. CARTER:  Did you previously testify that one of

17   the -- I'm sorry.  I'll withdraw the question.

18        Did you previously tell federal agents that one of the

19   reasons --

20            THE COURT:  That's irrelevant.

21            MR. DIAZ:  Objection.

22            THE COURT:  Counsel, please.

23   Q    BY MS. CARTER:  Did you make -- did Billy Khounthavong

24   tell you that one of the reasons that --

25            MR. DIAZ:  Leading.
```

1          THE COURT:  The objection is sustained.

2    Q    BY MS. CARTER:  What, if anything, did Billy Khounthavong

3    say about why he wanted to buy a property in Corona -- I'm

4    sorry.  I'll withdraw it and restate it again.

5          What, if anything, did Billy Khounthavong tell you about

6    wanting to buy a new house because the other house he owned was

7    slightly underwater?

8          MR. DIAZ:  Still leading, Your Honor.

9          THE COURT:  Objection sustained.

10   Q    BY MS. CARTER:  What, if anything, did Billy Khounthavong

11   tell you in the first conversation about what the value of

12   his -- the property he currently owned had to do with him

13   wanting to buy a new house?

14         MR. BRAUN:  Objection.  Leading.

15         THE COURT:  The objection is sustained.

16   Q    BY MS. CARTER:  What did Billy Khounthavong tell you about

17   the value of the house he already owned in Chino?

18   A    Can you repeat that question one more time, please.

19   Q    What, if anything, did Billy Khounthavong tell you in his

20   first conversation with you about the house, the -- about the

21   value of the house he already owned in Chino in relation to his

22   mortgages on that house?

23         MR. BRAUN:  Objection.  Leading, Your Honor.

24         THE COURT:  The objection is sustained.

25   Q    BY MS. CARTER:  Did you have a conversation with Billy

```
 1   Khounthavong about the value of the house in Chino that he
 2   already owned?
 3   A    Not in the first conversation.
 4   Q    Did he tell you -- what did he tell you about why he
 5   wanted to buy a house in Corona?
 6   A    He didn't give me a reason for it.
 7   Q    I'd now like to direct your attention to --
 8        Well, at this time, Your Honor, I'd like to move in,
 9   pursuant to the parties' stipulations, Exhibits 50 through 52,
10   60 through 64 --
11              THE COURT:  Just a minute.  50 through 52.
12              MS. CARTER:  Next range is 60 through 64, 66, 68,
13   70, 73, 76, 77, 81, 82, 113, 114, and 115.
14              THE COURT:  Any objection?
15              MR. DIAZ:  No, Your Honor.
16              MR. CANTALUPO:  No, Your Honor.
17              MR. BRAUN:  No, Your Honor.
18              THE COURT:  50 to 52, 60 to 64, 66, 68, 70, 73, 76
19   to 77, 81, 82, 113, 114, and 115 in evidence.
20                 (Exhibits 50, 51, 52, 60, 61, 62, 63, 64, 66,
21                  68, 70, 73, 76, 77, 81, 82, 113, 114, and 115
22                  received into evidence.)
23              MS. CARTER:  And I'd ask that Exhibits 51, 52, 3
24   through 5, and 11 through 13, and 113 and 114 be placed before
25   the witness.
```

**UNITED STATES DISTRICT COURT**

```
 1            THE COURT:  Give me those numbers again.
 2            MS. CARTER:  51, 52, 3, 4, 5, 11, 12, 13, 113, 114.
 3            THE COURT:  Any objection?
 4            MR. CANTALUPO:  No, Your Honor.
 5            THE COURT:  3, 4, 5, 11, 12, 13, 113, 114, 51, and
 6  162 [sic] in evidence.
 7                 (Exhibits 3, 4, 5, 11, 12, 13 received into
 8                 evidence.)
 9            MS. CARTER:  I may have misheard, Your Honor, but
10  has Exhibit 52 been received in evidence?  If not, I would like
11  to move it in at this time.
12            THE COURT:  Any objection?
13            MR. DIAZ:  No, Your Honor.
14            MR. CANTALUPO:  No, Your Honor.
15            MR. BRAUN:  No, Your Honor.
16            THE COURT:  52 in evidence.
17  Q   BY MS. CARTER:  Displaying Exhibit 51 --
18            THE COURT:  No.  You don't have to explain them.
19  They're in evidence.  They're in evidence.
20            MS. CARTER:  I'm --
21            THE COURT:  They're not to be explained now.  You
22  may argue them, but they're not to be explained.
23            MS. CARTER:  Your Honor, I apologize.  I was just
24  saying I was displaying this.
25            THE COURT:  You're displaying them.  No, don't
```

**UNITED STATES DISTRICT COURT**

1    display them.

2    Q    BY MS. CARTER:  Can I direct your attention to Exhibit 51.

3    Do you recognize this document?

4    A    Yes.

5    Q    Whose handwriting is on this document?

6    A    Mines.

7           MS. CARTER:  Publishing Exhibit 51 with the Court's

8    permission.

9           THE COURT:  No, not yet.  There's no evidence of

10   anything.

11   Q    BY MS. CARTER:  Did you create these notes during your

12   first conversation with Billy Khounthavong?

13   A    Yes.

14   Q    And the printed portion of page 51, is that a printout you

15   made during your first conversation with Billy Khounthavong?

16   A    Yes.

17   Q    What is this a printout from?

18   A    It's from DataQuick, or a title company.

19   Q    And does this printout -- what's the date at the bottom of

20   this printout?

21   A    April 1st, 2011.

22   Q    Was that approximately the date that you made this

23   printout?

24   A    It's showing that's printed, yes, April 1st, 2011.

25   Q    Did you make this printout while you were having that

1   first conversation with Billy Khounthavong?

2   A     I don't remember if I was on the phone with him, but, you

3   know, it -- I did print it out on that day.

4   Q     Did you make the notes on it while you were talking to

5   him?

6   A     As I can recall, yes, because --

7   Q     You were about -- why did you -- do you believe that you

8   made those notes as you were talking to him?

9   A     Because I have his contact and I have the brothers' name

10  and phone number on here.

11  Q     Now, you said that the printed -- printed-out portion was

12  from a database; is that correct?

13  A     I'm sorry.  Can you say that one more time.

14  Q     Why did you make the printout?

15  A     To get the property address.

16  Q     Is the printout a -- a title search?

17  A     It's a property profile that gives us the description of

18  the property.

19  Q     Does it also give other information about the property?

20  A     Yes.

21  Q     Is one of those pieces of information an assessed value of

22  the property?

23         THE COURT:  She hasn't claimed that she doesn't

24  remember anything about this conversation.

25  Q     BY MS. CARTER:  The database that you used to generate

```
 1    this from, does this also print out the value of the property?
 2              THE COURT:  She doesn't claim that she doesn't
 3    remember what the conversation was.
 4              MS. CARTER:  Your Honor, this is in evidence, I
 5    believe.
 6              THE COURT:  I don't care whether it's in evidence.
 7    She hasn't testified that it has anything to do with refreshing
 8    any recollection that she has of that conversation.
 9    Q    BY MS. CARTER:  What's a -- what's a title search,
10    Ms. Tran?
11    A    It's just -- title search, to the best of my knowledge, is
12    the information about the client:  The homeowner's name,
13    property address, and the legal description.
14    Q    After this first conversation with Billy Khounthavong, did
15    you make any -- during that first conversation, did you tell
16    him anything about whether or not you would help him purchase a
17    new home?
18    A    I don't recall at that time, but what I did was take down
19    the name and phone number and run their credit to see if they
20    would qualify for a loan first --
21    Q    What did --
22    A    -- as the preapproval.
23    Q    And did you find out -- and whose credit did you run?
24    A    Billy at the time, because I was talking to him.  And I
25    would have to get the information of the other brothers.
```

```
1    Q    Could you preapprove Billy on his own to purchase a new

2    home?

3    A    No.

4    Q    Why was that?

5    A    Because, No. 1, I'm a broker; so I would have to submit it

6    to a lender.  Number 2 is he didn't have enough income to

7    qualify on his own.

8    Q    So what did you do next in terms of trying to get him

9    pre-approved to buy a house?

10   A    Asked the client to fax in their pay stubs and bank

11   statements.

12   Q    Whose pay stubs and bank statements?

13   A    All three of the borrowers.

14   Q    Who -- and when you say all three of the borrowers, who

15   are you talking about?

16   A    Billy, Benny, and Johnny.

17   Q    Taking the income information and the credit information

18   for the three brothers together, could you preapprove them to

19   buy a home?

20   A    Yes.

21   Q    When you did that preapproval, did you take into account

22   the mortgages they already had on the property that they owned

23   in Chino?

24   A    Yes.

25   Q    At some point after your first conversation with Billy
```

**UNITED STATES DISTRICT COURT**

1    Khounthavong, did you ask the three Khounthavong brothers to

2    fill out blank loan application forms?

3    A    Yes.

4    Q    At about -- about how long after that first conversation

5    did you ask them to do that?

6    A    It should be my first initial contact.

7    Q    Why did you ask them to do that?

8    A    Can you -- why did I ask them to fill out the loan

9    application?

10   Q    Yes.

11   A    Because anytime you get a loan, the client or the borrower

12   has to complete an application.

13   Q    I'd now like to publish Exhibit 52.  Do you recognize

14   Exhibit 52?

15   A    Yes.

16   Q    What is it?

17   A    It's the loan application, uniform residential loan

18   application.

19   Q    Is it the entire application or only the first page?

20   A    The first page.

21   Q    Did you produce only this page to the Government in

22   connection with the investigation?

23   A    I'm sorry.  Can you repeat that.

24   Q    Did you produce the rest of this application to the

25   Government in connection with the investigation?

```
1   A      I believe so, yes.
2   Q      Were you asked at some point to produce additional
3   handwritten loan applications to the Government?
4   A      I don't remember.
5   Q      What, if anything, did you communicate to the Government
6   through your lawyer about whether you had any more documents?
7   A      Whatever I produced is what I have.
8   Q      Did the Khounthavongs ultimately find a house to buy in
9   2011?
10  A      Yes.
11  Q      About how long did it take them to find a house?
12  A      About two months.
13  Q      Where was the house that they ultimately decided to buy?
14  A      In Corona.
15  Q      Did you show houses to the Khounthavongs when they were
16  trying to decide what house to buy?
17  A      Yes.  I was the real estate agent on it.
18  Q      When you were showing the Khounthavongs houses so they
19  could decide which one to buy, who primarily went with you to
20  see the houses?
21  A      Billy and the brothers and then the mom and girlfriend, or
22  wife, also.
23  Q      Whose girlfriend or wife?
24  A      Billy and Benny.
25  Q      Who went -- which of the brothers went with you the most
```

```
1   often?

2   A     Most of my contact was with Billy.

3   Q     Was Billy the one who went -- who also went with you most

4   often to see property?

5   A     What I recall, yes.

6   Q     I'd now like to turn your attention to Exhibits 3 through

7   5.  Publishing the first page of Exhibit 3 in evidence, at the

8   top where it says Direct Lender, Inc., do you know why

9   Exhibits 3 through 5 all have that on the top?

10  A     Yes.

11  Q     Why is that?

12  A     Because that is the loan application from our company.

13  Q     What's the process by which Exhibits 3 through 5 got

14  filled out, the typewritten portion?

15  A     My processor would -- the borrower sends in their

16  document, and the processor will input their information.

17  Q     Who was the loan processor in your office who worked on

18  this transaction?

19  A     Jennie Nguyen and also Kathy Krawiec.

20  Q     Once a loan processor in your office filled in the printed

21  portion of these forms, how did they get to the Khounthavong

22  brothers for signature?

23  A     The processor would forward the loan application to

24  myself, and I would send it off to the client.

25  Q     How would you send it to them?
```

1    A    By e-mail.

2    Q    How would you get it back from them?

3    A    That depends on the client.  Either they can send it back

4    by e-mail, through fax, whatever is more convenient for them.

5    Q    Publishing the second page of Exhibit 3 and magnifying the

6    portion at the bottom called "Schedule of Real Estate Owned," I

7    want to direct your attention to the $750,000 number under

8    present market value.  Do you see that?

9    A    Yes.

10   Q    How was that number filled in to Exhibits 3 through 5?

11   A    My processor would input the information in.

12   Q    Where would this information come from?

13   A    I don't know, either she just input the number or if it's

14   from Zillow.

15   Q    When you ran title in April 2011, the title search

16   indicated -- what did the title search indicate about the value

17   of the property?

18   A    Based on that document, it's showing that it's four

19   hundred and -- I don't remember the exact number -- about four

20   hundred and something thousand.

21   Q    Based on your knowledge of the market at the time, did you

22   know that the property -- market -- present market value of the

23   Chino property was much less than $750,000?

24   A    I do now.  At the time we didn't pay much attention to

25   that document because we didn't do an appraisal.

```
 1   Q     How was it that your processor, or someone else from your
 2   office, chose the number $750,000 to input into this form?
 3   A     I -- I am not sure.  She must have input it in or send it
 4   to me, and I didn't even look at it.  But I'm not sure how that
 5   number got there.
 6   Q     Was there a standard practice in your office regarding
 7   what kind of numbers to put in for present market value when a
 8   property was underwater?
 9   A     No.
10   Q     Could that 700 -- that $750,000 number was much higher
11   than the actual market value of the property; correct?
12              MR. DIAZ:  Objection, Your Honor.
13              THE COURT:  Objection is sustained.
14   Q   BY MS. CARTER:  If the Chino property was underwater,
15   would there have been a reason not to list its actual market
16   value in these forms?
17   A     Can you repeat the question, please.
18              THE COURT:  Would you read the question to the
19   witness.
20   Q   BY MS. CARTER:  If the --
21              THE COURT:  Just a moment.
22                  (The record was read.)
23              THE WITNESS:  Is there a way you can rephrase it so
24   it's easier for me to understand, please.
25   Q   BY MS. CARTER:  Didn't you tell the FBI --
```

```
 1              THE COURT:  No, not what she told the FBI.  She's

 2   testifying here.

 3   Q    BY MS. CARTER:  Why, if the Chino property was underwater,

 4   would there be a reason not to tell the truth about that in the

 5   schedule of real estate owned?

 6   A    Can I -- can you repeat it one more time.

 7   Q    The Chino property was underwater.  Why not -- would there

 8   be a reason not to tell the truth about that in the schedule of

 9   real estate owned?

10              MR. DIAZ:  Objection.  It's argumentative.

11              THE COURT:  Objection is sustained.

12   Q    BY MS. CARTER:  Would there be -- would you expect it to

13   raise any red flags for a bank if the schedule of real estate

14   owned listed the correct present market value for an underwater

15   property?

16              MR. DIAZ:  Objection.

17              THE COURT:  She's not a banker.

18   Q    BY MS. CARTER:  Do you prepare forms like this for clients

19   in the course of your ordinary duties?

20   A    I take the client's information in, and my processor input

21   the information.

22   Q    How many of these types of forms has your office prepared

23   since you've been a real estate agent?

24   A    It's required for every loan.

25   Q    Can you give us an estimate of how many of these types
```

```
 1   you've prepared?

 2   A     I don't really know.

 3   Q     Is it more than a hundred?

 4   A     About there or close to it.

 5   Q     Have you ever listed that a property was underwater in any

 6   schedule of real estate owned?

 7             MR. CANTALUPO:  Objection.  Relevance.

 8             THE COURT:  Objection sustained.

 9   Q     BY MS. CARTER:  Did the Khounthavong brothers list this

10   present market value in their handwritten loan applications?

11   A     No.

12   Q     If they didn't list this present market value in their

13   handwritten loan application, how is it this number got onto

14   Exhibits 3 through 5?

15   A     I have explained that my processor input -- they keyed

16   in -- they key in the number of what they think or however she

17   came up with the number.

18   Q     Do you review these applications before they go to the

19   client?

20   A     Not at the time.  I just signed on the application and

21   forwarded it to the client.

22   Q     Do you believe that this number was accurate at the time

23   it was submitted --

24             THE COURT:  Her belief is totally irrelevant,

25   Counsel.
```

1   Q     BY MS. CARTER:  Did you know that -- whether this number

2   was accurate when you submitted it to Flagstar?

3   A     No, not at the time.

4   Q     At what point did you learn that this number was not

5   accurate?

6   A     At the time when Billy wanted to sell the house, and then

7   at that time then we would have checked or look up the comps.

8   Q     At what point did that happen?  At what point did Billy

9   Khounthavong first tell you that he wanted to sell the Chino

10  house?

11        THE COURT:  She never testified to that, Counsel,

12  that he told her.

13  Q     BY MS. CARTER:  Did Billy Khounthavong at some point

14  communicate to you that he wanted to sell the Chino house?

15  A     After the close of escrow.

16  Q     After the close of escrow on which property?

17  A     I helped Billy with the purchase loan; so I don't remember

18  exactly.  But as I recall, that would be after the close of

19  escrow because he stopped by my office to pick up some

20  documents, the closing statement.

21  Q     During that conversation did he say anything to you about

22  walking away from the property?

23  A     After the close of escrow, what I can recall to the best

24  of my knowledge, is that he asked if he stopped making the

25  payment, and I said to keep up with your payment, that I would

1    advise not to go behind on your payment.

2    Q     At that point did you discuss with him an alternative of

3    doing a short sale?

4    A     I told him that you can short sale it.

5    Q     Why did you tell him not to fall behind on his mortgage

6    payments on the Chino house?

7    A     Because he said that they were -- I can't remember

8    exactly, but I think something with one of the brother not

9    making a payment or not giving him the money for the payment.

10   Q     What, if anything, did you tell him about the advantages

11   of doing a short sale versus just walking away from the house?

12   A     I told him that, if you do a short sale, then usually you

13   can get forgiven with your credit.  You can rebuild it a little

14   faster than just going through a foreclosure and just not

15   making the payment.  If the property go in foreclosure, then

16   you will have bad credit for, like, seven years.

17   Q     What, if anything, did he tell you about whether he wanted

18   to do a short sale or walk away from the property?

19   A     Can you repeat that, please.

20   Q     What, if anything, did he tell you about whether he wanted

21   to do a short sale or walk away from the property?

22   A     So he preferred to do a short sale.

23          MS. CARTER:  I'd now like to have placed in front of

24   the witness Exhibits 60 through 64, which are in evidence, and

25   also Exhibit 10.

1       THE CLERK:  Exhibits 60 through 64 placed before the

2  witness.  Exhibit 10 is placed before the witness.

3  Q    BY MS. CARTER:  Can you take a look at Exhibit 10, which

4  I'm displaying on the screen.

5       What is Exhibit 10?

6  A    The final settlement statement.

7  Q    Is this also called a HUD-1?

8  A    Yes.

9  Q    Is this for the purchase of the Corona property?

10  A    Yes.

11  Q    Does it indicate --

12       THE COURT:  No.  It's in evidence.  The jury can

13  determine what it indicates.

14  Q    BY MS. CARTER:  Does this -- when did escrow close on the

15  Corona purchase?

16  A    July 22nd, 2011.

17  Q    Now, directing your attention to Exhibit 60, is the

18  nattrant e-mail an address you recognize?

19  A    Yes.

20  Q    Whose e-mail is that?

21  A    That is my e-mail address.

22  Q    And do you recognize loanofficerttl?

23  A    Yes.

24  Q    Whose e-mail address is that?

25  A    That's Tommy's.

1    Q    And do you recognize phan.katie?  Do you recognize that

2    e-mail address three lines above the Tommy e-mail address?

3    A    Yes.

4    Q    Whose e-mail address is that?

5    A    Katie Phan.

6    Q    How was Katie Phan involved in the short sale of the Chino

7    property, if at all?

8    A    She's the listing broker.

9    Q    How did she become the listing broker for this short sale?

10   A    You know, it's so long ago, but as I can recall, Tommy

11   probably had reached out to Katie and asked her for the

12   listing.

13   Q    When you say reached out to her and asked her for the

14   listing, what do you mean?

15   A    To refer the short sale over to Katie.

16   Q    Did you continue to play a role in communicating with

17   Katie Phan about the short sale?

18   A    I didn't communicate much with Katie.  So far as producing

19   the document, because I have the loan documents from the

20   brother -- from Billy, Benny and Johnny, so I forward it over,

21   or whatever the document that's needed.

22   Q    Now, the date on this e-mail is before the close of escrow

23   on the Corona property; correct?

24   A    Yes.

25   Q    Did you talk to Katie Phan about listing the Chino

1    property in a short sale before the close of escrow on the

2    Corona property?

3    A     I don't recall.

4    Q     Please turn to the next page of the e-mail, the e-mail on

5    Exhibit 60.  Does the date of Monday, July 18, 2011, refresh

6    your recollection about whether you talked to Katie Phan about

7    listing the Chino property in a short sale before the close of

8    escrow on the Corona property?

9    A     Can you ask me that question one more time.

10   Q     Does this date of July 18, 2011, refresh your recollection

11   about whether you talked to Katie Phan about doing a short sale

12   of the Chino property before the close of escrow on the Corona

13   property?

14   A     If I'm going based on the statement, it's July 18.

15              MR. BRAUN:  Objection.  Nonresponsive, Your Honor.

16              THE COURT:  Objection is sustained.  It will go out.

17   Q     BY MS. CARTER:  Displaying the next page of Exhibit 60,

18   page 4, what's the attachment to Exhibit 60, beginning at

19   page 4?

20              THE COURT:  I think the jury can read.  It's a

21   residential listing agreement - agency.  They can read.

22   Q     BY MS. CARTER:  Why is there a date of July 29, 2011, on

23   this listing agreement if this e-mail is dated July 18, 2011?

24   A     I don't know.

25   Q     What communications did you have with Katie Phan about

```
 1   what the listing price should be?
 2   A    As I can recall, it was Tommy that communicated with
 3   Katie.
 4   Q    Now, I'd like to direct your attention to Exhibit 61,
 5   where it says, "Hi, Katie.  Can you change listing of 400 K and
 6   address to Garden Park, not Part.  Thank you, Dear."  Is that
 7   you writing to Katie Phan?
 8   A    That is my e-mail.
 9            MR. BRAUN:  Objection.  Nonresponsive.
10            THE COURT:  Objection is sustained.
11   Q    BY MS. CARTER:  Is that you writing to Katie Phan?
12   A    Yes.
13   Q    Why did you change -- why were you telling her here, "Can
14   you change the listing to 400 K"?
15   A    I'm not sure because at that time Tommy also has access to
16   my e-mail address.
17   Q    When did the final document signing take place for the
18   purchase of the Corona property?
19   A    I don't remember the exact date.
20   Q    Would it have been the date on the final loan application
21   forms?
22   A    On the -- yes.
23            MS. CARTER:  I'd ask the clerk to place before the
24   witness, Exhibits 6 through 8.
25            THE CLERK:  Exhibit 6, 7, and 8 are placed before
```

1    the witness.

2    Q    BY MS. CARTER:  Displaying page 3, does the July 18, 2011

3    date on these final applications refresh your recollection

4    about when the final document signing occurred?

5    A    Yes.

6    Q    When did it occur?

7    A    July 18th, 2011.

8    Q    Who was present at the final document signing for the

9    Corona purchase?

10   A    The borrowers, which would be Billy, Benny, and Johnny,

11   and the notary and myself.

12   Q    Was Tommy Le also present?

13   A    I don't remember exactly.  I believe so.

14   Q    What time of day did the final document signing take

15   place?

16   A    I'm sorry.  It's really long.  Probably around 8:00 or

17   8:30.

18   Q    Is that at night or in the evening -- I mean at night or

19   in the morning?

20   A    At nighttime.

21   Q    In connection with the Corona purchase, did the lender

22   require a letter of explanation as to why the Khounthavongs

23   wanted to buy a new house in Corona if they already owned a

24   property in Chino?

25   A    Yes.

1    Q    Did you draft the first draft of the letters of

2    explanation that were sent to the lender on behalf of the

3    Khounthavongs?

4    A    My processor would draft the letter, forward it to me, and

5    then I would send it off to the client.

6    Q    I'd now like to turn your attention to Exhibits 12 and 13

7    in front of you.

8              THE CLERK:  Judge, she needs to use the restroom.

9              THE COURT:  We'll take a recess.  I would remind you

10   of your duty not to converse or otherwise communicate among

11   yourselves or with anyone upon any subject touching the merits

12   of the cause on trial.  And you are not to form or express any

13   opinion on the case until it is finally submitted to you for

14   your verdict.  The jurors are excused for ten minutes.  Jurors

15   are excused.  Court will remain in session.

16              THE CLERK:  All rise.

17                   (Jury out at 3:13 P.M.)

18                   (The following proceedings were held out of the

19                   presence of the jury:)

20              THE COURT:  Ten minutes.

21              THE CLERK:  This court is now in recess.

22                   (Recess taken.)

23              THE CLERK:  All rise.  This court is now in session.

24   Please be seated and come to order.

25              THE COURT:  Bring down the jury.

```
 1                      (Jury in at 3:26 P.M.)

 2                      (The following proceedings were held in the

 3                      presence of the jury:)

 4              THE COURT:  Record will show the jurors are all

 5    present in their proper places.  The defendants are present

 6    with their counsel.

 7    Q    BY MS. CARTER:  Can I direct your attention to Exhibits 11

 8    through 13.  Turning your attention to Exhibit 11, which I'm

 9    displaying on the screen, is this line of text at the bottom,

10    "This loan is FHA, Benny and Johnny are the one purchasing the

11    property, and Billy remain at Garden Park address," is that

12    line of text something that your office submitted

13    electronically to Flagstar Bank?

14    A    Yes.

15    Q    Where did you get the -- where did your office get the

16    information that Billy was going to remain at the Garden Park

17    address?

18    A    From Billy.

19    Q    Was it your understanding that all three brothers were

20    going to move into the Corona property?

21    A    Yes.  I'm sorry.  Can you repeat that question.

22              THE COURT:  Read the question to the witness.

23                      (The record was read.)

24              THE WITNESS:  Yes.

25    Q    BY MS. CARTER:  Now, turning your attention to Exhibit 13,
```

1    how was this letter of explanation drafted?

2    A     My processor draft it.

3    Q     Did you review it and send it to the Khounthavongs for

4    signature?

5    A     I would forward the e-mail to the client and ask them to

6    feel free to review or feel free to revise, sign, and send it

7    back.

8    Q     Did you do that also with the shorter letter of

9    explanation for Exhibit 12?

10   A     Yes.

11   Q     This third paragraph on Exhibit 13, "The purchase of this

12   home is and will not create a financial hardship for either of

13   us.  We are aware of the liability that is required to maintain

14   them in good standing," why was that included?

15   A     Because it's a condition from Flagstar Bank.

16   Q     Did you understand whether or not Flagstar wanted to know

17   if the Khounthavongs could pay the mortgage on the new house

18   and the mortgage on their old house?

19         MR. CANTALUPO:  Objection.  Leading.

20         THE COURT:  The objection is sustained.

21   Q     BY MS. CARTER:  Did you do any invest -- did you

22   determine, while you were pre-approving them, whether or not

23   the Khounthavong brothers could afford to pay for the old

24   mortgages on the Chino property and a new mortgage on the new

25   house?

```
1   A     Yes, because we have to disclose what the liability are.

2   Q     Where it says in this letter, "a liability," is that a

3   reference to the Chino mortgages?

4   A     Liabilities would include all debts.

5   Q     Where did the information come from that Billy is planning

6   on being married later this year?

7   A     Because Billy was with his girlfriend, and then I really

8   don't remember exactly, but I remember that he has a

9   girlfriend.  And then Benny also, that they were planning to

10  get married.

11  Q     Do you know whether or not Billy ever did get married in

12  2011?

13            MR. CANTALUPO:  Objection.  Relevance.

14            THE COURT:  The objection is sustained.

15  Q     BY MS. CARTER:  Do you know whether or not, as of the date

16  on this letter, Billy was planning -- I'll withdraw that

17  question.

18        Did you know that this letter of explanation was false at

19  the time you submitted it to Flagstar Bank on behalf of the

20  Khounthavongs?

21  A     Yes.

22  Q     Did you submit it to Flagstar Bank anyway?

23  A     Can I correct myself?  When I say "false," it's because

24  these are just sample letter of whatever the situation was, and

25  I don't really know if it's true or false at the moment.  And I
```

1    just send it off to the client to feel free to revise the way

2    whatever their living situation should be.

3    Q     I'd now like to direct your attention to Exhibit 113.

4            THE CLERK:  It should be in front of you.

5    Q     BY MS. CARTER:  Do you recognize this document?

6    A     Yes.

7    Q     What is it?

8    A     E-mail.

9    Q     Can you explain whether or not this is the e-mail where --

10   that -- well, let me withdraw the question.

11       These -- this e-mail address under the "to" line, right

12   under the date July 12, 2011, at 12:56:58 P.M., the AOL

13   address, it starts with bk.

14       Do you recognize that e-mail address?

15   A     Yes.

16   Q     Whose e-mail address is that?

17   A     Billy's.

18   Q     This next e-mail address, the Yahoo one that starts with

19   j2k, whose e-mail address that?

20   A     Johnny.

21   Q     And this benster47 e-mail address, whose e-mail address is

22   that?

23   A     Benny.

24   Q     Displaying the next page of Exhibit 113, was this hardship

25   letter attached to the e-mail address -- to the e-mail that we

1    just reviewed?

2    A    Yes.

3    Q    Did you get back any changes to the letter of explanation

4    after you forwarded it to Billy, Benny, and Johnny

5    Khounthavong?

6    A    I don't recall I got any changes.

7    Q    Did you ever get back a signed version of this letter of

8    explanation?

9    A    Yes.

10   Q    Did you send it in to Flagstar Bank?

11   A    Yes.

12   Q    Was there also a condition that required you not to be on

13   the Corona purchase loan documents as both the real estate

14   agent and the mortgage broker?

15   A    At the time when I submit the loan and I didn't know, and

16   then I got a condition from Flagstar Bank, telling me to remove

17   my name and putting Diem Pham on there.

18   Q    Who is Diem Pham?

19   A    He's another broker in our office.

20   Q    Had Diem Pham been working for you very long at the time

21   of these Corona loan documents?

22   A    As I recall, he signed on with us about April.

23   Q    Did Diem Pham do anything on the Corona purchase other

24   than sign a few documents?

25   A    On the loan application, and signing the loan application

1    documents.

2    Q     Other than --

3    A     Oh, uh-huh.

4    Q     I'm sorry.

5    A     Yes.

6    Q     Other than sign those documents you described, did

7    Diem Pham do anything as a buyer's agent on the Corona

8    purchase?

9    A     No.

10   Q     Did Diem Pham receive the real estate agent commission for

11   the Corona purchase?

12   A     No.

13   Q     What, if anything, did you pay him?

14   A     A flat fee.

15   Q     Can you estimate how much that fee was.

16   A     I believe it was 500.

17   Q     Who received the rest of the commission?

18   A     Well, I'm the broker of the company; so all the commission

19   goes to the officer, which is my company.

20   Q     Did you receive the rest of the commission?

21   A     Yes.

22   Q     After the final document signing for the Corona purchase,

23   did you send the Khounthavong brothers a copy of the loan --

24   the loan package?

25   A     I believe what I can recall is Billy came down to the

1    office to pick up a signed copy of the closing documents.

2    Q    I'd -- do you recall e-mailing them a copy of the loan

3    package?

4    A    I don't remember.

5    Q    I'd now like to direct your attention to Exhibit 114,

6    which I'm displaying.

7         Do you recognize this document?

8    A    Yes.

9    Q    Is this an e-mail that you sent to the Khounthavongs?

10   A    Yes.

11   Q    After you sent this, did any of the Khounthavongs ever

12   tell you that there were errors in any of the documents?

13   A    No.

14   Q    Did they ever tell you that there was a mistake in the

15   present market value of the Chino property?

16   A    No.

17   Q    Did they ever tell you that they wanted to report a

18   present market value closer to the $400,000 listing price that

19   was being negotiated?

20             MR. DIAZ:  Objection, Your Honor.

21             THE COURT:  Sustained.

22   Q    BY MS. CARTER:  Did they ever tell you anything about

23   wanting to report a different present market value?

24             THE COURT:  Objection is sustained.  That's leading,

25   Counsel.

1    Q    BY MS. CARTER:  Did you ever have any contact with them

2    where they made any change -- where they said anything about

3    the accuracy of these documents?

4    A    No, not that I could recall.

5    Q    Did you ever tell anyone involved in approving the Corona

6    purchase -- I'll withdraw that question.

7         Now, I'd like to turn your attention to Exhibit 63, which

8    I'm displaying, where it says natalietran@dbrloan.com.  Do you

9    recognize that e-mail address?

10   A    Yes.

11   Q    Whose e-mail is that?

12   A    Mines.

13   Q    And where it says jennienguyen@dbrloan, whose e-mail

14   address is that?

15   A    My processor.

16   Q    At the bottom of the page, the jennguyenxa e-mail address,

17   do you recognize that one?

18   A    Yes.

19   Q    Whose e-mail address is that?

20   A    The processor.

21   Q    Publishing the next page, the fourth page, fifth page,

22   seventh, the photographs contained in Exhibit 63, do you

23   recognize those?

24   A    Yes.

25   Q    What are they?

```
 1   A      They're pictures of their home.

 2   Q      Pictures of whose home?

 3   A      The Khounthavongs.

 4   Q      Which home are these pictures of?

 5   A      Garden Park.

 6   Q      Is that the Chino property?

 7   A      Yes.

 8   Q      Why were you asking your processor to forward these

 9   pictures to Katie Phan?

10   A      Because she would do all the documentations.

11   Q      What role were these photos going to have in the listing

12   of the Chino property for short sale?

13   A      For the listing of the short sale.

14   Q      How would these photos be displayed in the listing for the

15   short sale?

16   A      To put it on the listings, like on the Internet.

17   Q      Displaying the third page of Exhibit 63, where it says

18   "from" and then has a ten digit number starting with 626, is --

19   is that a phone number?

20   A      I believe so.

21   Q      Whose phone number is that?

22   A      I don't remember.

23   Q      Who sent you the listing photos to forward to Katie Phan?

24   A      I believe it was Johnny.

25   Q      When you say Johnny, are you referring to Johnny
```

1    Khounthavong?

2    A      Yes.

3             MS. CARTER:  I'd now like to move in, if there's no

4    objection, Defense Exhibit 231.

5             THE COURT:  Any objection?

6             MR. BRAUN:  No objection, Your Honor.

7             MR. CANTALUPO:  No objection.

8             MR. DIAZ:  No objection.

9             THE COURT:  231 in evidence.

10            (Defense Exhibit 231 received into evidence.)

11   Q    BY MS. CARTER:  Displaying the first page of Defense

12   Exhibit 231, is this another e-mail chain that you were on?

13   A      Yes.

14   Q      And at the top did your processor send this e-mail chain

15   to the Khounthavongs?

16   A      Yes.

17   Q      Now, at the bottom of the page, next to the word "Katie,"

18   whose Yahoo e-mail address is this?

19   A      That's Tommy's.

20   Q      And displaying the next page of Defense Exhibit 231, is

21   that e-mail to Tommy's e-mail address, addressed "Hello Katie"?

22   A      Can you repeat the question, please.

23   Q      I'll withdraw it and ask another one.

24         Why was this e-mail being sent to Tommy's e-mail address,

25   addressed "Hello Katie"?  Do you know?

1   A     I don't know.

2   Q     What role did Sarah Schweitzer have, if any, in the Chino

3   short sale?

4   A     I -- I don't know.

5   Q     Was this exhibit, Defense Exhibit 231, information about

6   an offer on the Chino property?

7   A     Yes.

8   Q     Are offers -- who generally communicates an offer from a

9   potential buyer to a listing agent?

10  A     I'm sorry.  Can you say that one more time.

11  Q     Based on your experience in the real estate industry, if a

12  buyer wants to communicate a potential offer to a listing

13  agent, who communicates for them?

14  A     A agent.

15  Q     Was Tommy involved in communicating with buyers' agents

16  about potential offers for the Chino short sale?

17            MR. CANTALUPO:  Objection.  Relevance.

18            THE COURT:  Objection sustained.

19  Q     BY MS. CARTER:  Did you ever have any conversations with

20  any of the Khounthavongs about Tommy using Katie's name,

21  communicating with anyone?

22  A     No, not that I can recall.

23  Q     Did you send the listing agreement with Katie Phan to the

24  Khounthavongs for their signature?

25            MR. CANTALUPO:  Objection.  Vague.

1          THE COURT:  Objection is sustained.

2   Q    BY MS. CARTER:  Were you involved in any way in

3   transmitting the listing agreement with Katie Phan to the

4   Khounthavongs for their signature?

5   A    Yes.

6   Q    Who needed to approve a short sale of the Chino property?

7          MR. CANTALUPO:  Objection.  Relevance.  Foundation.

8          THE COURT:  The objection is sustained.

9   Q    BY MS. CARTER:  Did you communicate with the Khounthavongs

10  regarding documents that were needed for the Chino short sale?

11  A    I forwarded the documents, whatever I have, yes.

12  Q    Did the short sale lenders --

13         MR. BRAUN:  Objection.  Nonresponsive.

14         THE COURT:  The objection is sustained.  That will

15  go out.  It's nonresponsive.  She said she sent, not she got

16  from.

17  Q    BY MS. CARTER:  Were you involved in collecting documents

18  from the Khounthavongs for the Chino short sale?

19  A    Yes.

20  Q    Was one of those -- did the short sale lenders on -- for

21  the Chino short sale require a hardship letter?

22  A    Yes.

23  Q    How was the hardship letter for the Chino property short

24  sale created?

25         MR. CANTALUPO:  Objection.  Asked and answered.

120

```
 1                THE COURT:  The objection is sustained.
 2                MS. CARTER:  I believe the prior testimony --
 3                THE COURT:  Objection sustained, Counsel.
 4    Q    BY MS. CARTER:  I'd like to direct your attention to
 5    Exhibit 64, which I'll display.  Did you send this e-mail at
 6    the bottom of Exhibit 64 with the subject line, "hardship" with
 7    no D?
 8    A    I don't have the exhibit.
 9    Q    Oh.
10         May I ask that the clerk place Exhibit 64 before the
11    witness.
12                THE CLERK:  It was identified previously.  Am I
13    correct?
14                MS. CARTER:  I believe it's in evidence and was
15    previously identified.
16                THE CLERK:  It's right here.
17    Q    BY MS. CARTER:  Are both your personal and DBR Loan e-mail
18    addresses on this first page of Exhibit 64?
19    A    Yes.
20    Q    Displaying -- is the second page of Exhibit 64 a draft of
21    a hardship letter to support the Chino short sale?
22    A    Yes.
23    Q    How was this draft created?
24                MR. CANTALUPO:  Objection.  Asked and answered.
25                THE COURT:  Objection sustained.
```

**UNITED STATES DISTRICT COURT**

1    Q    BY MS. CARTER:  Were you involved in creating this
2    hardship letter?
3              MR. CANTALUPO:  Same objection.
4              THE COURT:  Objection sustained.
5    Q    BY MS. CARTER:  Did you send -- I'm sorry.
6         Did you receive the signed copy of this hardship letter
7    from the Khounthavong brothers to submit to Flagstar Bank?
8    A    I -- I don't remember exactly, but from this e-mail, it's
9    my e-mail.
10             MR. CANTALUPO:  Objection.  Nonresponsive.
11             THE COURT:  Sustained.
12   Q    BY MS. CARTER:  You previously testified that you were
13   involved with collecting documents from the Khounthavong
14   brothers for the short sale.
15        What did you do with them after you collected them?
16   A    I forwarded it to my processor.
17   Q    For what purpose?
18   A    She would put the package together to forward to the
19   escrow officer.
20   Q    Why was it being forwarded to the escrow officer?
21   A    For the short sale.
22   Q    What was your understanding about what the escrow officer
23   was going to do with the documents?
24   A    She's the negotiator.
25   Q    What does that mean?

1   A     She negotiates with the bank for the short sale.

2   Q     Would that include submitting documents to the bank on

3   behalf of the Khounthavongs?

4   A     That's correct.

5   Q     Did you ever have any discussion with any of the

6   Khounthavongs about them opening up new bank accounts in July

7   2011?

8   A     Not that I can recall.

9   Q     Did you ever have any discussions with any of the

10  Khounthavongs about a joint bank account that they had at

11  Chase Bank?

12  A     It's been so long, I don't remember having that

13  conversation.

14  Q     I'd now like to direct your attention to Exhibits 75, 76,

15  and 77.

16        THE CLERK:  Exhibit 75, 76, and 77 are identified

17  and placed before the witness.

18  Q     BY MS. CARTER:  Displaying Exhibit 75 in evidence, at any

19  point during 2011, did anyone forward this e-mail to you?

20  A     I don't really recall.

21  Q     Do you recall learning at any point that Bank of America

22  was requesting two months of bank statements to support the

23  Chino short sale?

24  A     Yes.

25  Q     How did you learn that?

1    A    Because I remember -- what I can recall is I asked the

2    brothers for their copy of -- proof of income and proof of bank

3    statement.

4    Q    Did you get anything in response?

5    A    Yes.

6    Q    What did you get in response?

7    A    What I can recall is whatever my processor had requested,

8    I would communicate that, and they would send the updates.

9    Q    Did the Khounthavongs send bank statements in to you?

10   A    Either to myself or to my processor.

11   Q    I'd direct your attention to Exhibit 76, which I'm

12   displaying.  Was this the e-mail that you sent requesting the

13   additional bank statements?

14   A    Yes.

15   Q    At this point did you know whether any of the

16   Khounthavongs had opened new bank accounts at Chase Bank?

17   A    No, not that I know of.

18   Q    Now, directing your attention to Exhibit 77, which I'm

19   displaying, this center page where it says "from Natalie Tran,"

20   is that an e-mail that you sent?

21   A    Yes.

22   Q    Do you recognize this e-mail address, Chambrielle?

23   A    Yes.

24   Q    Whose e-mail address is that?

25   A    One of the escrow officer.

1    Q     Do you recognize this e-mail address,

2    pauline@caleagleescrow?

3    A     Yes.

4    Q     Whose e-mail address is that?

5    A     One of the escrow officer.

6    Q     Why did you forward this information to Chambrielle Pham

7    at California Eagle Escrow, copy to Pauline Pham at California

8    Eagle Escrow, and Katie Phan?

9    A     Because they were handling the short sale.

10   Q     Displaying the bottom of that page, where it says "new fax

11   (51 pages)," what does that mean about how this information

12   came in to your Yahoo account?

13   A     It's been so long, it would be -- I'm assuming it's a fax

14   that I received.

15   Q     Who did you receive it from?

16   A     I don't know.

17   Q     Displaying the first page where it says "Atten: Natalie"

18   and it says one fifty -- 1 of 51 in the corner, does this

19   refresh your recollection about who sent you this information?

20   A     From Chase.

21   Q     Do you recall from seeing this cover sheet that says

22   atten -- "Atten: Natalie," who sent you this information?

23   A     It's been so long, I really don't remember who sent that

24   to me.

25   Q     How many pages are there in this exhibit?  Are there all

1    51 pages in front of you?

2    A    Yes.

3    Q    Whose information are in those 51 pages?

4    A    The Khounthavongs.

5    Q    Does the exhibit contain any Chase bank account

6    statements?

7    A    I don't see it.

8    Q    Did you see any Washington Mutual bank account statements

9    in there?

10              MR. BRAUN:  Objection.  I believe it's the same

11   thing.

12              THE COURT:  Beg pardon?

13              THE CLERK:  Can you speak into your microphone, or

14   stand.

15              MR. BRAUN:  I object.  For clarification, I think

16   they were the same thing.

17              THE COURT:  The objection is sustained.

18   Q    BY MS. CARTER:  I'd now like to direct your attention to

19   Exhibit 115, and I'll display that.  Where this e-mail says,

20   "Per Natalie, the brothers moved out of Garden Park.  Hence,

21   they were no longer eligible for HAFA," do you know what that

22   refers to?

23   A    Yes.

24   Q    What's it refer to?

25   A    To the short sale.

```
 1   Q    What kind of short sale were the Khounthavongs originally

 2   trying to do for the Chino property?

 3              MR. BRAUN:  Objection.  Relevance.

 4              THE COURT:  The objection is sustained.

 5   Q    BY MS. CARTER:  What did you communicate if -- what did

 6   you understand about why the Khounthavong brothers were no

 7   longer pursuing a HAFA short sale?

 8              MR. BRAUN:  Same objection.

 9              THE CLERK:  Mr. Braun, when you object, can you

10   speak into the mic, or stand.

11              MR. BRAUN:  Same objection, Your Honor.

12              THE COURT:  The objection is sustained.

13       We'll take our afternoon adjournment at this time.  I

14   would remind you of your duty not to converse or otherwise

15   communicate among yourselves or with anyone upon any subject

16   touching the merits of the cause on trial, and you are not to

17   form or express any opinion of the case until it is finally

18   submitted to you for your verdict.

19       The jurors are excused until 9:30 tomorrow morning.  The

20   Court will remain in session.

21              THE CLERK:  All rise.

22                  (Jury out at 4:11 P.M.)

23                  (The following proceedings were held out of the

24                  presence of the jury:)

25              THE COURT:  9:30 tomorrow morning.
```

1          MR. DIAZ:  Your Honor --

2          THE COURT:  I want no more of this, "I don't

3    remember" or "Would you give me that question again."  I want

4    this to go along.  You're boring this jury to death.

5          MR. DIAZ:  Your Honor, if I may, would the Court

6    direct Government's counsel and the agent not to communicate

7    with the witness before she completes her testimony.

8          THE COURT:  Yes.  Absolutely.

9          MR. DIAZ:  Thank you.

10         THE COURT:  Tomorrow morning at 9:30.

11         THE CLERK:  This court is adjourned.

12              (Matter adjourned at 4:12 P.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5          I, KHOWOONSUN CHONG, FEDERAL OFFICIAL REALTIME

6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10  STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13  THE UNITED STATES.

14

15          DATED THIS 11TH DAY OF MAY, 2015.

16

17

18          /S/ KHOWOONSUN CHONG

19          _____
            KHOWOONSUN CHONG, CSR NO. 12907, CRR
20          FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25

**UNITED STATES DISTRICT COURT**