1          UNITED STATES DISTRICT COURT

2         CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4

5    THE HONORABLE MANUEL L. REAL, U.S. DISTRICT JUDGE

6                  PRESIDING

7

8   THE UNITED STATES OF AMERICA,  )
                                   )
9            Plaintiff,            )
                                   )
10      vs.                        )       No. CR 13-904-R
                                   )
11                                 )
   BILLY KHOUNTHAVONG, ET AL.,     )
12                                 )
             Defendants.           )
13   _____)

14

15

16      REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

17            LOS ANGELES, CALIFORNIA

18          MONDAY, FEBRUARY 9, 2015

19

20            **VOLUME IV/P.M. SESSION**

21               PAGES 1 - 71

22   _____

23          DEBORAH K. GACKLE, CSR, RPR
               United States Courthouse
24       312 North Spring Street, Room 402A
            Los Angeles, California 90012
25               (213) 620-1149

1    **APPEARANCES OF COUNSEL:**

2

3         **For the Plaintiff:**

4

5              STEPHANIE YONEKURA
               UNITED STATES ATTORNEY
6              BY:  MARGARET L. CARTER
               BY:  LAWRENCE S. MIDDLETON
7              ASSISTANT UNITED STATES ATTORNEYS
               1400 United States Courthouse
8              312 North Spring Street
               Los Angeles, California  90012
9

10             ALSO PRESENT:  SPECIAL AGENT DALTON

11

12

13        **For the Defendant JOHNNY KHOUNTHAVONG:**

14

15             Humberto Diaz
               Law Offices of Humberto Diaz
16             714 West Olympic Boulevard Suite 450
               Los Angeles, CA 90015
17             213-745-7477
               Fax: 213-745-7447
18             Email: JHDiazLaw@gmail.com

19

20        **For the Defendant BENNY KHOUNTHAVONG:**

21

22             Adam H Braun
               Adam H Braun Law Offices
23             1880 Century Park East Suite 710
               Los Angeles, CA 90067
24             310-277-2272
               Fax: 310-277-2270
25             Email: adam@braunesquire.com

```
1    APPEARANCES (CONTINUED):

2


3


4         For the Defendant BILLY KHOUNTHAVONG:

5


6             Dominic Cantalupo
              Dominic Cantalupo Law Offices
7             100 Wilshire Boulevard Suite 940
              Santa Monica, CA 90401-1113
8             310-397-2637
              Fax: 310-388-6016
9             Email: dcantalupo@att.net

10


11


12                         - - - - - -

13


14


15


16


17


18


19


20


21


22


23


24


25
```

**I N D E X**

| GOVERNMENT'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| BIANCHI, MARC (Continued) | 8 | | | |
| | | 13 | | |
| | | 27 | | |
| | | 27 | 49 | |
| MEADOWS, LAURA | 62 | 66 | | |
| | | 68 | | |

1    **LOS ANGELES, CALIFORNIA; MONDAY, FEBRUARY 9, 2015; 1:40 P.M.**

2                          -- -- --

3

4                  (Open Court – Jurors Present)

5          THE CLERK:  No. 8, CR 13-904-R, United States of

6    America v. Billy Khounthavong, et al.

7          Counsel, please state your appearance.

8          MS. CARTER:  Good afternoon, Your Honor.  Maggie

9    Carter and Lawrence Middleton on behalf of the government.

10   Seated at counsel table is also Special Agent Jason Dalton of

11   the FBI, and witness, Marc Bianchi, is on the witness stand.

12         MR. CANTALUPO:  Good afternoon, Your Honor.  Dominic

13   Cantalupo appearing with Billy Khounthavong, he is present.

14         MR. BRAUN:  Good afternoon, Your Honor.  Adam Braun

15   with Benny Khounthavong, who is present.

16         MR. DIAZ:  Good afternoon, Your Honor.  Umberto Diaz

17   on behalf of Johnny Khounthavong, who is present.

18         Your Honor, the underlying lawsuit does not pertain

19   to my client, Johnny Khounthavong; but from looking at what has

20   been even proposed as the redacted complaint, the very first

21   thing that I see in that is a complaint for the civil rights

22   violations, talk about 14th Amendment, use of force.  I think

23   that the redacted copy, in essence, is even more prejudicial as

24   to the third defendant, Your Honor, because I don't see how

25   this can be cleared up and he can be not prejudiced as a result

1        of this.

2                  There has been, apparently, an unusual amount of

3        interest in the public about cases related to the sheriff, Your

4        Honor.  This is not really, from my point of view, that.  This

5        is supposed to be mortgage fraud case.  Maybe from the point of

6        view of the government it's something else, but as to Johnny

7        Khounthavong, I don't think it is proper to bring anything else

8        into it.

9                  MS. CARTER:  Your Honor, the government is seeking to

10       introduce a very redacted copy of the complaint, Exhibit 89,

11       because the government has to prove both that two defendants

12       were parties to a lawsuit, and that they knowingly failed to

13       disclose it, and that all three defendants knowingly conspired

14       to make false statements to a bank.  The government has offered

15       to stipulate to a more -- even more summarized version of the

16       complaint, but we were unable to reach a stipulation.

17                 Under the circumstances, the government has to

18       introduce a copy of the redacted complaint both to prove up

19       what it has to prove at trial, and also to respond adequately

20       to the expected defense, which is that because these defendants

21       were sued along with L.A. County, and in their official

22       capacities, as well as their individual capacities, it was

23       justifiable for them to fail to disclose this lawsuit in their

24       applications.  We expect that to be the defense from the

25       defense exhibits that have been marked, and also from our

1    negotiations regarding the stipulation.

2           In light of what's expected, and in light of what the

3    government has to prove at trial, it seems like the government

4    is justified in introducing this exhibit.  The case law also

5    makes clear, Your Honor, that when, in a 1014 case, failure to

6    disclose lawsuits is alleged, that the government can get into

7    the laws -- the existence of the lawsuit and any details that

8    might be relevant.

9           MR. DIAZ:  Your Honor, if I may -- and co-counsel can

10   speak because it really pertains -- the only item of value of

11   what government counsel said is essentially existence of a

12   lawsuit, nothing else.

13          Any details, particularly what I would term as

14   inflammatory details, Your Honor, civil rights violations,

15   acting within the scope of the rights, deliberate indifference

16   to the rights, conspiracy between the two defendants, Your

17   Honor.  I mean, it goes on and on, essentially giving a great

18   detail of allegations that have nothing to do whether or not it

19   was a lawsuit in existence at the time that these mortgage

20   documents were prepared.

21          THE COURT:  Well, the matter would be submitted, and

22   not to be any evidence of -- with reference to that lawsuit

23   will be admitted up until the time that the court can rule upon

24   the motion.

25          All right.  Bring down the jury.

1          Let's move on with this case.  There's too much

2     detail of nothing.

3                    (Open Court – Jury Present)

4          THE COURT:  The record will show the jurors are all

5     present in their proper places; defendants are present with

6     their counsel.

7          Mrs. E, thank you for coming.  I hope that everything

8     will be all right in the next day or two.  Thank you.

9          THE CLERK:  And, sir, you are reminded that you are

10    still under oath.  Please state your full and true name for the

11    record and spell your last name.

12         THE WITNESS:  Marc Bianchi, B-i-a-n-c-h-i.

13         MS. CARTER:  I'm going to ask the court's clerk to

14    place before this witness Exhibits 12, 13, 15 through 20, and

15    110, and I'm now publishing the first page of Exhibit 110 and

16    magnifying the top portion.

17                  **DIRECT EXAMINATION  (CONTINUED)**

18    BY MS. CARTER:

19    Q.   Good afternoon, Mr. Bianchi.

20         What is this document in front of you?

21    A.   This is a commitment letter that Flagstar, or a Flagstar

22    underwriter, will issue once an approval has been made on a

23    loan application.

24    Q.   Does this document set forth the conditions that a

25    borrower or prospective borrower has to meet before the loan

1    can close?

2    A.    Yes.   It outlines the general terms, the financing, the

3    property address, the type of loan, as well as those items,

4    yes.

5              MS. CARTER:   Now publishing page two of Exhibit 110.

6    Q.    I'd like to direct your attention to condition No. 15,

7    which reads, "Provide LOE regarding relationship of borrowers.

8    Johnny is listed on the 1003 as not occupying property.   LOE

9    also to provide motivation for Benny and Billy purchasing this

10   home while owning another property."

11             What is an LOE, Mr. Bianchi?

12   A.    The acronym stands for letter of explanation.

13   Q.    And now directing your attention to condition No. 12.

14             Explain why this condition was included.

15   A.    The underwriter added the condition because Natalie Tran,

16   named on this No. 12, was acting as the real estate agent as

17   well as the loan officer in the transaction, and for FHA

18   financing, that dual relationship is not allowed.

19   Q.    After the date on that front page of the commitment

20   letter, July 5th, 2011, did Flagstar Bank receive any letters

21   of explanation regarding why the Khounthavongs wanted to buy a

22   new property in Corona when they already owned a residence?

23   A.    Yes, we did.

24   Q.    I'd now like to direct your attention to Exhibits 12 and

25   13.

```
 1              Are these the letters of explanation that Flagstar
 2    received?
 3    A.   Yes.
 4    Q.   Publishing first the first page of Exhibit 12, and then
 5    the first page of Exhibit 13.
 6              Were these received by Flagstar Bank near the dates
 7    on the tops of the letter?
 8    A.   Yes.
 9    Q.   How were these letters of explanation used by Flagstar?
10    A.   The explanations help assess the overall risk of the
11    transaction or perhaps individual concerns within the
12    transaction that could determine whether program eligibility is
13    met.
14    Q.   What did the Khounthavongs represent in these letters
15    regarding who was going to reside in the new house that they
16    were seeking a Flagstar loan for?
17    A.   The letter indicated that Benny and Johnny Khounthavong
18    would be occupying the new property that they were purchasing.
19    Q.   Did Flagstar Bank receive any other letters of explanation
20    that stated that Billy Khounthavong wanted to stay in the Chino
21    house only if he could get a loan modification?
22    A.   There was no indication of that in the letters, no.
23    Q.   Were there any other letters of explanation stating that
24    Billy Khounthavong was having any trouble paying the mortgages
25    on the existing Chino property?
```

1  A.   No.  We were not aware of any issues at the time of

2  underwriting.

3  Q.   Was there any indication in these letters of explanation

4  that the Khounthavong brothers were going to try to do a short

5  sale of the Chino property if they couldn't get a loan

6  modification?

7  A.   No.

8  Q.   Were there any other letters in the Flagstar file

9  indicating that the Khounthavong brothers were going to stop

10  making payments on their Chino mortgages if they didn't get a

11  loan modification?

12  A.   No.

13  Q.   At some point in the loan application process was driver's

14  license information required to verify who the borrowers who

15  were applying for the loans?

16  A.   Yes.

17  Q.   I'd now like to direct your attention to Exhibit 20.  I'm

18  publishing the first page of Exhibit 20, publishing the second

19  page of Exhibit 20, and publishing the third page of

20  Exhibit 20, the fourth page, the fifth page, the sixth page,

21  the seventh page, the eighth page.

22          Is Exhibit 20 the driver's license and Social

23  Security information that was submitted for this Flagstar file?

24  A.   Yes.

25  Q.   At some point in the loan application process were the

1  borrowers required to sign warnings which indicated that it was

2  a crime to make false statements in connection with their

3  Flagstar loan application?

4  A.   Yes.

5  Q.   I'd now like to turn your attention to Exhibits 15 through

6  17.  Publishing the first page of Exhibit 15.  Magnifying the

7  paragraph No. 3.

8        Do you recognize Exhibits 15 through 17?

9  A.   Yes, I do.

10  Q.   What are these documents?

11  A.   We call these a borrower's certification and

12  authorization, and these are taken or signed at the time of

13  original application.

14  Q.   And in this case, would that have been around June 22nd,

15  2011?

16  A.   Yes.

17  Q.   Is there one for each of the three Khounthavong brothers

18  who applied for a Flagstar loan?

19  A.   Yes.

20  Q.   I'd now like to turn your attention to Exhibits 18 and 19.

21  Publishing the first page of Exhibit 18, and magnifying the

22  numbered paragraph three.

23        Do you recognize Exhibit 18?

24  A.   Yes, I do.

25  Q.   What's this document?

```
 1   A.   It is virtually identical to the borrower's authorization
 2   that is signed at the time of initial application; however,
 3   this one is signed with the closing documents.
 4   Q.   Magnifying the bottom portion.
 5        Is Exhibit 18 signed by all three brothers?
 6   A.   Yes.
 7   Q.   Now displaying Exhibit 19.
 8        Do you recognize this exhibit?
 9   A.   I do.
10   Q.   What is it?
11   A.   It is another document that is provided at time of closing
12   advising all borrowers the potential penalties for
13   misrepresentation or false statements.
14   Q.   And is this one signed also by all three brothers?
15   A.   Yes.
16        MS. CARTER:  No further questions at this time, Your
17   Honor.
18        THE COURT:  Cross-examination for defendant's, Billy.
19                    CROSS-EXAMINATION
20   BY MR. CANTALUPO:
21   Q.   Good afternoon.
22        Your function at Flagstar Bank was to supervise your
23   personnel in the approval of loans; is that correct?
24   A.   That is correct.
25   Q.   And in order to do that, Flagstar Bank creates a file for
```

1    the potential borrowers, correct?

2    A.    Yes.

3    Q.    And you talked about on direct examination last week about

4    co-borrowers.   Sometimes co-borrowers are required to complete

5    the same loan application.

6                  Do you remember that testimony?

7    A.    I do.

8    Q.    And that's correct, right, some co-borrowers are asked to

9    complete the same loan application.

10   A.    Yes.

11   Q.    Other times co-borrowers are not asked to complete the

12   same, they complete separate ones, correct?

13   A.    Yes.

14   Q.    But whether it is an application that is jointly -- has

15   co-borrower information on it or is separate, it all goes into

16   the same loan file, correct?

17   A.    Yes.

18   Q.    In other words, all the information on all the borrowers

19   are collected into one file; is that correct?

20   A.    That is correct.

21   Q.    And the reason for that is in order to properly assess

22   whether or not Flagstar is going to issue a loan, Flagstar

23   needs to be aware of all the information; is that correct?

24   A.    Yes.

25   Q.    Sometimes borrowers' loan applications may -- may not --

```
 1    excuse me.  Let me rephrase that.

 2              When there is a joint loan that is going to be

 3    issued, in other words, there are co-borrowers, sometimes

 4    looking at just one borrower's information is not sufficient

 5    for Flagstar to make a determination, correct?

 6    A.   That is correct.

 7    Q.   Now, in this case, my client and his brothers each

 8    submitted individual loan applications, correct?

 9    A.   Yes.

10    Q.   And if I recall correctly your testimony of last week, the

11    loan application that my client signed on July 18th, the body

12    of that was prepared by Flagstar; is that correct?

13    A.   Yes, that is correct.

14    Q.   And that would have been from information that Flagstar

15    had in its loan file?

16    A.   Yes.  Those documents are generated from our loan

17    operating system.  So --

18    Q.   Okay.

19    A.   -- software.

20    Q.   I'm going to put up on the screen -- this is Government's

21    Exhibit 5.

22              MR. CANTALUPO:  I apologize, Your Honor.  I'm not

23    sure how to work this.

24              This is the first page of Exhibit 6.

25              Zoom in a little bit.
```

1   Q.   This is Benny Khounthavong's loan application, correct?

2   He is one of the co-borrowers.

3   A.   Yes.

4   Q.   And we look at page four of that loan application, and we

5   see property description for Chino, California, correct?

6   A.   Correct.

7   Q.   And you understood that to be a property that the

8   co-borrowers owned jointly; is that correct?

9   A.   Yes, that is correct.

10           MR. CANTALUPO:   I just want to make a correction.  I

11   think that was Exhibit 7.

12   Q.   Now I'm going to show you Exhibit 6.

13           Exhibit 6, the first page indicates that it's an

14   application for Billy Khounthavong.

15           Do you see that?

16   A.   Yes.

17   Q.   And on page four in this property attachment, it's blank.

18   There's no information about the Chino property, correct?

19   A.   Correct.

20   Q.   But that doesn't matter to Flagstar Bank because they knew

21   about the Chino property, correct?

22           MS. CARTER:   Objection, relevance.

23           THE COURT:   Objection is overruled.

24           THE WITNESS:   Yes, we did know about the property.

25   ///

1    BY MR. CANTALUPO:

2    Q.    And so the property being listed on one co-borrower

3    application and being excluded from other co borrowers'

4    applications wasn't important to Flagstar Bank, was it?

5    A.    It doesn't change the risk of the loan for Flagstar Bank.

6    Q.    Because Flagstar was able to evaluate the risk because

7    they knew that the co-borrowers had owned that Chino property,

8    correct?

9    A.    That is correct.

10   Q.    In your capacity -- and I believe you said you were a

11   supervisor of a team of mortgage evaluators; is that a fair

12   description of your function?

13   A.    Yes.

14   Q.    Are you familiar with foreclosures?

15   A.    I am.

16   Q.    And is it true that a foreclosure on a property occurs

17   when a borrower doesn't pay the mortgage, correct?

18   A.    Correct.

19   Q.    And if a borrower doesn't pay the mortgage, the bank

20   forecloses and basically takes back ownership of the property,

21   correct?

22   A.    Yes.

23   Q.    And if that were to happen, if the bank were to foreclose

24   on a property and take back the property, and the property is

25   worth less than the mortgage, you're familiar with the term of

1    "nonrecourse"?

2    A.    Yes.

3    Q.    And nonrecourse means the bank is just stuck with the

4    property, there's no way for the bank to recoup any of the

5    excess mortgage that's owed from the original borrower; isn't

6    that correct?

7              MS. CARTER:  Objection, beyond the scope.

8              THE COURT:  The objection is overruled.

9              THE WITNESS:  Yes, that is correct.

10   BY MR. CANTALUPO:

11   Q.    So basically when a bank forecloses on a property,

12   regardless of the outstanding mortgage, all the bank gets is

13   the property back.

14   A.    Correct.

15   Q.    And are you familiar in your capacity -- in your job there

16   with Flagstar Bank what happens to a foreclosed property that

17   goes back to the bank?

18   A.    Somewhat familiar.  I don't work with it every day.

19   Q.    But it's fair to say that the property goes into the

20   bank's inventory of homes owned?

21   A.    Yes.  It becomes a real estate-owned property, and we turn

22   around and list the property at a later date for resale.

23   Q.    And prior to listing it for resale, and up to the point

24   where it is ultimately resold, the bank's obligated to maintain

25   the property, correct?

```
1    A.    Yes.

2    Q.    They would have to make property tax payments?

3    A.    Yes.

4    Q.    And --

5              MS. CARTER:  Objection, beyond the scope.

6              THE COURT:  The objection is overruled.

7    BY MR. CANTALUPO:

8    Q.    And the bank would also have to continue to perhaps pay

9    insurance on the house?

10   A.    I don't know that answer.

11   Q.    Okay.  And how about maintenance on the house?  Before the

12   property is sold and while it's in the bank's inventory, would

13   the bank continue to maintain the property in good working

14   order?

15   A.    They're obligated to, but whether they do, some lenders

16   choose not to.

17   Q.    Do you know what Flagstar does?

18   A.    I do not.

19   Q.    But the bottom line is, when the property is in the bank's

20   inventory, the objective, the main objective of the bank is to

21   eventually sell that property.

22   A.    Yes.

23   Q.    And in order to sell that property -- or excuse me, let me

24   rephrase that.

25              And the bank's objective in selling that property
```

```
1    would be to attempt to obtain the highest price for that
2    property, correct?
3    A.    If possible.  The main objective is to recover losses that
4    they took from the default on the mortgage.
5    Q.    And those lawsuits would not only just include the amount
6    of the mortgage, but there are other costs involved in
7    foreclosure; isn't that true?
8    A.    Yes.
9    Q.    And would you happen to know any of those costs?
10   A.    There's legal costs; there's just labor costs; there's
11   court costs that could be involved.  There's several types of
12   costs that we could end up having to write off on our books.
13   Q.    So it's fair to say that a foreclosure for the bank is
14   somewhat expensive.
15   A.    Yes.
16   Q.    I'm going to show you Government's Exhibit 110.
17         This is the commitment letter from Flagstar Bank, and
18   I believe you have already explained to the jury that this
19   letter is generated by Flagstar Bank once they decide to
20   approve a loan; is that right?
21   A.    Yes.
22   Q.    And sometimes in approving the loan, there are items that
23   need to be cleared up, and that's what Exhibit 110 discusses,
24   some of those items, correct?
25   A.    That is correct.
```

```
 1    Q.   And this letter goes to the loan broker or who's

 2    representing the buyers; isn't that correct?

 3    A.   Yes.  It would go to the loan officer or the mortgage

 4    broker.

 5    Q.   And in this case, you understood that the Khounthavongs

 6    were working with a loan officer and loan broker, Natalie Tran?

 7    A.   Yes.

 8    Q.   I want to direct your attention again to item 12.

 9         Do you see that on the screen?

10    A.   I do.

11    Q.   Item 12.  It talks about Natalie Tran is the selling agent

12    and the loan officer listed on the submission.

13         The concern for Flagstar Bank was that -- was what --

14    in Natalie Star[sic] acting in those two capacities?

15    A.   It's an FHA loan that we were considering on this loan

16    application, and if we were to allow that transaction to close

17    with one individual acting in a dual capacity, we would not be

18    able to obtain FHA mortgage insurance on that property, which

19    would expose our bank to potential losses down the road in the

20    event of a foreclosure.

21    Q.   And as far as you know, Natalie Tran, acting in that dual

22    capacity, had nothing to do with the co-borrowers, correct?

23    They didn't direct her to do that, as far as you know?

24         MS. CARTER:  Objection, calls for speculation.

25         THE COURT:  The objection is overruled.
```

```
1              THE WITNESS:  I'm unaware.
2   BY MR. CANTALUPO:
3   Q.   Do you recall how Ms. Tran ultimately resolved that issue
4   that's explained in No. 12 of the commitment letter?
5   A.   No, I don't.  I'd have to look at the file again.
6   Q.   And in your capacity as a Flagstar employee, are you
7   familiar with short sales?
8   A.   I am.
9   Q.   And it's fair to say that a short sale is the sale of a
10  property for something less than the mortgage outstanding on
11  the property.  Is that a simple definition of a short sale?
12  A.   It is.
13  Q.   And it would also be fair to say that in a short sale when
14  a bank agrees to sell a property short, its costs are a lot
15  less than in a foreclosure; isn't that correct?
16  A.   It can be, yes.
17  Q.   Because they don't have as much legal fees, correct?
18  A.   Yes.
19  Q.   I need to you to say yes.  Thank you.
20       Also the property in a short sale never gets put into
21  the bank's inventory; isn't that correct?
22  A.   That is correct.
23  Q.   And, therefore, in a short sale situation, the bank is not
24  responsible for those costs of maintaining the property so that
25  it can sell readily.
```

1    A.    Right.

2    Q.    Isn't that correct?

3    A.    Yes.

4    Q.    So based on your experience, it's fair to say that a

5    short-sale situation is a much better situation for the bank to

6    be in than in a foreclosure situation, correct?

7    A.    It can be.  There are some cases where that may not be

8    true.  There are different loan programs out there that have

9    different levels of mortgage insurance that will make a lender

10   whole or partially whole.  And there's other programs where

11   there is no additional mortgage insurance, so any losses would

12   go directly to the bank.

13   Q.    And the mortgage insurance, though, that is something that

14   is acquired at the time the loan is made, correct?

15   A.    That is correct.

16   Q.    Do you have -- or excuse me.

17             MR. CANTALUPO:  Can the clerk put Exhibit 90 --

18   Government's Exhibit 91 in front of the witness.

19             And I don't believe, Your Honor, that this is in

20   evidence yet, but if the government has no objection, I'd like

21   to admit Government's Exhibit 91 into evidence.

22             MS. CARTER:  No objection, Your Honor.

23             THE COURT:  Ninety-one in evidence.

24             (Government's Exhibit 91 received in evidence.)

25   ///

```
 1              THE CLERK:  Ninety-one is placed before the witness.

 2    BY MR. CANTALUPO:

 3    Q.   Could you please just kind of take a look at it.

 4    Familiarize yourself.

 5              Have you had a chance to take a look at that?

 6    A.   Yes.

 7    Q.   And it is copies of bank statements for Bank of America in

 8    the name of Billy Khounthavong; is that correct?

 9    A.   Some documents in here named Benny, as well.  Canceled

10    checks.  But overall, it looks like financial statements, bank

11    statements for Billy.

12    Q.   All right.

13              I think if you turn to about the third or fourth

14    page, you're going to come up to the first statement.  It's

15    dated way back in January 30th, 2008.

16              Do you see that?

17    A.   I do.

18    Q.   I'm going to come back to that in a second.  If you would

19    just kind of keep your place there.

20              And I want to show you page two of Government's

21    Exhibit 6, which is Billy Khounthavong's loan application dated

22    July 18th.  And you see here in the asset side -- well, you see

23    just one number, $2,000, cash deposit on property.

24              Do you see that?

25    A.   I do.
```

1    Q.   There's no Bank of America accounts on this statement,

2    correct?

3    A.   That is correct.

4    Q.   Now, if the bank statement or the bank account was listed

5    on a co-borrower's account, that would be a mistake, correct?

6    A.   Correct.

7    Q.   But since the co-borrowers are applying for the same loan,

8    and all of their information goes into a loan file, it would be

9    true and correct that the bank would have notice of any bank

10   statements that were reported on all of the borrowers'

11   applications, correct?

12   A.   Correct.  We would aggregate the data into our loan file

13   for all three borrowers.

14   Q.   And assuming that your loan file contained Bank of America

15   account information for Billy Khounthavong, and again, Flagstar

16   Bank prepared that July 18th statement, correct?  The loan

17   application.

18   A.   The final loan application, that is correct.

19   Q.   Yes.

20        And if there is no reporting of Mr. Khounthavong's

21   bank statement, that is just a mistake that the bank made,

22   correct?

23   A.   Not necessarily.  It may have been omitted intentionally

24   on our part.  At times we will, in order to remove the need for

25   some documentation, we will only focus in on the amount of

```
 1   assets that we need, and obtain documents for those.  And any
 2   additional items such as retirement accounts, or other asset
 3   depository accounts, we may them in the file, but we wouldn't
 4   consider them in our analysis and put them on the final 1003.
 5   Q.   So if I understand you correctly, what you're saying is
 6   that the loan application that is generated by Flagstar Bank
 7   will contain only those assets or liabilities that are
 8   necessary for the bank to determine whether or not to agree to
 9   lend money, correct?
10   A.   Correct.
11   Q.   It doesn't necessarily contain all assets and all
12   liabilities of a borrower, correct?
13   A.   Not necessarily all assets.  It should contain all
14   liabilities.
15   Q.   Thank you.
16          MR. CANTALUPO:  I have no further questions.
17          THE COURT:  Defendant Benny.
18          MR. BRAUN:  Your Honor, I'd ask the clerk to put in
19   front of the witness Exhibits 238 and 215.
20          And at this time, pursuant to a stipulation reached
21   between the parties and filed with the court on January 22nd of
22   this year, the defense would move to admit Exhibits 238 and
23   215.
24          THE COURT:  238 and 215 in evidence.
25          MR. BRAUN:  Thank you, Your Honor.
```

1              (Government's Exhibits 215 and 238 received in

2    evidence.)

3                        **CROSS—EXAMINATION**

4    BY MR. BRAUN:

5    Q.   I'd first like you to have before you Exhibit 238, if you

6    would.

7    A.   Yes.

8    Q.   Now, the government in your direct examination reviewed

9    with you a series of four-page applications at Exhibits 2, 3, 4

10   and 5, and then 6, 7 and 8.

11              Do you recall that?

12   A.   I do.

13   Q.   And the loan packages that the Khounthavong brothers

14   signed were not just a series of four-page applications; is

15   that correct?

16   A.   Correct, there's additional disclosures and documents.

17   Q.   And focusing for the moment on Exhibit 238, if you would,

18   about how many pages is that?  And I'd just direct your

19   attention to the --

20   A.   Forty, 50.

21   Q.   Okay.

22              Take a look at the first page.  Do you see

23   Exhibit 238 and a number 000001?

24   A.   I do.

25   Q.   And if you look at the last page of Exhibit 238 -- and I'm

1    just publishing the last page at this point, Your Honor.

2              Do you see a page number at the bottom of that?  And

3    I'm pointing with my finger.

4    A.    Yes.

5    Q.    And what number is that?

6    A.    104.

7    Q.    So the June 2011 loan package that the brothers signed at

8    Exhibit 238, that was about a 101-page -- or, sorry, a 104-page

9    loan package; is that correct?

10   A.    Between the three borrowers, that would be correct.

11   Q.    And if you would, just take a moment either based on your

12   training and experience, or your review of Exhibit 238, and

13   estimate the percentage of pages that the brothers would have

14   been required to sign or initial on this June 2011 loan

15   package.

16             MS. CARTER:  Objection, the document speaks for

17   itself.

18             THE COURT:  The objection is overruled.

19             THE WITNESS:  The vast majority of these documents do

20   require some sort of acknowledgment.  If I had to estimate, I

21   would say 10 to 20 percent don't have to be signed, at most.

22   BY  MR. BRAUN:

23   Q.    So in other words, 80 to 90 percent of the pages have to

24   be either signed or initialed by the borrowers; is that

25   correct?

1    A.    Yes.

2    Q.    With respect to this June loan package, June 2011 loan

3    package, I'd like you to turn to the URLA that pertains to

4    Benny Khounthavong, the Uniform Residential Loan Application,

5    and so I would just direct your attention to page 41 of

6    Exhibit 238.

7    A.    Yes.

8    Q.    Do you have that in front of you?

9    A.    Yes.

10   Q.    So at the 41st page is where Benny Khounthavong's URLA

11   appears; is that correct?

12   A.    That is correct.

13   Q.    Now, there's a section on the Uniform Residential Form

14   Application -- I'm publishing Exhibit 41 at this time -- where

15   the borrowers to list their present address.

16          Do you see that section?

17   A.    I do.

18   Q.    And in addition to listing their present address, they're

19   to indicate whether they own or rent that property; is that

20   correct?

21   A.    That is correct.

22   Q.    Okay.  And is it fair to say based on your review of all

23   the loan applications in this case, that each of the brothers

24   indicated that they owned their present address?

25   A.    Yes.

1   Q.   And that was whether it was in the June application or the

2   July application; is that correct?

3   A.   Yes.

4   Q.   Okay.

5        MR. BRAUN:  I'm going to publish the 42nd page of

6   Exhibit 238 this time.

7   Q.   And in each of the applications, the brothers are to list

8   their current work address; is that correct?

9   A.   That is correct.

10  Q.   And that information is so that the bank or lending

11  institution can verify income; is that correct?

12  A.   Yes.

13  Q.   Now, on the page 43 of that loan package, Benny

14  Khounthavong's residential loan application, there is a Bank of

15  America account that appears there, 4986.

16       Do you see that last four digits?

17  A.   I do.

18  Q.   And a few moments ago you had a chance to review

19  Exhibit 91; is that correct?

20  A.   Briefly, yes.

21  Q.   Okay.  Briefly.

22       And you recall that Exhibit 91 was for a bank account

23  belonging to Billy Khounthavong; is that correct?

24  A.   Yes.

25  Q.   Okay.

1          And the last four digits of that account were 4986;

2    is that correct?  You can take a moment to look at 91.

3    A.    Yes, Exhibit 91 did include that account number, the last

4    four digits.

5    Q.    So it's fair to say if a Bank of America account belonging

6    to Billy Khounthavong appears in Benny Khounthavong's loan

7    application, that it appears to be a mistake; is that correct?

8    A.    Yes.

9    Q.    Now, I'd like to turn to the July 2011 loan package, and

10   that would be Exhibit 215, which I believe you have in front of

11   you.

12   A.    I have Exhibit 215.

13   Q.    Exhibit 215, I'll represent for you, is that July 2011

14   loan package.

15          Do you recognize it?

16   A.    Yes, I do.

17   Q.    And the July loan package is a pretty hefty package, is

18   that correct, a lot of pages?

19   A.    Yes.

20   Q.    Okay.

21          And could you hold it up for the jury, the entire

22   package.

23          And, again, looking at the bottom of Exhibit 215, and

24   having you turn to the last page, there's approximately 161

25   pages in that loan application; is that correct?

```
 1   A.   Yes.
 2   Q.   And, again, could you estimate for the jury on about what
 3   percentage of the pages the borrowers in this case, the
 4   Khounthavong brothers, would have been required to either sign
 5   or initial?
 6   A.   I would estimate about the same.
 7   Q.   So about 80 to 90 percent of pages?
 8   A.   Right.
 9   Q.   And I'd like to have you turn to -- I'm going to publish
10   at this time -- page 114 of Exhibit 215, if you would.
11             MR. BRAUN:   Publishing page 114 of Exhibit 215.
12   Q.   And on about the 114th page of this loan application
13   appears the Uniform Residential Loan Application of Benny
14   Khounthavong; is that correct?
15   A.   That is correct.
16   Q.   And, again, Benny Khounthavong, like his brothers, was
17   required, in addition to, in other sections, to indicate
18   whether he owns the property that he lives in; is that correct?
19   A.   Yes, that is correct.
20   Q.   Also list his current employer and the work address?
21   A.   Yes.
22   Q.   And on the second page of his Uniform Residential Loan
23   Application, which appears at page 115 of this July loan
24   application, is a column for Liabilities; is that correct?
25   A.   Yes, that is correct.
```

1    Q.   And to the extent that the Citibank credit card reflected

2    there with a credit card balance of $4,135, account ending in

3    5954, belongs to Billy Khounthavong, would it be a mistake for

4    that credit card debt to appear in Benny Khounthavong's

5    application?

6    A.   Yes.  It should show on the appropriate application.

7    Q.   And similarly, to the extent a Fiscal Credit Union debt or

8    loan of $8,550, with an account number ending in 0143, belongs

9    to Billy Khounthavong, would it be a mistake for that Fiscal

10   Credit Union debt to appear in Billy Khounthavong's

11   application?

12   A.   It is poor data entry.  Whether it's a mistake is

13   difficult to say, because when we look at the loans from the

14   overall risk, again aggregating all the data is really what we

15   look at.  So as long as all that data is accurate -- ideally,

16   the liability should be in the appropriate places on the

17   appropriate applications.

18   Q.   So if Billy has credit card debt and a Fiscal Credit Union

19   loan, it should appear on his application, not on one of his

20   brother's?

21   A.   Yes, it should.

22   Q.   You were asked a few questions about Natalie Tran, the

23   real estate agent, being advised or warned that she could not

24   act as both the real estate agent as well as the loan officer.

25            Do you recall that?

1    A.    I do.

2    Q.    And I'd like to have you turn to -- if you have

3    Exhibit 238 handy.  And I'm going to have you turn to page 74

4    of Exhibit 238.

5          Do you see that?

6    A.    I do.

7    Q.    Natalie Tran addressed this request by whiting out her

8    signature on page 74 of 238 on the June loan package and having

9    an employee sign where she had; is that correct?

10         MS. CARTER:  Objection, calls for speculation.

11         THE COURT:  The objection is overruled.

12         THE WITNESS:  It appears that way.

13   BY MR. BRAUN:

14   Q.    And in your experience, can a real estate agent comply

15   with the FHA-VA requirements by simply whiting out their name,

16   having an employee write their name in its place, and

17   collecting both commissions?

18   A.    That could create some challenges from the FHA-VA

19   insuring.  This is a Flagstar document, internal document only

20   that we had the mortgage broker execute for our purposes, and

21   not for insurance purposes.

22   Q.    Would you advise, if you were handling the package, a real

23   estate agent to simply list a subordinate in her place and

24   collect both commissions on an FHA loan?

25   A.    Never.

1   Q.   During the loan application process that we've been

2   reviewing, Flagstar's communication was with Natalie Tran and

3   her staff; is that correct?

4   A.   That is correct.

5   Q.   And so its requests, if any, were directed to Natalie Tran

6   and her staff; is that correct?

7   A.   Yes.

8   Q.   And you had indicated in your direct testimony that the

9   market value listed for a property currently owned by borrowers

10  was not necessarily a critical factor in the loan application.

11  I want to ask you a couple questions about that.

12       Which properties do you typically order an appraisal

13  on?  The subject property, meaning the property that you're --

14  you, as Flagstar, are issuing the loan on, or on properties

15  that a borrower might currently own?

16  A.   We order appraisals on the property that will be

17  collateral for our mortgage.

18  Q.   And the mortgage, the first mortgage listed by the various

19  brothers in their June and July application, that was viewed as

20  a debt by Flagstar; is that correct?

21  A.   That is correct.

22  Q.   Now, just a couple last questions about loan closings.

23  You indicated that Flagstar prepared the July 2011 package.

24       Would Flagstar typically allow the borrowers to print

25  out themselves the loan package and bring it to a closing?

1    A.    No.

2    Q.    And would Flagstar allow the borrowers to take the

3    executed agreements signed before the notary with them after

4    the closing?

5    A.    No.

6    Q.    And to the extent that the notary in this case claimed

7    that the borrowers were the ones that brought the loan

8    applications to the closing, and took them after the signing,

9    is that something that seems plausible to you?

10   A.    I'm sorry.  Can you repeat that question?

11   Q.    Sure.

12          To the extent that the notary in this case contended

13   that the borrowers were the ones that brought the loan

14   applications to the closing, and then took the executed

15   agreements with them after, is that something that Flagstar

16   would have permitted?

17   A.    No.

18   Q.    And is that something that seems plausible to you in your

19   experience?

20   A.    No.

21          MS. CARTER:  Objection, vague and calls for improper

22   opinion.

23          THE COURT:  Objection is overruled.

24          MR. BRAUN:  Nothing further, Your Honor.  Thank you.

25          THE COURT:  Defendant Johnny.

1                        **CROSS−EXAMINATION**

2   BY MR. DIAZ:

3   Q.   Good afternoon.

4   A.   Good afternoon.

5   Q.   I take it you never dealt with Natalie Tran or −−

6   A.   No.

7   Q.   Or with the person Dien Phan?

8   A.   No.

9   Q.   Who dealt with those individuals from your company?

10  A.   That would have been my underwriter, Jessica.

11  Q.   And she is no longer with the company?

12  A.   She is with the company.

13  Q.   Now, am I correct in understanding that from reviewing

14  these documents, that you are telling us that there are a

15  number of mistakes or omissions in these applications?

16            MS. CARTER:  Objection, states −−

17            THE COURT:  The objection is overruled.

18            THE WITNESS:  If indeed some of the debts are on the

19  wrong applications, we're saying mistakes, again, we look at

20  the bigger picture of the loan.  But I guess to answer your

21  question, yes, they should be in the appropriate spots and some

22  are not.

23  BY MR. DIAZ:

24  Q.   Okay.  Well, let me show you, if I may, the first

25  application submitted.  The first −− or actually, that will be

1    the second, section No. 2.  That tells us what is the purpose

2    of this loan, correct?

3    A.    That is correct.

4    Q.    And from this application, which is the -- the one for

5    Johnny Khounthavong, it appears that that's -- the property

6    that they're trying purchase is going to be his primary

7    residence, correct?

8    A.    Johnny and Benny.

9    Q.    Yes.

10   A.    Yes.

11   Q.    But this application -- there's three different

12   applications, correct, one for Johnny, one for Benny, one for

13   Billy?

14   A.    Are you talking about this section that you've provided

15   here?

16   Q.    Yes.  This one in particular.

17   A.    There's no way to know who is going to occupy the property

18   based on the top section.

19   Q.    It says title will be held in Benny and Johnny, correct?

20   A.    Correct.  That's vesting, though.

21   Q.    And the person who's making the application, namely,

22   Johnny, he is saying, This is going to be my primary residence.

23   A.    Page three would indicate whether it's going to be

24   their -- occupied as their primary residence.

25   Q.    Okay.

```
 1              The person who then provides this information gives
 2    you also enough data so that you can verify where this person
 3    works and what he or she does for a living, correct?
 4    A.    That is correct.
 5    Q.    And all of these people have here on your paperwork an
 6    address for the L.A. County Sheriff's that is in Chino,
 7    California.
 8              Do you see that?
 9    A.    I do.
10    Q.    Are you familiar with the Southern California area?
11    A.    No, I'm not.
12    Q.    Would you know whether or not the L.A. County Sheriff will
13    have an office in Chino?
14    A.    No, I would not know.
15    Q.    Now, Chino is the place where they currently live,
16    correct?
17    A.    Yes.
18    Q.    So if somebody entered Chino there as the address for
19    their employers, and that is not a location for the L.A. County
20    Sheriff, it is probably a mistake.
21    A.    Yes.
22    Q.    And if the address is -- or the phone number is incorrect,
23    that would also indicate that somebody made a mistake along the
24    way.
25    A.    Yes.
```

1    Q.   Now, this is, again, on the same -- the first application

2    for Johnny Khounthavong.  On monthly income and combined

3    expenses, please help me figure this out.

4         The applicant is telling you that he currently has

5    expenses of about 5,000 or close to $6,000, correct?

6    A.   Correct.

7    Q.   And under the proposed, after he purchases an additional

8    house, then his combined expenses are going to be reduced.

9    A.   Not necessarily.

10   Q.   Where it says Total, it says $3700, compared to 55-,

11   $5600.

12   A.   If this was a refinance transaction, then, yes.  But on a

13   purchase transaction, not necessarily, because you have an

14   existing primary residence, you're purchasing a new primary

15   residence.  If you retain both, then you could potentially add

16   5617 to 3702.

17   Q.   So the present and proposed, they don't necessarily

18   reflect what is happening with this individual borrower?

19   A.   Not just from this section.  That is why you have to

20   review the whole application.

21   Q.   Now, following the same application, the first one that

22   was submitted, may I direct your attention to where it says,

23   section six, and it lists a net worth for Johnny Khounthavong

24   of -- what is that figure?  $762,000?

25   A.   Correct.

1  Q.   Now, from just looking at this, you know that this is a

2  mistake, correct, or is there a dispute as to that?

3  A.   I don't know that that's a mistake.

4  Q.   Taking a look at this application, it was your

5  understanding that Mr. Johnny Khounthavong told you that he was

6  worth $700,000?

7  A.   That number is including the present market value of the

8  existing residence.

9  Q.   With the present market value of the existing residence,

10 the net worth would be $700,000?

11 A.   Not necessarily, no.

12 Q.   What would be his net worth with the present market value

13 included?

14 A.   Well, based on the application, you would have $5,000 in

15 net worth from the property, plus any other assets that can be

16 included, liquid assets.

17 Q.   You will end up with about a little under $10,000.

18 A.   Okay.

19 Q.   So would you agree with me that this figure of $760,000 is

20 clearly somebody's mistake?

21 A.   A computer system automatically generates this.  For me to

22 say that is a mistake, I can't say that.  Because it will

23 automatically do the math based on all the real estate and all

24 the assets.

25 Q.   Well, let me -- there was another application submitted in

1    July, was it not?

2    A.    Pardon me?

3    Q.    Do you remember the July application?

4    A.    Yes.

5    Q.    What was the net worth for Johnny Khounthavong in that

6    application?

7    A.    I would have to look at it.

8          Do you know what exhibit it is?

9    Q.    It is -- if we can take a look at Exhibit 8.  Should be

10   before you.

11         THE CLERK:  Exhibit 8 is placed before the witness.

12         THE WITNESS:  Okay.

13   BY MR. DIAZ:

14   Q.    According to Exhibit 8, Mr. Bianchi, what is the net worth

15   of Johnny Khounthavong?

16   A.    $3812.

17   Q.    Would you now agree with me that the $700,000 figure on

18   that exhibit is clearly somebody's mistake?

19   A.    No.

20   Q.    It's not necessarily a mistake?

21   A.    No.

22         Can I go back to the exhibit and explain it?

23   Q.    We'll go back to it in just a second.

24         Now, the exhibit, the first application indicated

25   that this residence was going to be Johnny Khounthavong's

1   primary residence, correct?

2   A.   The mortgage that Flagstar was doing?

3   Q.   Yes.

4   A.   Yes, for Johnny, yes, that is correct.

5   Q.   But at one time, you have just testified that you

6   requested a letter of explanation because that was not really

7   going to be his primary residence, correct?  That he, Johnny

8   Khounthavong, was not going to be residing there.

9   A.   In the new property?

10   Q.   Yes.

11   A.   We didn't fully understand the scope of the transaction

12   based on how I read the notes in the file.  The underwriter had

13   concerns about who really was going to live in what property.

14   So we asked for the letter of explanation.

15   Q.   That was condition -- may I have one moment, Your Honor?

16         That was condition No. 15, correct, of your

17   conditional approval?

18   A.   Yes.

19   Q.   And you said Johnny is not listed as going to be occupying

20   it, correct?

21   A.   That's the condition that the underwriter typed based on

22   her review.

23   Q.   Even though the very first page of that application says

24   that it's going to be his primary residence.

25   A.   No.  He is purchasing a primary residence, is what is on

1  page one of the application.

2  Q.    He is purchasing a primary residence for somebody else?

3  A.    No.   In FHA financing, when an individual may not qualify

4  on their own, they are allowed to bring on what we call a

5  nonoccupant co-borrower, meaning somebody who is going to go on

6  the financing, complete the transaction, but has no intentions

7  of actually occupying that property.

8  Q.    And the letter of explanation that you received indicates

9  that, indeed, Johnny Khounthavong was going to be occupying the

10  new residence, correct?

11  A.    That is correct.

12  Q.    There was one of the brothers who was going to be staying

13  behind in the other residence, correct?

14  A.    That is correct.

15  Q.    And that would be consistent with the application saying

16  primary residence title will be in Benny and Johnny

17  Khounthavong, correct?

18  A.    Correct.

19  Q.    Now, at the very last -- almost next to the last, when it

20  says, "Do you intend to occupy," it says "No."

21          Do you see that?

22  A.    I do.

23  Q.    And was it based on that one entry that then your

24  underwriter decided they needed to have a letter of

25  explanation?

1    A.    Yes.

2    Q.    And it was not -- the letter of explanation, then, informs

3    you that it was Johnny and Benny Khounthavong who were going to

4    occupy the new residence, correct, and Billy was going to stay

5    behind?

6    A.    That is correct.

7    Q.    And a subsequent application was then filed with you in

8    early July, and the same information is asked, correct, "Do you

9    intend to occupy?"

10          Do you see that entry?

11   A.    I do.

12   Q.    And, again, somebody entered as to Johnny Khounthavong,

13   no, that he did not intend to occupy that.

14          Do you see that?

15   A.    I do.

16   Q.    Now, that was not your understanding of the law, correct?

17   A.    Correct.

18   Q.    In other words, there's clearly a mistake in this

19   particular application.

20   A.    Yes.

21   Q.    And help me out, because the next -- sorry -- the next

22   entry where it says, "Have you had ownership of any interest in

23   a property," it's left blank.

24          Do you notice that?

25   A.    I do.

1    Q.   But looking at this application together with the earlier

2    June application -- well, let me go back.

3              Based on your training and experience, would it be

4    acceptable to you as a lending institution to accept an

5    application that has blank entries?  Should that have been --

6    A.   If we could catch it up front, and make the corrections,

7    that would be ideal.  But if things are incomplete and they're

8    missed by human error, this would not impact the losses that we

9    could take.  So it wouldn't -- we wouldn't go back and ask them

10   to correct it.

11   Q.   So because this was not entered, then you did not expect

12   to have any information in this application as to the ownership

13   of the Chino property that they currently had, correct?

14   A.   I'm sorry.  Can you repeat that for me?

15   Q.   There are two items here.  One is, "Do you have an

16   ownership interest in a property," and that's left blank.

17   A.   Yes.

18   Q.   Therefore, you have another section, don't you, as what

19   you have a schedule of real estate owned.

20              Do you see that?

21   A.   Yes.

22   Q.   And it's left blank?

23   A.   Yes, it is.

24   Q.   Now, this is your second application, correct?

25   A.   It is.  It's the final application.

1   Q.   And by this time, you know that something should be there.

2   Because these three gentlemen own a home, correct?

3   A.   Yes.  If all three owned the home, then it should be on

4   all three applications.

5   Q.   And the fact that it is not in there means that a mistake

6   was made along the way of compiling this document?

7   A.   Clerical data entry mistake, yes.

8   Q.   Now, with regards to the entries as to the accounts, you

9   were asked before if the account information that appears in

10  section six should be reflective of the account information for

11  that individual completing that.

12          Remember that?

13  A.   I do, yes.

14  Q.   And you were asked specifically about the 5865 account and

15  the 4986 account in the context of another application for

16  another brother.

17          Remember that?

18  A.   I do.

19  Q.   And one belonged to Benny, and one belonged to Billy, but

20  none of those belonged to Johnny, correct?

21          Remember that?

22  A.   Yes.

23  Q.   So if these two accounts now are appearing in a document

24  that is being prepared by Johnny Khounthavong, there's a

25  mistake in those entries, correct?

1    A.    Yes.

2    Q.    And would it be possible for you to know whether that

3    mistake was made by Dien Phan or Natalie Tran?

4    A.    Yeah.  I'm not certain where that came from.

5    Q.    Whether it was made by your underwriters, it's not

6    possible now to --

7    A.    Without going back and reviewing our systems and our

8    histories, I wouldn't be able to tell you that.

9    Q.    And do you know whether anybody in your organization

10   discussed a possibility of a short sale with Natalie Tran?

11   A.    No, I'm not aware.

12   Q.    If Natalie Tran claims that she discussed the short sale

13   of a property with her bank rep at Flagstar, would that be

14   likely to be an untrue statement?

15   A.    I'm sorry.  A what statement?

16   Q.    Untrue, a false.

17   A.    I have no way of knowing if Natalie Tran communicated with

18   a representative of Flagstar about a short sale.

19   Q.    So if Natalie Tran talked to somebody at Flagstar about a

20   short sale, you would have no idea?

21   A.    I would have no idea.

22   Q.    Now, the July -- well, let me go back.

23         You reviewed this two applications, I take it, in

24   great detail, Mr. Bianchi, before you took the stand?

25   A.    Yes.

1   Q.   How would you explain things, for example, such as one

2   application listing different years of employment at the same

3   job as compared to the other application?

4   A.   The original application comes in based on what the

5   mortgage broker received or has information on employment

6   history.  During our underwriting process, we go through and we

7   do a verbal verification of employment for every borrower on

8   the transaction.  And at that point we do get a hire date, and

9   once we put that in, it will change the current -- the service

10  time on the job.

11  Q.   And you would try to correct mistakes that might have been

12  made along the way?

13  A.   Correct, or be more accurate with the information.

14  Q.   And if still the mistakes persist on the last application,

15  then those mistakes, we just simply don't know where they came

16  from.

17  A.   Right.

18          MR. DIAZ:  May I have one moment, Your Honor?

19          Nothing further, Your Honor.

20          THE COURT:  Redirect?

21          MS. CARTER:  Yes, Your Honor.

22                     **REDIRECT EXAMINATION**

23  BY MS. CARTER:

24  Q.   Good afternoon, again, Mr. Bianchi.

25  A.   Good afternoon.

1   Q.   You were asked on cross-examination about Exhibits 6 and

2   7.

3              Do you recall that?

4   A.   I do.

5   Q.   And do you recall that Exhibit 7 is the final URLA for

6   Benny Khounthavong?

7   A.   Yes.

8   Q.   Does that one contain an entry for the Chino property in

9   the schedule of real estate owned?

10  A.   I would have to see it again to be sure.

11  Q.   Can I direct your attention to second page of that

12  exhibit -- I'm sorry -- to the fourth page of that exhibit.

13  A.   Yes, it is included.

14  Q.   Now, the other two brothers didn't include this property

15  on their final applications in Exhibits 6 and 8; is that

16  correct?

17  A.   Yes, that is correct.

18  Q.   Well, on cross-examination, you were asked whether those

19  blanks in the schedule of real estate owned for Exhibits 6 and

20  8 influenced Flagstar Bank's evaluation of risk.

21             Do you recall that?

22  A.   I do.

23  Q.   When evaluating the risk of this loan, did Flagstar take

24  into account for all of the borrowers the representations made

25  in the schedule of real estate owned for all three final loan

```
 1   applications?
 2           MR. CANTALUPO:  Objection, vague.
 3           THE COURT:  Objection is sustained.
 4   BY MS. CARTER:
 5   Q.   What representations did Flagstar take into account
 6   regarding the Schedules of Real Estate Owned in the final set
 7   of loan applications, Exhibits 6 through 8?
 8   A.   The Chino property was listed on one final loan
 9   application, not all three of them.  As I've mentioned in
10   previous testimony, we aggregate that data.  So regardless of
11   whose 1003 it showed up on, we still factor that property into
12   our analysis to assess our risk from a repayment as well as
13   occupancy standpoint.
14   Q.   How could it affect Flagstar's lending decision if that
15   market value number of $750,000 was overstated by approximately
16   more than $250,000?
17   A.   We would potentially -- pardon me.  Let me rephrase that.
18           We would ask for additional information about what
19   was going on with the property, and the intent.  And depending
20   on the explanation that we received, we may or may not have
21   proceeded with this transaction.
22   Q.   How could it influence Flagstar Bank's lending decision if
23   the Chino property listed in this exhibit could have been
24   foreclosed on?
25   A.   I'm sorry.  Can you say that last part again?
```

1    Q.   How could it affect Flagstar Bank's lending decision if

2    this Chino property could be foreclosed on shortly after

3    Flagstar was granted the loan?

4    A.   Well, if we knew about any late payments or a notice of

5    default on the Chino property, what would have come into

6    question is what we call the willingness to repay, and that

7    goes through the current and past credit history.  And if we

8    have a situation where somebody is struggling on a current

9    property, we most likely will not grant a new loan because of

10   the risk of repayment.

11   Q.   How could it influence Flagstar Bank's lending decision if

12   the Chino property listed in this exhibit could be subject to a

13   short sale in the near future?

14   A.   Potentially, again, we would have asked for some

15   additional information, documentation.  To answer the question,

16   we may not have proceeded with this transaction.

17   Q.   Was there any notice in any document in the loan files for

18   either the initial submission in June of 2011 or the final loan

19   document package from July 2011 that gave Flagstar -- that

20   suggested that there was a different present market value for

21   the Chino property other than $750,000 listed in the loan

22   applications?

23   A.   No, there was no other documents in the file that

24   indicated any other value.

25   Q.   Could it influence Flagstar's lending decision if a

1    present market value under $500,000 was listed for this Chino

2    property on one of the loan applications?

3    A.    Yes.

4    Q.    How so?

5    A.    We would have had inconsistencies between applications;

6    therefore, any time we have an inconsistency within

7    underwriting, we are required to address it and at that point

8    determine the risk that it presents to our bank.

9    Q.    How could an inconsistency of a present market value of

10   $500,000 versus $750,000 be different for Flagstar than the

11   inconsistencies that you reviewed on cross-examination of

12   $750,000 versus no entry at all for the Chino property?

13   A.    There really isn't much difference there.

14   Q.    You testified on cross-examination that when the schedules

15   of real estate owned were left blank in the final application

16   for Benny -- for Billy Khounthavong and Johnny Khounthavong,

17   that didn't matter because there was a schedule of real estate

18   owned that Flagstar evaluated for Benny Khounthavong.

19          Do you recall that?

20   A.    I do.

21   Q.    If one of the brothers had listed a market value of

22   $500,000 for the Chino property, stating that it was

23   underwater, could that have influenced Flagstar's lending

24   decision?

25   A.    Yes, it could have.

```
 1              MS. CARTER:  May I have a moment, Your Honor?
 2          No further questions at this time.
 3              THE COURT:  Mr. Bianchi, what property have we been
 4  talking about this last two days?  Is that the Corona property?
 5              THE WITNESS:  Primarily, yes, the Corona property.
 6              THE COURT:  Is there any other property that the loan
 7  was being applied for?
 8              THE WITNESS:  Not applied for, but we had the Chino
 9  property that we had to include in our analysis.
10              THE COURT:  And in terms of the Corona property, this
11  is the grant of the loan on the Corona property?
12              THE WITNESS:  Yes, sir.
13              THE COURT:  And it was given by the bank?
14              THE WITNESS:  Yes, Your Honor.
15              THE COURT:  Is it still existing?
16              THE WITNESS:  I'm not sure today.  We sold the loan
17  in March of 2013 to another investor.
18              THE COURT:  So you have no interest in that loan at
19  all today.
20              THE WITNESS:  That is correct, Your Honor.
21              THE COURT:  All right.
22              MR. CANTALUPO:  Thank you, Your Honor.
23                      RECROSS-EXAMINATION
24  BY MR. CANTALUPO:
25  Q.   Mr. Bianchi, I want to address government's questions to
```

1   you just now where she talked about -- prosecutor talked about

2   information being presented by one brother on a loan

3   application.

4           That's not entirely correct, is it, because Flagstar

5   prepares these loan applications; isn't that true?

6   A.   We do not prepare the initial, we prepare the final.

7   Q.   So on the final loan applications, and those would have

8   been the July 18th package of documents, correct?

9   A.   Yes.

10  Q.   And just to be clear again:  Those documents are generated

11  by Flagstar, correct?

12  A.   Correct.

13  Q.   And they are based on information that Flagstar has

14  collected in its loan file, correct?

15  A.   Correct.

16  Q.   And all the information in its loan file relates to each

17  of the potential co-borrowers here, the three brothers on

18  trial, correct?

19  A.   That is correct.

20  Q.   And so when there is a representation on one loan

21  application that one of the brothers has property in Chino,

22  California, and it's not on another brother's loan application,

23  from Flagstar's point of view, that is not an inconsistency,

24  correct?

25  A.   No.   That is correct.

1   Q.   Because Flagstar knows about the property.  That's the

2   bottom line.

3   A.   Yes.

4   Q.   And just to be clear:  In preparing these documents that

5   Flagstar prepares, the information that goes into them is only

6   what is necessary for Flagstar to make its determination of

7   risk; isn't that correct?

8   A.   We include all data and figures in our analysis that we

9   are utilizing to obtain insurance on a loan.

10  Q.   And so, again, if I understood your testimony earlier

11  today correctly, sometimes Flagstar doesn't need to list every

12  single asset that a potential borrower has, correct?

13  A.   That is correct.

14  Q.   But the liability section is what is important to

15  Flagstar.

16  A.   Yes, it does.

17  Q.   And so in the Chino property that these brothers owned,

18  the most important number to Flagstar was the liability, the

19  mortgage on the Chino property, correct?

20  A.   From a debt qualification standpoint, correct.  The

21  occupancy component also comes into play any time we have real

22  estate on an application.

23  Q.   And by "occupancy," you just mean who was living in the

24  Chino property?

25  A.   Who is going to live in my house.  The loan that Flagstar

1  is doing the financing for, yeah, that is specifically what we

2  address.

3  Q.   Who is going to live in the Corona property, correct?

4  A.   Correct.

5  Q.   That is because that's the property that would be the

6  collateral for Flagstar Bank?

7  A.   You are correct, yes.

8          MR. CANTALUPO:  Thank you.

9          THE COURT:  Recross, the Defendant Benny.

10                    **RECROSS-EXAMINATION**

11  BY MR. BRAUN:

12  Q.   And just following up, because Flagstar viewed the Chino

13  property as a debt of $745,000 rather than a significant asset,

14  that is why Flagstar didn't conduct an appraisal of that

15  property; is that correct?

16  A.   We're not required to obtain an appraisal from any of the

17  investors or the government-sponsored entities out there to

18  establish what an existing primary residence or rental property

19  value is worth.  We do go by what a borrower puts on the

20  application.

21  Q.   But if you were relying on a home, say, as a $750,000

22  asset available for the borrower to use to pay your mortgage,

23  you would want to verify in some way that value of the home; is

24  that correct?

25  A.   If we're talking about a liquid asset, I would -- yes.

1   Q.   And again, the reason why it wasn't needed really was the

2   Chino home was viewed as a significant liability or debt by the

3   borrowers; is that correct?

4   A.   That is correct, and net worth was not evaluated.

5   Q.   Now, lastly, if the brothers no longer had the Chino home

6   after you closed the loan with them, whether it was through

7   short sale or foreclosure or just a conventional sale, that

8   would have reduced their monthly expenses by approximately 6500

9   a month; is that correct?

10  A.   Yes.

11  Q.   And what I'm basing on is the URLA.  They listed the

12  carrying costs for the mortgage on the Chino property as being

13  $6,499 a month.

14       Do you recall that?

15  A.   Yes.

16  Q.   And certainly if they had $6500 less a month in monthly

17  expenses, it would have made it easier for them to continue to

18  pay the mortgage on the Corona home; is that correct?

19  A.   That is correct.

20       MR. BRAUN:  Nothing further.

21       THE COURT:  Defendant Johnny.

22                    **RECROSS-EXAMINATION**

23  BY MR. DIAZ:

24  Q.   Mr. Bianchi, going back to the value of the Chino

25  property.  If your bank was interested in finding out what the

```
 1    value of that was, there's a number of tools available at your

 2    disposal, correct?

 3    A.   There certainly are, yes.

 4              MS. CARTER:  Objection.  The court's prior ruling.

 5              THE COURT:  Objection is overruled.

 6    BY MR. DIAZ:

 7    Q.   You could do an appraisal yourself?

 8    A.   I could, but it would be a cost to my bank.

 9    Q.   Of course.

10              You also have a way of looking at the tax assessor's

11    value, correct, if you want to look at it?

12    A.   Assuming the assessor's in line with market value.

13    Q.   Not always, but you could take a look at that readily?

14    A.   It should give you a ballpark, yes.

15    Q.   And there may be some newer Internet sources, correct?

16    A.   That is correct.

17    Q.   Zillow comes to mind?

18    A.   Yes.

19    Q.   There are other web pages, websites, that give you an

20    estimate?

21    A.   Yes.

22    Q.   Those things are readily available to you and your bank,

23    correct?

24    A.   Yes, they are.

25    Q.   Now, you said that your bank kept the loan until 2013?
```

```
1    A.    That is correct.

2    Q.    After the time that you gave control of the loan to

3    somebody else, the loan was current, correct?

4    A.    The loan was performing, yes.

5    Q.    It was not in default?

6    A.    That is correct.

7    Q.    There was not late payments?

8    A.    No, sir.

9              MR. DIAZ:  Nothing further, Your Honor.

10             THE COURT:  All right.  The number of -- so I can

11   clarify it for the jury -- the number of $750,000 was the

12   figure that the bank -- that your bank had for the Chino

13   property?

14             THE WITNESS:  Yes, Your Honor.

15             THE COURT:  And your bank made a loan based upon

16   $750,000 as a obligation of the Chino property; is that right?

17             THE WITNESS:  Just to clarify, Your Honor --

18             THE COURT:  You had that figure of $750,000 as the,

19   quote, "value" of the Chino property.

20             THE WITNESS:  Correct.  Right.  Which was greater

21   than the current balance on the mortgage.

22             THE COURT:  Well, you would have liked better, the

23   number on the value of the property, would you not, in making

24   the loan?

25             THE WITNESS:  That is correct, Your Honor.
```

1          THE COURT:  So you would have rather had had the

2    figure of $540,000 on the claim for the Chino property.

3          THE WITNESS:  If that's what current market value

4    was, yes, sir.

5          THE COURT:  Or the mortgage.

6          THE WITNESS:  Well, the value is what we weigh in

7    with the mortgage.

8          THE COURT:  All right.

9          You may step down.

10         THE WITNESS:  Thank you.

11         THE COURT:  Call your next witness.

12         MR. MIDDLETON:  Your Honor, at this time the

13   government calls Ms. Laura Meadows.

14         And, Your Honor, with this witness, the government

15   will be using Exhibits 6, 7, 8, 9, and 10, all of which have

16   previously been admitted into evidence.

17         (Witness sworn.)

18         THE WITNESS:  I do.

19         THE CLERK:  Thank you.  Please take a seat.

20         Please state your full name and true name for the

21   record, and spell your last name.

22         THE WITNESS:  Laura Joanne Meadows, M-e-a-d-o-w-s.

23   ///

24   ///

25

1      __LAURA MEADOWS; GOVERNMENT'S WITNESS, SWORN, TESTIFIED:__

2                          __DIRECT EXAMINATION__

3      BY MR. MIDDLETON:

4      Q.   Ms. Meadows, good afternoon.

5      A.   Thank you.

6      Q.   Are you currently employed?

7      A.   No.

8      Q.   And do you currently receive income by providing services

9      as a notary republic -- I'm sorry -- notary public?

10     A.   Can you repeat the question?

11     Q.   My question was, do you currently receive income by

12     providing services as a notary public?

13     A.   I still have my license.  I have not used it for -- as a

14     source of income for a while, no.

15     Q.   Okay.

16              Now, how long have you been a notary public?

17     A.   Since approximately 2003.

18     Q.   And exactly what is a notary public?

19     A.   We witness the signing of certain legal documents that

20     need to be notarized for record.

21     Q.   Now, in the past, have you been employed in jobs involving

22     real estate transactions?

23     A.   Yes.

24     Q.   And what position have you held?

25     A.   An assistant to a loan officer.

1    Q.   And for what period of time, roughly, were you an

2    assistant to a loan officer?

3    A.   I'd say from 2003 to maybe 2009.

4    Q.   Now, going back to your services as a notary public, in

5    order to be a notary public, are there certain qualifications

6    or certifications that you have to have?

7    A.   Yes, you have to pass a background check; you have to take

8    a state exam; and that's about --

9    Q.   And you did those things?

10   A.   Yes.

11   Q.   Now, in your capacity as a notary public, have you had

12   occasion to notarize loan documents and other documents

13   associated with real estate transactions?

14   A.   Yes.

15   Q.   And have some of those occasions involved notarizing

16   documents as part of the loan closing process?

17   A.   Yes.

18   Q.   And what's a closing?

19   A.   A closing is at the end of a transaction, the final

20   documentation before the loan closes.

21   Q.   And how many times would you estimate that you've

22   notarized the documents as part of closings?

23   A.   Hundreds of times.  I mean, when I was doing it actively.

24   Q.   And were you doing it actively back in 2011?

25   A.   To a certain degree, yes.

1   Q.   Now, when you notarize a document, exactly what are you

2   saying or what are you representing by your signature and by

3   your stamp?

4   A.   You properly identify the people and match them with the

5   names on the documents, and you check their identification, and

6   you witness that they are the people signing.

7   Q.   I'm going to place on the display what has been admitted

8   into evidence as Exhibit No. 9, and I'm going to display the

9   first page.

10        Ms. Meadows, do you recognize this document?

11  A.   Yes, a deed of trust.

12  Q.   Now, is that a document that you would normally notarize

13  as part of a closing?

14  A.   Yes.

15  Q.   And I'm going to now place on the display page seven of

16  Exhibit No. 9.

17        Is this deed of trust that is Exhibit No. 9, is that

18  a document that you notarized?

19  A.   Yes, that is my seal and my signature.

20  Q.   And you recognize both your seal and your signature on

21  that document?

22  A.   Yes.

23  Q.   And in notarizing this document, who are the individuals

24  who appeared before you to sign the deed of trust?

25  A.   I can see -- well, there were three names:  Johnny, Billy,

1    and Benny Khounthavong.

2    Q.    Now, do you have any recollection of those individuals

3    signing this document?

4    A.    Not in particular, no.

5    Q.    Now, does it also include the date that this

6    certification -- I'm sorry -- this notarization was done?

7    A.    Yes, it does.

8    Q.    And that would be July 18th of 2011?

9    A.    Yes.

10   Q.    So, Ms. Meadows, would this document be part of a closing

11   for the Khounthavongs that occurred on July 18th of 2011?

12   A.    Yes.

13   Q.    Now, in addition to the deed of trust, are there other

14   documents that would be signed at a closing?

15   A.    Yes, there's other documentations involved.

16   Q.    And in a typical closing, would those documents include

17   the loan applications?

18   A.    Yes, typically.

19   Q.    And you should have in front of you Exhibits 6, 7 and 8.

20         Can you take a look at those exhibits, and let me

21   know when you've had a chance to look at them.

22   A.    Okay.

23   Q.    And have you had a chance to look at those?

24   A.    Yes.

25   Q.    And what are Exhibits 6, 7 and 8?

1    A.    Loan applications for each of the borrowers.

2    Q.    And when you say "each of the borrowers" --

3          THE COURT:  Approach the bench.

4                (Proceedings held at sidebar:)

5          MR. MIDDLETON:  They did, in fact, appear and sign

6    the documents.  She is going to be very short.  I don't have --

7          THE COURT:  Can you stipulate that she did sign them?

8          MR. DIAZ:  Yes.

9          MR. CANTALUPO:  Yes.

10         MR. BRAUN:  Yes.

11         THE COURT:  It's taken care of.  We don't need her.

12         (Proceedings resumed in open court)

13         THE COURT:  Ladies and gentlemen of the jury, it's

14   been stipulated that the defendants' signatures on the

15   documents that have been presented have been made by them.

16         Thank you.  You may step down.

17         MR. CANTALUPO:  Your Honor, we do have questions for

18   this witness that are not related to the signatures themselves.

19         THE COURT:  All right.

20                      **CROSS-EXAMINATION**

21   BY MR. CANTALUPO:

22   Q.    Good afternoon, Ms. Meadows.

23   A.    Hello.

24   Q.    In the notarization process, it's true that you need to

25   identify the identity of the person signing, correct?

1    A.    Yes.

2    Q.    You look at their driver's license?

3    A.    Correct.

4    Q.    In real estate transactions, it's also true that the

5    person signing would need to put a fingerprint down, correct?

6    A.    Correct.

7    Q.    It's also true that in these loan closings, there is a lot

8    of papers that need to be signed and initialed, correct?

9    A.    Yes.

10   Q.    And you sit there and you point out where the signature

11   needs to go?

12   A.    Yes.  I mean, I would tell them the signature spots.

13   Sometimes it's highlighted; sometimes it's not.  It depends on

14   how they were packaged through the escrow company.

15   Q.    And based on your experience in notarizing real estate

16   transaction closings, it would be fair to say that that process

17   of signing and initialing takes between a half hour to an hour,

18   correct?

19   A.    Correct.

20         MR. CANTALUPO:  Thank you.

21         THE COURT:  You may step down.

22         MR. DIAZ:  Your Honor, I'm sorry.  May I, please?

23   I'll be very brief.

24   ///

25   ///

1              **<u>CROSS-EXAMINATION</u>**

2     BY MR. DIAZ:

3     Q.   Ms. Meadows, you were interviewed by the case agent in

4     this case back in November of 2013.

5              Do you remember that?

6              THE COURT:  No, Counsel, please.

7              You may step down.

8              MR. DIAZ:  Your Honor, may I have a --

9              THE COURT:  No.

10             You may step down.

11             She may step down.  It's been stipulated.

12             MR. DIAZ:  It's not related --

13             THE COURT:  It's stipulated by you and the other

14    counsel.

15             MR. DIAZ:  It has nothing to do with the signature

16    itself, Your Honor.

17             THE COURT:  All right.  Members of the jury, we'll

18    take a recess.  I would remind you of your duty not to converse

19    or otherwise communicate among yourselves or with anyone upon

20    any subject touching the merits of the cause on trial, and

21    you're not to form or express any opinion in the case until

22    it's finally submitted to you for your verdict.

23             Jury is excused until called; the court will remain

24    in session.

25       (Proceedings held outside the presence of the jury:)

1          THE COURT:  It's been stipulated that these

2    signatures, that's the only reason she was called, and that's

3    it, Counsel.

4          MR. DIAZ:  Your Honor, if she can remain on call for

5    the defense to call her back on our case.

6          THE COURT:  Subpoena her if you have something that

7    is important.

8          MR. DIAZ:  It is, Your Honor.  This witness made

9    statements that were false when she was first interviewed.  She

10   testified as to what had happened, she testified as to who was

11   present, she testified as to whether or not --

12         THE COURT:  Her impeachment doesn't make any

13   difference.  It was stipulated that she notarized the

14   signatures.  That's been stipulated, Counsel.  We don't need to

15   mess up things.  All right.

16         We'll be recess for ten minutes.

17                    (Recess)

18         THE COURT:  I'm going to send the jury home for

19   tonight, and get them back tomorrow morning, unless -- your

20   next witness will be whom?

21         MR. MIDDLETON:  Mr. Adam Herson, Your Honor.

22         THE COURT:  How long will he take?

23         MR. MIDDLETON:  I think the government's examination

24   would take maybe 40 minutes.

25         THE COURT:  Forty minutes?

1        MR. MIDDLETON:  That's correct, Your Honor.

2        THE COURT:  What is he going to testify about?

3        MR. MIDDLETON:  He's going to testify about the short

4   sale file, Your Honor.

5        THE COURT:  No.  We'll send them home.

6        Bring down the jury.

7        MR. MIDDLETON:  Your Honor, I may able to do it in

8   less time --

9        THE COURT:  We'll do it.

10                (Open Court - Jury Present)

11        THE COURT:  The record will show the jurors are all

12   present in their proper places; the defendants are present with

13   their counsel.

14        I'm going to excuse you until tomorrow morning at

15   ten o'clock.  I would remind you of your duty not to converse

16   or otherwise communicate among yourselves or with anyone upon

17   any subject touching the merits of the cause on trial, and

18   you're not to form or express any opinion in the case until

19   it's finally submitted to you for your verdict.

20        Jury is excused until ten o'clock tomorrow morning.

21   The jury is excused; the court will remain in session.

22     (Proceedings held outside the presence of the jury:)

23        THE COURT:  All right.  I want to address the

24   government:  The question in this case is that these people

25   made false statements to the loan, Flagstaff[sic] and the

1    so-called usual Bank of America that's had probably thousands

2    of the kind of thing that happened or wanted to happen at the

3    Chino house.

4         And unless, unless, Ms. Tran is going to testify that

5    these people told her to sign or didn't tell her about the

6    matters which were left blank or -- in those matters, because

7    what was told to the bank, Flagstaff at least, didn't bother

8    the giving of a mortgage.  So how is this jury going to

9    understand that, more specifically to the government, that

10   indictment is such a mess that this jury will not ever

11   understand those counts in that indictment.

12        Ten o'clock tomorrow morning.

13        (Proceedings concluded at 3:43 p.m.)

14                        - - - - -

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I hereby certify that pursuant to Section 753,

4    Title 18, United States Code, the foregoing is a true and

5    correct transcript of the stenographically reported proceedings

6    held in the above-entitled matter and that the transcript page

7    format is in conformance with the regulations of the Judicial

8    Conference of the United States.

9

10     Date:  June 1, 2015

11

12                    /S/_____

13                       Deborah K. Gackle
                         CSR No. 7106
14

15

16

17

18

19

20

21

22

23

24

25

**$**

$10,000 [1] 40/17
$2,000 [1] 24/23
$250,000 [1] 51/16
$3700 [1] 40/10
$3812 [1] 42/16
$4,135 [1] 33/2
$5,000 [1] 41/14
$500,000 [3] 53/1 53/10 53/22
$540,000 [1] 61/2
$5600 [1] 40/11
$6,000 [1] 40/5
$6,499 [1] 58/13
$6500 [1] 58/16
$700,000 [3] 41/6 41/10 42/17
$745,000 [1] 57/13
$750,000 [8] 51/15 52/1 53/10 53/12 57/21 60/11 60/16 60/18
$760,000 [1] 41/19
$762,000 [1] 40/24
$8,550 [1] 33/8

**/**

/S [1] 72/12

**0**

000001 [1] 27/23
0143 [1] 33/8

**1**

10 [2] 28/21 61/15
100 [1] 3/7
1003 [3] 9/8 26/4 51/11
101-page [1] 28/8
1014 [1] 7/5
104 [1] 28/8
104-page [1] 28/8
110 [5] 8/15 8/15 9/5 20/16 20/23
1113 [1] 3/7
114 [2] 32/10 32/11
1149 [1] 1/25
114th page [1] 32/12
115 [1] 32/23
12 [8] 8/14 9/13 9/16 9/24 10/4 21/8 21/11 22/4
13 [4] 4/7 8/14 9/25 10/5
13-904-R [2] 1/10 5/5
1400 [1] 2/7
14th Amendment [1] 5/22
15 [6] 8/14 9/6 12/5 12/6 12/8 43/16
161 [1] 31/24
17 [2] 12/6 12/8
18 [5] 12/20 12/21 12/23 13/5 72/4
1880 [1] 2/3
18th [6] 15/11 24/22 25/16 55/8 65/8 65/11
19 [2] 12/20 13/7
1:40 [1] 5/1

**2**

20 [6] 8/14 11/17 11/18 11/19 11/20 11/22
20 percent [1] 28/21
2003 [2] 62/17 63/3
2008 [1] 24/15
2009 [1] 63/3
2011 [13] 9/20 12/15 28/7 28/14 29/2 31/9 31/13 35/23 52/18 52/19 63/24 65/8 65/11
2013 [3] 54/17 59/25 68/4
2015 [3] 1/18 5/1 72/10
213 [1] 1/25
213-745-7447 [1] 2/17
213-745-7477 [1] 2/17
215 [10] 26/19 26/23 26/24 27/1 31/10 31/12 31/13 31/23 32/10 32/11

2270 [1] 2/24
2272 [1] 2/24
22nd [2] 12/14 26/21
238 [15] 26/19 26/22 26/24 27/1 27/5 27/17 27/23 27/25 28/8 28/12 29/6 30/6 34/3 34/4 34/8
2637 [1] 3/8
27 [2] 4/7 4/8

**3**

30th [1] 24/15
310-277-2270 [1] 2/24
310-277-2272 [1] 2/24
310-388-6016 [1] 3/8
310-397-2637 [1] 3/8
312 [2] 1/24 2/8
3702 [1] 40/16
3:43 [1] 71/13

**4**

40 [1] 69/24
402A [1] 1/24
41 [2] 29/5 29/14
41st [1] 29/10
42nd [1] 30/5
43 [1] 30/13
450 [1] 2/16
49 [1] 4/8
4986 [3] 30/15 31/1 47/15

**5**

5,000 [1] 40/5
50 [1] 27/20
55 [1] 40/10
5617 [1] 40/16
5865 [1] 47/14
5954 [1] 33/3
5th [1] 9/20

**6**

6016 [1] 3/8
62 [1] 4/10
620-1149 [1] 1/25
6500 [1] 58/8
66 [1] 4/10
68 [1] 4/10

**7**

71 [1] 1/21
710 [1] 2/23
7106 [1] 72/13
714 [1] 2/16
74 [2] 34/3 34/8
7447 [1] 2/17
7477 [1] 2/17
753 [1] 72/3

**8**

80 [2] 28/23 32/7
89 [1] 6/10

**9**

90 [1] 23/17
90 percent [2] 28/23 32/7
90012 [2] 1/24 2/8
90015 [1] 2/16
90067 [1] 2/23
90401-1113 [1] 3/7
91 [7] 23/18 23/21 23/24 30/19 30/22 31/2 31/3
940 [1] 3/7

**A**

able [4] 17/6 21/18 48/8 70/7

about [38] 5/22 6/3 14/3 14/3 16/18 16/21 16/24 18/11 21/11 24/13 27/18 28/8 32/2 32/6 32/7 32/12 33/22 35/11 35/22 38/14 40/5 41/17 43/13 47/14 48/18 48/19 50/1 51/18 52/4 54/4 55/1 55/1 56/1 57/25 63/8 70/2 70/3 71/5
above [1] 72/6
above-entitled [1] 72/6
accept [1] 46/4
acceptable [1] 46/4
According [16] 25/4 25/5 25/15 30/15 30/22 31/1 31/3 31/5 33/2 33/8 47/9 47/10 47/14 47/15 50/24 51/5
accounts [5] 25/1 26/2 26/3 47/8 47/23
accurate [2] 33/15 49/13
acknowledgment [1] 28/20
acquired [1] 23/14
acronym [1] 9/12
act [1] 33/24
acting [5] 7/15 9/16 21/14 21/17 21/21
actively [2] 63/23 63/24
actually [2] 37/25 44/7
adam [5] 2/22 2/22 2/25 5/14 69/21
add [1] 40/15
added [1] 9/15
addition [3] 29/18 32/17 65/13
additional [6] 23/11 26/2 27/16 40/7 51/18 52/15
address [13] 9/3 29/15 29/18 29/24 30/8 32/20 39/6 39/18 39/22 53/7 54/25 57/2 70/23
addressed [1] 34/7
adequately [1] 6/19
admit [1] 23/21 26/22
admitted [3] 7/23 61/16 64/7
advise [1] 34/22
advised [1] 33/23
advising [1] 13/12
affect [2] 51/14 52/1
after [8] 9/19 36/3 36/8 36/15 40/7 52/2 58/6 60/2
afternoon [12] 5/8 5/12 5/14 5/16 8/19 13/21 37/3 37/4 49/24 49/25 62/4 66/22
again [17] 21/8 22/5 25/15 31/23 32/2 32/16 33/14 37/19 40/1 45/12 49/24 50/10 51/25 52/14 55/10 56/10 58/1
agent [9] 2/10 5/10 9/16 21/11 33/23 33/24 34/14 34/23 68/3
aggregate [2] 25/12 51/10
aggregating [1] 33/14
ago [1] 30/18
agree [3] 26/8 41/19 42/17
agreements [2] 36/3 36/15
agrees [1] 22/14
al [2] 1/11 5/6
all [44] 6/13 7/25 8/4 8/8 13/5 13/12 13/14 14/15 14/18 14/18 14/23 18/12 24/12 25/8 25/10 25/13 26/11 26/13 26/13 29/22 33/14 33/15 39/5 41/23 41/23 47/3 47/4 50/24 50/25 51/9 53/12 54/19 54/21 55/16 56/8 60/10 61/8 61/15 66/19 68/17 69/15 70/11 70/23
allegations [1] 7/18
alleged [1] 7/6
allow [3] 21/16 35/24 36/2
allowed [2] 9/18 44/4
almost [1] 44/19
along [4] 6/21 39/23 47/6 49/12
already [2] 9/22 20/18
also [18] 2/10 5/10 6/19 6/25 7/4 9/9 13/14 19/8 22/13 22/20 32/20 39/2 39/23 56/21 59/10 65/5 67/4 67/7

**A**

always [1]  59/13
am [3]  17/15 22/8 37/13
Amendment [1]  5/22
AMERICA [8]  1/8 5/6 24/7 25/1 25/14 30/15
31/5 71/1
among [2]  68/19 70/16
amount [3]  6/2 20/5 25/25
analysis [4]  26/4 51/12 54/9 56/8
ANGELES [4]  1/17 1/24 2/8 2/16 2/23 5/1
another [8]  9/10 13/11 41/25 46/18 47/15
47/16 54/17 55/22
answer [3]  19/10 37/20 52/15
any [33]  7/7 7/13 7/22 9/20 10/19 10/23
10/24 11/1 11/3 11/8 18/4 20/9 23/11 25/9
26/1 35/5 41/15 45/22 46/12 52/4 52/17
52/17 52/24 53/6 54/6 56/21 57/16 65/2
68/20 68/21 69/12 70/17 70/18
anybody [1]  48/9
anyone [2]  68/19 70/16
anything [1]  6/7
apologize [1]  15/22
apparently [1]  6/2
appear [4]  33/4 33/10 33/19 66/5
appearance [1]  5/7
APPEARANCES [2]  2/1 3/1
appeared [1]  64/24
appearing [2]  5/13 47/23
appears [9]  29/11 30/15 31/6 31/7 32/13
32/23 34/12 38/5 47/9
applicant [1]  40/4
application [73]
applications [27]  6/24 14/25 15/8 17/4 25/11
27/9 27/14 29/23 30/7 33/17 36/8 36/14
37/15 37/19 38/12 47/4 48/23 50/15 51/1
51/7 52/22 53/2 53/5 55/5 55/7 65/17 66/1
applied [3]  12/18 54/7 54/8
applying [2]  11/15 25/7
appraisal [4]  35/12 57/14 57/16 59/7
appraisals [1]  35/16
Approach [1]  66/3
appropriate [4]  33/6 33/16 33/17 37/21
approval [3]  8/22 13/23 43/17
approve [1]  20/20
approving [1]  20/22
approximately [4]  31/24 51/15 58/8 62/17
are [56]  8/4 8/5 8/9 8/9 10/1 12/10 12/12
14/4 14/8 14/11 14/19 15/3 15/16 17/14
18/15 20/6 20/22 22/6 22/14 23/7 23/8 25/7
26/7 30/7 35/14 37/14 37/14 37/18 37/22
38/14 39/10 40/8 44/4 46/7 46/15 47/23 53/7
55/10 55/13 56/9 57/7 59/3 59/19 59/22
59/24 62/6 63/5 64/1 64/2 64/6 64/23 65/13
65/25 66/18 70/11 70/12
area [1]  39/10
around [2]  12/14 18/22
as [60]  5/20 5/23 5/25 6/6 6/22 6/22 7/13 9/3
9/3 9/8 9/16 9/16 9/17 21/21 21/21 21/23
21/23 22/6 22/17 24/9 26/2 33/15 33/15
33/24 33/24 33/24 35/14 35/19 38/24 39/18
41/2 43/19 45/12 46/4 46/12 46/18 47/8 49/1
49/3 51/9 51/12 51/12 57/13 57/21 58/2
58/12 60/16 60/18 62/9 62/12 62/13 63/4
63/11 63/16 63/22 64/8 64/13 69/10 69/10
69/11
ask [5]  8/13 26/18 35/11 46/9 51/18
asked [10]  14/8 14/11 13/22 43/14 45/8 47/9
47/14 50/1 50/18 52/14
assess [3]  10/10 14/21 51/12
assessor's [2]  59/10 59/12
asset [6]  24/22 26/2 56/12 57/13 57/22 57/25
assets [7]  26/1 26/7 26/11 26/13 41/15 41/16

**41/24**

assistant [3]  2/7 62/25 63/2
associated [1]  63/13
assuming [2]  25/14 59/12
at [69]  5/10 5/19 6/19 7/3 7/19 11/1 11/13
11/25 12/12 13/2 13/11 13/16 13/22 15/4
16/4 18/22 22/5 23/14 24/3 24/5 25/24 26/20
27/9 27/22 27/25 28/1 28/2 28/7 28/21 29/10
29/14 31/2 31/23 32/10 32/23 33/13 33/15
37/19 41/1 41/4 42/7 42/9 43/5 44/19 46/1
48/13 48/19 49/2 49/8 53/7 53/12 54/2 54/18
59/1 59/10 59/11 59/13 61/12 63/19 65/14
65/20 65/21 65/23 66/4 67/2 70/14 71/2 71/7
71/13
att.net [1]  3/9
attachment [1]  16/17
attempt [1]  20/1
attention [11]  9/6 9/13 9/24 11/17 12/5 12/20
21/8 27/19 29/5 40/22 50/11
ATTORNEY [1]  2/5
ATTORNEYS [1]  2/7
authorization [2]  12/12 13/1
automatically [2]  41/21 41/23
available [5]  57/22 59/1 59/22
aware [3]  11/1 14/23 48/11

**B**

B-i-a-n-c-h-i [1]  8/12
back [18]  17/20 17/24 18/13 18/17 24/15
24/18 42/22 42/23 46/2 46/9 48/7 48/22
58/24 63/4 63/24 68/4 69/5 69/19
background [1]  63/7
balance [2]  23/2 60/21
ballpark [1]  59/14
bank [60]  6/14 9/20 10/6 10/19 13/22 13/25
16/20 17/4 17/5 17/19 17/23 18/3 18/4 18/11
18/12 18/16 18/17 19/8 19/13 19/20 20/13
20/17 20/19 21/13 21/19 22/14 22/23 23/5
23/12 24/7 24/7 24/10 25/1 25/4 25/4 25/9
25/9 25/14 25/16 25/21 25/21 26/6 26/8
30/10 30/14 30/22 31/5 48/13 53/8 54/13
57/6 58/25 59/8 59/22 59/25 60/12 60/12
60/15 71/1 71/7
bank's [10]  18/20 18/24 19/12 19/19 19/25
22/21 50/20 51/22 52/1 52/11
based [14]  23/24 31/7 31/22 38/18 41/14
41/23 43/12 43/21 44/23 46/3 49/4 55/13
60/15 67/15
basically [2]  17/20 18/11
basing [1]  58/11
be [84]
because [23]  5/24 6/11 6/20 7/10 9/15 16/20
17/6 17/6 22/17 32/9 40/13 41/22 43/6
45/21 46/11 47/2 52/9 53/17 55/4 56/1 57/5
57/12 71/6
becomes [1]  18/21
been [26]  5/20 6/2 6/25 8/22 12/14 15/14
25/23 28/14 32/4 35/1 37/10 46/5 49/11
51/23 54/3 55/8 61/16 62/21 64/7
66/14 66/15 66/15 68/11 69/1 69/14
before [12]  8/14 8/25 19/11 24/1 27/5 36/3
42/10 42/11 47/9 48/24 63/20 64/24
behalf [2]  5/9 5/17
behind [2]  44/13 45/5
being [7]  17/2 17/3 33/23 47/24 54/7 55/2
58/12
believe [4]  17/10 20/18 23/19 31/10
belonged [3]  47/19 47/19 47/20
belonging [2]  30/23 31/5
belongs [2]  33/3 33/8
bench [1]  66/3
BENNY [25]  2/20 5/15 9/9 10/17 16/1 24/9
26/17 29/4 29/10 30/13 31/6 32/13 32/16

**33/4 38/8 38/12 38/19 44/16 45/3 47/19 50/6
53/16 53/18 57/9 65/4**
better [2]  23/5 60/22
between [5]  7/16 26/21 28/10 53/5 67/17
beyond [2]  18/7 19/5
BIANCHI [11]  4/6 5/11 8/12 8/19 9/11 42/14
48/24 49/24 54/3 54/25 58/24
bigger [1]  37/20
BILLY [24]  1/11 3/4 5/6 5/13 9/9 10/20
10/24 13/18 16/14 24/8 24/11 24/21 25/15
30/23 31/6 33/3 33/9 33/10 33/18 38/13 45/4
47/19 53/16 64/25
bit [1]  15/25
blank [7]  16/17 45/23 46/5 46/16 46/22
53/15 71/6
blanks [1]  50/19
body [1]  55/11
books [1]  20/12
borrower [15]  8/25 8/25 14/15 17/2 17/17
17/19 18/5 26/12 35/15 40/18 44/5 49/7
56/12 57/19 57/22
borrower's [4]  12/11 13/1 15/4 25/5
borrowers [31]  9/7 11/14 12/1 13/12 14/1
14/4 14/4 14/8 14/11 14/18 15/3 16/2 16/8
17/7 21/22 25/7 25/13 28/10 28/24 29/15
32/3 35/9 35/24 36/2 36/7 36/13 50/24 55/17
58/3 66/1 66/2
borrowers' [3]  14/25 17/3 25/10
both [7]  6/11 6/18 33/24 34/17 34/24 40/15
64/20
bother [1]  71/7
bottom [5]  13/4 19/19 28/2 31/23 56/2
Boulevard [2]  2/16 3/7
Braun [3]  2/22 2/22 5/14
braunesquire.com [1]  2/25
brief [1]  67/23
Briefly [2]  30/20 30/21
bring [5]  6/7 7/25 35/25 44/4 70/6
broker [5]  21/1 21/4 21/6 34/20 49/5
brother [2]  47/16 55/2
brother's [2]  33/20 55/22
brothers [21]  11/4 11/9 12/17 13/5 13/14
15/7 27/13 28/7 28/13 29/23 30/7 32/4 32/16
35/19 44/12 50/14 53/21 55/17 55/21 56/17
58/5
brought [2]  36/7 36/13
but [26]  5/19 6/6 6/16 14/14 16/20 18/19
19/15 19/19 20/6 23/20 24/10 25/7 26/3
37/20 38/11 40/12 43/5 44/6 46/1 46/7 47/19
54/8 56/14 57/21 59/8 59/13
buy [1]  9/21
buyers [1]  21/2

**C**

CA [3]  2/16 2/23 3/7
CALIFORNIA [9]  1/2 1/17 1/24 2/8 5/1 16/5
39/7 39/10 55/22
call [6]  12/11 44/4 52/6 61/11 69/4 69/5
called [3]  68/23 69/2 71/1
calls [4]  21/24 34/10 36/21 61/13
came [2]  48/4 49/15
can [27]  5/25 5/25 7/6 7/9 7/23 9/1 22/16
22/25 23/7 23/17 30/11 31/2 34/14 36/10
39/2 41/15 42/9 42/22 44/8 52/11 51/25
60/10 62/10 64/25 65/20 66/7 69/4
can't [1]  41/22
Canceled [1]  24/9
Cantalupo [3]  3/6 3/6 5/13
capacities [3]  6/22 6/22 21/14
capacity [6]  17/10 18/15 21/17 21/22 22/6
63/11
card [4]  33/1 33/2 33/4 33/18
care [1]  66/11

# C

carrying [1] 38/12
CARTER [2] 2/6 5/9
case [17] 6/5 7/4 7/5 8/1 12/14 15/7 21/5
29/23 32/3 36/6 36/12 68/3 68/4 68/21 69/5
70/18 70/24
cases [2] 6/3 23/7
cash [1] 24/23
catch [1] 46/6
cause [2] 68/20 70/17
CENTRAL [1] 1/2
Century [1] 2/23
certain [4] 48/4 62/19 63/5 63/25
certainly [2] 58/16 59/3
certification [2] 12/11 65/6
certifications [1] 63/6
certify [1] 72/3
challenges [1] 34/18
chance [4] 24/5 30/18 65/21 65/23
change [2] 17/5 49/9
check [2] 63/7 64/5
checks [1] 24/10
Chino [38] 10/20 10/25 11/5 11/10 16/5
16/18 16/21 17/7 39/6 39/13 39/15 39/18
46/13 50/8 51/8 51/23 52/2 52/5 52/12 52/21
53/1 53/12 53/22 54/8 55/21 56/17 56/19
56/24 57/12 58/2 58/5 58/12 58/24 60/12
60/16 60/19 61/2 71/3
choose [1] 19/16
circumstances [1] 6/17
Citibank [1] 33/1
civil [2] 5/21 7/14
claim [1] 61/2
claimed [1] 36/6
claims [1] 48/12
clarify [2] 60/11 60/17
clear [3] 7/5 55/10 56/4
cleared [2] 5/25 20/23
clearly [3] 41/20 42/18 45/18
Clerical [1] 47/7
clerk [3] 8/13 23/17 26/18
client [3] 5/19 15/7 15/11
close [3] 21/16 21/16 40/5
closed [1] 58/6
closes [1] 63/20
closing [13] 13/3 13/11 35/25 36/4 36/8
36/14 63/16 63/18 63/19 64/13 65/10 65/14
65/16
closings [4] 35/22 63/22 67/7 67/16
co [17] 7/9 14/4 14/4 14/8 14/11 14/15 15/3
16/2 16/8 17/2 17/3 17/7 21/22 25/5 25/7
44/5 55/17
co-borrower [3] 14/15 17/2 44/5
co-borrower's [1] 25/5
co-borrowers [11] 14/4 14/4 14/8 14/11 15/3
16/2 16/8 17/7 21/22 25/7 55/17
co-counsel [1] 7/9
Code [1] 72/4
collateral [2] 35/17 57/6
collect [1] 34/24
collected [2] 14/19 55/14
collecting [1] 34/17
column [1] 32/24
combined [2] 40/2 40/8
come [3] 24/14 24/18 52/5
comes [3] 49/4 56/21 59/17
coming [1] 8/7
commissions [2] 34/17 34/24
commitment [4] 8/21 9/19 20/17 22/4
communicate [2] 68/19 70/16
communicated [1] 48/17
communication [1] 35/2

company [4] 37/9 37/11 37/12 67/14
compared [2] 40/10 49/3
compiling [1] 47/6
complaint [5] 5/20 5/21 6/10 6/16 6/18
complete [5] 14/4 14/9 14/11 14/12 44/6
completing [1] 47/11
comply [1] 34/14
component [1] 56/21
computer [1] 41/21
concern [1] 21/13
concerns [2] 10/11 43/13
concluded [1] 71/13
condition [7] 9/6 9/13 9/14 9/15 43/15 43/16
43/21
conditional [1] 43/17
conditions [1] 8/24
conduct [1] 57/14
Conference [1] 72/8
conformance [1] 72/7
connection [1] 12/2
consider [1] 26/4
considering [1] 21/15
consistent [1] 44/15
conspiracy [1] 7/16
conspired [1] 6/13
contain [4] 26/7 26/11 26/13 50/8
contained [1] 25/14
contended [1] 36/12
context [1] 47/15
continue [3] 19/8 19/13 58/17
CONTINUED [3] 3/1 4/6 8/17
control [1] 60/2
conventional [1] 58/7
converse [2] 68/18 70/15
copies [1] 24/7
copy [3] 5/23 6/10 6/18
Corona [7] 9/22 54/4 54/5 54/10 54/11 57/3
58/18
correct [174]
correction [1] 16/10
corrections [1] 46/6
correctly [3] 15/10 26/5 56/11
cost [1] 59/8
costs [9] 20/6 20/9 20/10 20/10 20/11 20/12
22/14 22/24 58/12
could [26] 10/12 10/21 20/11 20/12 24/3
31/21 32/2 33/23 34/18 40/15 46/6 46/9
51/14 51/22 51/23 52/1 52/2 52/11 52/12
52/25 53/9 53/23 53/25 59/7 59/8 59/13
couldn't [1] 11/5
counsel [11] 2/1 5/7 5/10 7/9 7/11 8/6 68/6
68/14 69/3 69/14 70/13
counts [1] 71/11
County [4] 6/21 39/6 39/12 39/19
couple [2] 35/11 35/22
course [1] 59/9
court [10] 1/1 5/4 7/23 8/3 20/11 26/21 66/12
68/23 70/10 70/21
court's [2] 8/13 59/4
Courthouse [2] 1/23 2/7
CR [2] 1/10 5/5
create [1] 34/18
creates [1] 13/25
credit [8] 33/1 33/2 33/4 33/7 33/10 33/18
33/18 52/7
crime [1] 12/2
critical [1] 35/10
cross [11] 4/3 13/18 13/19 27/3 37/1 50/1
50/18 53/11 53/14 66/20 68/1
cross-examination [10] 13/18 13/19 27/3
37/1 50/1 50/18 53/11 53/14 66/20 68/1
CSR [2] 1/23 72/13
current [8] 30/8 32/20 49/9 52/7 52/8 60/3

60/21 61/3
currently [8] 25/9 35/15 39/15 40/4 46/13
62/6 62/8 62/11

# D

DALTON [2] 2/10 5/10
data [8] 25/12 33/12 33/14 33/15 39/2 47/7
51/10 56/8
date [5] 9/19 18/22 49/8 65/5 72/10
dated [2] 24/15 24/21
dates [1] 10/6
day [2] 8/8 18/18
days [1] 54/4
dcantalupo [1] 3/9
dealt [2] 37/5 37/9
DEBORAH [2] 1/23 72/13
debt [8] 33/4 33/7 33/10 33/18 35/20 56/20
57/13 58/2
debts [1] 37/18
decide [1] 20/19
decided [1] 44/24
decision [6] 51/14 51/22 52/1 52/11 52/25
53/24
deed [4] 64/11 64/17 64/24 65/13
default [3] 20/4 52/5 60/5
defendant [8] 2/13 2/20 3/4 5/24 26/17 36/25
57/9 58/21
defendant's [1] 13/18
defendants [7] 1/12 6/11 6/13 6/20 7/16 8/5
70/12
defendants' [1] 66/14
defense [5] 6/20 6/24 6/25 26/22 69/5
definition [1] 22/11
degree [1] 63/25
deliberate [1] 7/15
depending [1] 51/19
depends [1] 67/13
deposit [1] 24/23
depository [1] 26/3
description [2] 16/5 17/12
detail [3] 7/18 8/2 48/24
details [3] 7/7 7/13 7/14
determination [2] 15/5 56/6
determine [3] 10/12 26/8 53/8
Diaz [3] 2/15 2/15 5/16
did [13] 9/20 9/23 10/14 10/19 16/24 31/3
45/13 46/11 50/23 51/5 63/9 66/5 66/7
didn't [8] 11/10 21/23 43/11 50/14 53/17
57/14 71/5 71/7
Dien [2] 37/7 48/3
difference [2] 53/13 69/13
different [6] 23/8 23/9 38/11 49/2 52/20
53/10
difficult [1] 33/13
digits [3] 30/16 31/1 31/4
direct [15] 4/3 8/17 9/6 9/24 11/17 14/3 21/8
21/23 27/8 27/18 29/5 35/8 40/22 50/11 62/2
directed [1] 35/5
directing [1] 9/13
directly [1] 23/12
disclose [3] 6/13 6/23 7/6
disclosures [1] 27/16
discussed [2] 48/10 48/12
discusses [1] 20/23
display [3] 64/7 64/8 64/15
displaying [1] 13/7
disposal [1] 59/2
dispute [1] 41/2
DISTRICT [3] 1/1 1/2 1/5
DIVISION [1] 1/3
do [86]
document [19] 8/20 8/24 12/25 13/11 28/16
34/19 34/19 47/6 47/23 52/17 52/19 64/1

# D

**document...** [7] 64/10 64/12 64/18 64/21
64/23 65/3 65/10
**documentation** [3] 25/25 52/15 63/20
**documentations** [1] 65/15
**documents** [23] 7/20 12/10 13/3 15/16 24/9
26/1 27/16 28/19 37/14 52/23 55/8 55/10
56/4 62/19 63/12 63/12 63/16 63/22 64/5
65/14 65/16 66/6 66/15
**does** [8] 5/18 8/24 19/17 39/3 50/8 56/16
65/5 65/7
**doesn't** [7] 16/20 17/5 17/17 17/19 26/11
56/11 69/12
**doing** [4] 43/2 57/1 63/23 63/24
**Dominic** [3] 3/6 3/6 5/12
**don't** [15] 5/24 6/7 18/18 19/10 22/5 22/17
23/19 28/21 40/17 41/3 46/18 49/15 66/6
66/11 69/14
**done** [1] 65/6
**down** [10] 7/25 21/19 61/9 66/16 67/5 67/21
68/7 68/10 68/11 70/6
**driver's** [3] 11/13 11/22 67/2
**dual** [3] 9/18 21/17 21/21
**During** [2] 35/1 49/6
**duty** [2] 68/18 70/15

# E

**each** [7] 12/17 15/7 29/23 30/7 55/16 66/1
66/2
**earlier** [2] 46/1 56/10
**early** [1] 45/8
**easier** [1] 58/17
**East** [1] 2/23
**eighth** [1] 11/20
**either** [4] 28/11 28/24 32/4 52/18
**eligibility** [1] 11/21
**else** [5] 6/6 6/7 7/12 44/2 60/3
**Email** [3] 2/18 2/25 3/9
**employed** [2] 62/6 62/21
**employee** [3] 22/6 34/9 34/16
**employer** [1] 32/20
**employers** [1] 39/19
**employment** [3] 49/2 49/5 49/7
**end** [3] 20/12 41/17 63/19
**ending** [2] 33/2 33/8
**enough** [1] 39/2
**entered** [3] 39/18 45/12 46/11
**entire** [1] 31/21
**entirely** [1] 55/4
**entities** [1] 57/17
**entitled** [1] 72/6
**entries** [3] 46/5 47/8 47/25
**entry** [7] 33/12 44/23 45/10 45/22 47/7 50/8
53/12
**error** [1] 46/8
**escrow** [1] 67/14
**essence** [1] 5/23
**essentially** [2] 7/11 7/17
**establish** [1] 57/18
**estate** [19] 9/16 18/21 33/23 33/24 34/14
34/23 41/23 46/19 50/9 50/19 50/25 51/6
53/15 53/17 56/22 62/22 63/13 67/4 67/15
**estate-owned** [1] 18/21
**estimate** [6] 28/13 28/20 32/2 32/6 59/20
63/21
**et** [2] 1/11 5/6
**evaluate** [1] 17/6
**evaluated** [2] 53/18 58/4
**evaluating** [1] 50/23
**evaluation** [1] 50/20
**evaluators** [1] 17/11
**even** [4] 5/20 5/23 6/15 43/23

**event** [1] 21/20
**eventually** [1] 19/21
**ever** [1] 71/10
**every** [3] 18/18 49/7 56/11
**everything** [1] 8/7
**evidence** [9] 7/22 23/20 23/21 23/23 23/24
26/24 27/2 61/16 64/8
**exactly** [2] 62/18 64/1
**exam** [1] 63/8
**examination** [19] 8/17 13/18 13/19 14/3 27/3
27/8 37/1 49/22 50/1 50/18 53/11 53/14
54/23 57/10 58/22 62/2 66/20 68/1 69/23
**example** [1] 49/1
**excess** [1] 18/5
**excluded** [1] 17/3
**excuse** [4] 15/1 19/23 23/16 70/14
**excused** [3] 68/23 70/20 70/21
**execute** [1] 34/20
**executed** [2] 36/3 36/14
**exhibit** [64] 6/10 7/4 8/15 9/5 10/4 10/5
11/17 11/18 11/19 11/20 11/22 12/6 12/21
12/23 13/5 13/7 13/8 15/21 15/24 16/11
16/12 16/13 20/16 20/23 23/17 23/18 23/21
23/24 24/21 27/17 27/23 27/25 28/8
28/12 29/6 29/14 30/6 30/19 30/22 31/3
31/10 31/12 31/13 31/23 32/10 32/11 34/3
34/4 42/8 42/9 42/11 42/14 42/18 42/22
42/24 50/5 50/12 50/12 51/23 52/12 64/8
64/16 64/17
**Exhibit 110** [3] 9/5 20/16 20/23
**Exhibit 12** [1] 10/4
**Exhibit 13** [1] 10/5
**Exhibit 15** [1] 12/6
**Exhibit 18** [2] 12/21 12/23
**Exhibit 19** [1] 13/7
**Exhibit 20** [4] 11/17 11/18 11/20 11/22
**Exhibit 215** [3] 31/10 31/23 32/10
**Exhibit 238** [10] 27/5 27/17 27/23 27/25 28/8
28/12 29/6 30/6 34/3 34/4
**Exhibit 41** [1] 29/14
**Exhibit 7** [2] 16/11 50/5
**Exhibit 8** [3] 42/9 42/11 42/14
**Exhibit 89** [1] 6/10
**Exhibit 91** [4] 23/21 30/19 30/22 31/3
**exhibits** [18] 6/25 8/14 9/24 12/5 12/8 12/20
26/19 26/22 27/1 27/9 50/1 50/15 50/19 51/7
61/15 61/19 65/20 65/25
**existence** [3] 7/7 7/11 7/19
**existing** [6] 10/25 40/14 41/8 41/9 54/15
57/18
**expect** [2] 6/24 46/11
**expected** [2] 6/20 7/2
**expenses** [5] 40/3 40/5 40/8 58/8 58/17
**expensive** [1] 20/14
**experience** [6] 23/4 28/12 34/14 36/19 46/3
67/15
**explain** [3] 9/14 42/22 49/1
**explained** [2] 20/18 22/4
**explanation** [13] 9/12 9/21 10/1 10/9 10/19
10/23 11/3 43/6 43/14 44/8 44/25 45/2 51/20
**explanations** [1] 10/10
**expose** [1] 21/19
**express** [2] 68/21 70/18
**extent** [4] 33/1 33/7 36/6 36/12

# F

**fact** [2] 47/5 66/5
**factor** [2] 35/10 51/11
**fail** [1] 6/23
**failed** [1] 6/12
**failure** [1] 7/5
**fair** [9] 17/11 18/19 20/13 22/9 22/13 23/4
29/22 31/5 67/16

**false** [6] 6/14 12/2 13/13 48/16 69/9 70/25
**familiar** [6] 17/14 17/25 18/45/18 18 22/7
39/10
**Familiarize** [1] 24/4
**far** [2] 21/21 21/23
**Fax** [3] 2/17 2/24 3/8
**FBI** [1] 5/11
**FEBRUARY** [2] 1/18 5/1
**fees** [2] 22/17
**few** [2] 30/18 33/22
**FHA** [7] 9/17 21/15 21/18 34/15 34/18 34/24
44/3
**FHA-VA** [2] 34/15 34/18
**fifth** [1] 11/20
**figure** [7] 40/3 40/24 41/19 42/17 60/12
60/18 61/2
**figures** [1] 56/8
**file** [16] 11/8 11/23 13/25 14/16 14/19 15/15
22/5 25/8 25/12 25/14 26/3 43/12 52/23
55/14 55/16 70/4
**filed** [2] 26/21 45/7
**files** [1] 52/17
**final** [13] 25/18 26/4 46/25 50/5 50/15 50/25
51/6 51/8 52/18 53/6 55/6 55/7 63/19
**finally** [2] 68/22 70/19
**financial** [1] 24/10
**financing** [5] 9/2 9/18 44/3 44/6 57/1
**finding** [1] 58/25
**finger** [1] 28/3
**fingerprint** [1] 18/3
**first** [22] 5/20 8/15 10/4 10/4 10/5 11/18 12/6
12/21 15/24 16/13 24/14 27/5 27/22 35/18
37/24 37/25 40/1 40/21 42/24 43/23 64/9
69/9
**Fiscal** [3] 33/7 33/9 33/18
**Flagstaff** [2] 70/25 71/7
**Flagstar** [65] 8/21 8/21 9/20 10/1 10/6 10/9
10/16 10/19 11/8 11/23 12/3 12/18 13/22
13/25 14/22 14/22 15/5 15/12 15/14 16/20
17/4 17/5 17/6 18/16 19/17 20/17 20/19
21/13 22/6 25/15 26/6 34/19 35/14 35/20
35/23 35/24 36/2 36/15 43/2 48/13 48/18
48/19 50/20 50/23 51/5 51/22 52/1 52/3
52/11 52/19 53/10 53/18 55/4 55/11 55/13
56/1 56/5 56/6 56/11 56/15 56/18 56/25 57/6
57/12 57/14
**Flagstar's** [5] 35/2 51/14 52/25 53/23 55/23
**focus** [1] 25/25
**focusing** [1] 27/17
**following** [2] 40/21 57/12
**force** [1] 5/22
**foreclose** [1] 17/23
**foreclosed** [3] 18/16 51/24 52/2
**forecloses** [2] 17/20 18/11
**foreclosure** [7] 17/16 20/7 20/13 21/20 22/15
23/6 58/7
**foreclosures** [1] 17/14
**foregoing** [1] 72/4
**form** [3] 29/13 68/21 70/18
**format** [1] 72/7
**forth** [1] 8/24
**Forty** [2] 27/20 69/25
**four** [7] 16/4 16/17 27/9 27/14 30/16 31/1
31/4
**four-page** [2] 27/9 27/14
**fourth** [3] 11/20 24/13 50/12
**fraud** [1] 6/5
**front** [8] 8/20 9/19 23/18 26/19 29/8 31/10
46/6 65/19
**full** [2] 8/10 61/20
**fully** [1] 43/11
**function** [2] 13/22 17/12
**further** [7] 13/16 26/16 36/24 49/19 54/2

## F

further... [2] 38/20 60/9
future [1] 52/13

## G

GACKLE [2] 1/23 72/13
gave [2] 52/19 60/2
general [1] 9/2
generated [4] 15/16 20/19 26/6 55/10
generates [1] 41/21
gentlemen [2] 47/2 66/13
get [6] 7/6 10/21 11/5 11/10 49/8 69/19
gets [2] 18/12 22/20
give [2] 59/14 59/19
given [1] 54/13
gives [1] 39/1
giving [2] 7/17 71/8
gmail.com [1] 2/18
go [11] 21/3 23/12 42/22 42/23 44/5 46/2 46/9 48/22 49/6 57/19 67/11
goes [8] 7/17 14/15 18/17 18/19 21/1 25/8 52/7 56/5
going [46] 8/13 10/15 11/4 11/9 14/22 15/2 15/20 16/12 20/16 24/14 24/18 30/5 32/9 34/3 38/6 38/17 38/22 38/23 40/8 42/25 43/7 43/8 43/13 43/19 43/24 44/5 44/9 44/12 45/3 45/4 48/7 51/19 56/25 57/3 58/24 63/4 64/7 64/8 64/15 66/6 69/18 70/2 70/3 70/14 71/4 71/8
good [13] 5/8 5/12 5/14 5/16 8/19 13/21 19/13 37/3 37/4 49/24 49/25 62/4 66/22
government [17] 5/9 6/6 6/9 6/11 6/14 6/17 7/3 7/3 7/6 7/11 23/20 27/8 57/17 61/13 61/14 70/24 71/9
government's [11] 4/3 15/20 20/16 23/18 23/21 23/24 24/20 27/1 54/25 62/1 69/23
government-sponsored [1] 57/17
grant [2] 52/9 54/11
granted [1] 52/3
great [2] 7/17 48/24
greater [1] 60/20
guess [1] 37/20

## H

had [27] 15/15 17/7 21/22 24/5 28/20 30/18 34/9 34/20 35/8 43/12 45/22 46/13 53/5 53/21 54/8 54/9 58/5 58/16 60/12 60/18 61/1 61/1 63/11 65/21 65/23 69/10 71/1
half [1] 67/17
handling [1] 34/22
handy [1] 34/3
happen [3] 17/23 20/9 71/2
happened [2] 69/10 71/2
happening [1] 40/18
happens [1] 18/16
has [21] 5/19 6/2 6/11 6/14 6/17 6/19 7/3 8/22 8/25 14/14 23/20 33/18 40/4 44/6 46/5 49/5 55/13 55/21 56/12 64/7 68/15
have [91]
having [5] 10/24 20/12 31/24 34/8 34/16
he [17] 5/13 5/25 10/21 16/2 32/18 32/18 38/22 39/3 40/4 40/7 41/5 43/7 43/25 44/2 45/13 69/22 70/2
He's [1] 70/3
hefty [1] 31/17
held [6] 38/19 62/24 66/4 68/25 70/22 72/6
Hello [1] 66/23
help [3] 10/10 40/3 45/21
her [13] 21/23 34/7 34/23 35/3 35/6 43/22 48/13 66/11 69/5 69/6 69/12 71/5 71/5
here [14] 24/9 24/22 38/15 39/5 46/15 55/17
hereby [1] 72/3
Herson [1] 69/21

highest [1] 20/1
highlighted [1] 17/13
hire [1] 49/8
his [11] 15/7 32/16 32/20 32/22 33/19 33/19 38/6 40/8 41/12 43/7 43/24
histories [1] 48/8
history [2] 49/6 52/7
hold [1] 31/7
home [10] 9/10 47/2 47/3 57/21 57/23 58/2 58/5 58/18 69/18 70/5
homes [1] 18/20
Honor [44] 5/8 5/12 5/14 5/16 5/18 5/24 6/4 6/9 7/5 7/9 7/14 7/17 13/17 15/22 23/19 23/22 26/18 26/25 28/1 36/24 43/15 49/18 49/19 49/21 54/1 54/14 54/20 54/22 60/9 60/14 60/17 60/25 61/12 61/14 66/17 67/22 68/8 68/16 69/4 69/8 69/21 70/1 70/4 70/7
HONORABLE [1] 1/5
hope [1] 8/7
hour [2] 67/17 67/17
house [7] 10/15 10/21 19/9 19/11 40/8 56/25 71/3
how [19] 5/24 10/9 15/23 19/11 22/3 27/18 43/12 49/1 51/14 51/22 52/1 52/11 53/4 53/9 62/16 63/21 67/14 69/22 71/8
however [1] 13/2
human [1] 46/8
Humberto [2] 2/15 2/15
Hundreds [1] 63/23

## I

I'd [15] 9/6 9/24 11/17 12/5 12/20 22/5 23/20 26/18 27/5 27/18 29/3 31/9 32/9 34/9 38/2
I'll [2] 31/13 67/23
I'm [33] 8/13 8/15 11/17 15/20 15/22 16/12 20/16 22/1 24/18 27/25 28/3 29/14 30/5 32/9 34/3 36/10 39/11 46/14 48/4 48/11 48/15 50/12 51/25 54/16 58/11 62/9 64/7 64/8 64/15 65/6 67/22 69/18 70/14
I've [1] 51/9
idea [2] 48/20 48/21
ideal [1] 46/7
ideally [1] 33/15
identical [1] 13/1
identification [1] 64/5
identify [2] 64/4 66/25
identity [1] 66/25
if [61] 7/9 10/21 11/5 11/10 15/10 17/19 17/23 17/23 20/3 21/16 23/20 24/13 24/18 25/4 25/20 26/5 27/5 27/17 27/25 28/11 28/20 31/5 32/10 33/18 34/2 34/22 35/5 37/18 37/24 39/18 39/22 40/12 40/15 42/9 46/6 46/7 47/3 47/9 47/23 48/12 48/17 48/19 49/14 51/14 51/22 52/1 52/4 52/7 52/11 52/25 53/21 56/10 57/21 57/25 58/5 58/16 58/25 59/11 61/3 69/4 69/6
impact [1] 46/8
impeachment [1] 69/12
important [4] 17/4 56/14 56/18 69/7
improper [1] 36/21
in [198]
include [7] 20/5 31/3 50/14 54/9 56/8 65/5 65/16
included [4] 9/14 41/13 41/16 50/13
including [1] 41/7
income [5] 30/11 40/2 62/8 62/11 62/14
incomplete [1] 46/7
inconsistencies [2] 53/5 53/11
inconsistency [3] 53/6 53/9 55/23
incorrect [1] 39/22
indeed [2] 37/18 44/9
indicate [4] 29/19 32/17 38/23 39/23
indicated [7] 10/17 12/1 29/24 35/8 35/23

42/24 52/24
indicates [2] 16/13 44/8
indicating [1] 11/9
indication [2] 10/22 11/3
indictment [2] 71/10 71/11
indifference [1] 7/15
individual [7] 6/22 10/11 15/8 21/17 40/18 44/3 47/11
individuals [3] 37/9 64/23 65/2
inflammatory [1] 7/14
influence [3] 51/22 52/11 52/25
influenced [2] 50/20 53/23
information [24] 11/14 11/23 14/15 14/18 14/23 15/4 15/14 16/18 25/8 25/15 30/10 39/1 45/8 46/12 47/9 47/10 49/5 49/13 51/18 52/15 55/2 55/13 55/16 56/5
informs [1] 45/2
initial [5] 13/2 28/14 32/5 52/18 55/6
initialed [2] 28/24 67/8
initialing [1] 67/17
institution [2] 30/11 46/4
insurance [7] 19/9 21/18 23/9 23/11 23/13 34/21 56/9
insuring [1] 34/19
intend [3] 44/20 45/9 45/13
intent [1] 51/19
intentionally [1] 25/23
intentions [1] 44/6
interest [4] 6/3 45/22 46/16 54/18
interested [1] 58/25
internal [1] 34/19
Internet [1] 59/15
interviewed [2] 68/3 69/9
into [17] 6/8 7/6 14/15 14/19 18/19 22/20 23/21 25/8 25/12 50/24 51/5 51/11 52/5 56/5 56/21 61/16 64/8
introduce [2] 6/10 6/18
introducing [1] 7/4
inventory [4] 18/20 19/12 19/20 22/21
investor [1] 54/17
investors [1] 57/17
involved [4] 20/6 20/11 63/15 65/15
involving [1] 62/21
is [261]
isn't [9] 18/5 20/7 21/2 22/15 22/21 23/2 53/13 55/5 56/7
issue [3] 8/22 14/22 22/3
issued [1] 15/3
issues [1] 11/1
issuing [1] 35/14
it [124]
it's [33] 6/6 16/13 16/17 18/19 19/12 20/13 21/15 22/9 23/4 24/14 31/5 33/12 38/23 42/20 43/24 45/23 46/22 46/25 48/5 55/22 66/11 66/13 66/24 67/4 67/7 67/13 67/13 68/11 68/12 68/13 68/22 69/1 70/19
item [3] 7/10 21/8 21/11
items [5] 9/3 20/22 20/24 26/2 46/15
its [7] 15/15 22/14 34/16 35/5 55/14 55/16 56/6
itself [2] 28/17 68/16
IV [1] 1/20
IV/P.M [1] 1/20

## J

January [2] 24/15 26/21
January 22nd [1] 26/21
January 30th [1] 24/15
Jason [1] 5/10
Jessica [1] 37/10
JHDiazLaw [1] 2/18
Joanne [1] 61/22
job [3] 18/15 49/3 49/10

## J

jobs [1] 62/21
JOHNNY [30] 2/13 5/17 5/19 6/6 9/8 10/17 36/25 38/5 38/8 38/12 38/19 38/22 40/2 40/23 41/5 42/5 42/15 42/25 43/4 43/7 43/19 44/9 44/16 45/3 45/12 47/20 47/24 53/16 58/21 64/25
joint [1] 15/2
jointly [2] 14/14 16/8
JUDGE [1] 1/5
Judicial [1] 72/7
July [19] 9/20 15/11 24/22 25/16 30/2 31/9 31/13 31/17 32/23 35/19 35/23 42/1 42/3 45/8 48/22 52/19 55/8 65/8 65/11
July 18th [6] 15/11 24/22 25/16 55/8 65/8 65/11
July 2011 [4] 31/9 31/13 35/23 52/19
July 5th [1] 9/20
June [11] 12/14 28/7 28/14 29/2 29/2 30/1 34/8 35/19 46/2 52/18 72/10
June 2011 [2] 28/7 28/14
June 22nd [1] 12/14
jurors [3] 5/4 8/4 70/11
jury [18] 7/25 8/3 20/18 31/21 32/2 60/11 66/13 68/17 68/23 68/25 69/18 70/6 70/10 70/20 70/21 70/22 71/8 71/10
just [27] 15/4 16/10 18/3 20/5 20/10 24/3 24/19 24/23 25/21 27/14 27/18 28/1 28/11 29/5 35/22 40/19 41/1 42/23 43/5 49/15 55/1 55/10 56/4 56/23 57/12 58/7 60/17
justifiable [1] 6/23
justified [1] 7/4

## K

keep [1] 24/19
kept [1] 59/25
KHOUNTHAVONG [45] 1/11 2/13 2/20 3/4 5/6 5/13 5/15 5/17 5/19 6/7 10/17 10/20 10/24 11/4 11/9 12/17 16/14 24/8 25/15 27/13 29/4 30/23 31/6 32/4 32/14 32/16 33/3 33/9 38/5 40/2 40/23 41/5 42/5 42/15 43/8 44/9 44/17 45/3 45/12 47/24 50/6 53/16 53/16 53/18 65/1
Khounthavong's [9] 16/1 24/21 25/20 29/10 30/14 31/6 33/4 33/10 42/25
Khounthavongs [4] 9/21 10/14 21/5 65/11
kind [3] 24/3 24/19 71/2
knew [3] 16/20 17/7 52/4
know [17] 16/24 19/10 19/17 20/9 21/21 21/23 38/17 39/12 39/14 41/1 41/3 42/8 47/1 48/2 48/9 49/15 65/21
knowing [1] 48/17
knowingly [2] 6/12 6/13
knows [1] 56/1

## L

L.A [4] 6/21 39/6 39/12 39/19
labor [1] 20/10
Ladies [1] 66/13
last [16] 8/11 14/3 15/10 27/25 28/1 30/16 31/1 31/3 31/24 35/22 44/19 44/19 49/14 51/25 54/4 61/21
lastly [1] 58/5
late [2] 52/4 60/7
later [1] 18/22
LAURA [4] 4/10 61/13 61/22 62/1
law [5] 2/15 2/22 3/6 7/4 45/16
LAWRENCE [2] 2/6 5/9
laws [1] 7/7
lawsuit [5] 5/18 6/12 6/23 7/7 7/12 7/19 7/22
lawsuits [2] 7/6 20/5
least [1] 71/7
left [5] 45/23 46/16 46/22 53/15 71/6

legal [3] 20/10 22/17 62/19
lend [1] 26/9
lender [1] 23/9
lenders [1] 19/15
lending [8] 30/10 46/4 51/14 51/22 52/1 52/1 52/11 52/25 53/23
less [5] 17/25 22/10 22/15 58/16 70/8
less than [1] 17/25
let [8] 15/1 19/23 37/24 41/25 46/2 48/22 51/17 65/20
Let's [1] 8/1
letter [8] 8/21 9/12 9/20 10/7 10/17 20/17 20/19 21/1 22/4 43/6 43/14 44/8 44/24 45/2
letters [9] 9/20 10/1 10/9 10/14 10/19 10/22 10/23 11/3 11/8
levels [1] 23/9
liabilities [4] 26/7 26/12 26/14 32/24
liability [4] 33/16 56/14 56/18 58/2
license [1] 11/14 11/22 62/13 67/2
light [2] 7/2 7/2
like [14] 7/3 9/6 9/24 11/17 12/5 12/20 23/20 24/10 27/5 29/3 31/9 32/9 32/16 34/2
liked [1] 60/22
likely [2] 48/14 52/9
line [3] 19/19 56/2 59/12
liquid [2] 41/16 57/25
list [6] 18/22 29/15 30/7 32/20 34/23 56/11
listed [14] 9/8 17/2 21/12 25/4 35/9 35/18 43/19 51/8 51/23 52/12 52/21 53/1 53/21 58/11
listing [3] 18/23 29/18 49/2
lists [1] 40/23
little [2] 15/25 41/17
live [4] 39/15 43/13 56/25 57/3
lives [1] 32/18
living [2] 39/3 56/23
loan [116]
loans [3] 11/15 13/23 33/13
location [1] 39/19
LOE [3] 9/7 9/8 9/11
long [3] 33/15 62/16 69/22
longer [2] 37/11 58/5
look [19] 16/4 22/5 24/3 24/5 27/22 27/25 31/2 33/13 33/15 37/19 41/4 42/7 42/9 59/11 59/13 65/20 65/21 65/23 67/2
looking [6] 5/19 15/4 31/23 41/1 46/1 59/10
looks [1] 24/10
LOS [6] 1/17 1/24 2/8 2/16 2/23 5/1
losses [4] 20/3 21/19 23/11 46/8
lot [3] 22/14 31/18 67/7

## M

M-e-a-d-o-w-s [1] 61/22
made [14] 8/22 23/14 25/21 39/23 47/6 48/3 48/5 49/12 50/24 58/17 60/15 66/15 69/8 70/25
Maggie [1] 5/8
magnifying [4] 8/16 12/6 12/21 13/4
main [2] 19/20 20/3
maintain [2] 18/24 19/13
maintaining [1] 22/24
maintenance [1] 19/11
majority [1] 28/19
make [9] 6/14 12/2 15/6 16/10 19/2 23/9 46/6 56/6 69/12
makes [1] 7/5
making [3] 11/10 38/21 60/23
MANUEL [1] 1/5
many [2] 27/18 63/21
MARC [3] 4/6 5/11 8/12
March [1] 54/17
MARGARET [1] 2/6
marked [1] 6/25

market [11] 35/9 41/7 41/9 41/12 51/15 52/20 53/1 53/9 53/13 53/21 59/12 61/3
match [1] 64/4
math [1] 41/23
matter [4] 7/21 16/20 53/17 72/6
matters [2] 71/6 71/6
may [25] 7/9 14/25 14/25 23/7 25/23 26/3 37/24 40/22 43/15 44/3 49/18 51/25 52/20 52/16 54/1 59/15 61/9 66/16 67/21 67/22 68/7 68/8 68/10 68/11 70/7
maybe [3] 6/5 63/3 69/24
me [19] 15/1 15/1 19/23 19/23 23/16 37/24 40/3 41/19 41/21 41/25 42/2 42/17 45/21 46/2 46/14 48/22 51/17 51/17 65/20
MEADOWS [9] 4/10 61/13 61/22 62/1 62/4 64/10 65/10 66/22 68/3
mean [4] 7/17 56/23 63/23 67/12
meaning [2] 35/13 44/5
means [2] 18/3 47/5
meet [1] 8/25
Members [1] 68/17
mentioned [1] 51/9
merits [2] 68/20 70/17
mess [2] 69/15 71/10
met [1] 10/13
MIDDLETON [2] 2/6 5/9
might [3] 7/8 35/15 49/11
mind [1] 59/17
minutes [3] 69/16 69/24 69/25
misrepresentation [1] 13/13
missed [1] 46/8
mistake [19] 25/5 25/21 31/7 33/3 33/9 33/12 39/20 39/23 41/2 41/3 41/20 41/22 42/18 42/20 45/18 47/5 47/7 47/25 48/3
mistakes [5] 37/15 37/19 49/11 49/14 49/15
modification [3] 10/21 11/6 11/11
moment [6] 27/17 28/11 31/2 43/15 49/18 54/1
moments [1] 30/18
MONDAY [2] 1/18 5/1
money [1] 26/9
Monica [1] 3/7
month [3] 58/9 58/13 58/16
monthly [3] 40/2 58/8 58/16
more [6] 5/23 6/15 6/15 49/13 51/16 71/9
morning [4] 69/19 70/14 70/20 71/12
mortgage [30] 6/5 7/19 17/11 17/17 17/19 17/25 18/5 18/12 20/4 20/6 21/3 21/18 22/10 23/9 23/11 23/13 34/20 35/17 35/18 35/18 43/2 49/5 56/19 57/22 58/12 58/18 60/21 61/5 61/7 71/8
mortgages [2] 10/24 11/10
most [3] 28/21 52/9 56/18
motion [1] 7/24
motivation [1] 9/9
move [2] 8/1 26/22
Mr [2] 8/19 54/25
Mr. [9] 9/11 25/20 41/5 42/14 48/24 49/24 54/3 58/24 69/21
Mr. Adam [1] 69/21
Mr. Bianchi [6] 9/11 42/14 48/24 49/24 54/3 58/24
Mr. Johnny [1] 41/5
Mr. Khounthavong's [1] 25/20
Mrs. [1] 8/7
Mrs. E [1] 8/7
Ms [4] 62/4 64/10 66/22 68/3
Ms. [4] 22/3 61/13 65/10 71/4
Ms. Laura [1] 61/13
Ms. Meadows [1] 65/10
Ms. Tran [2] 22/3 71/4
much [4] 8/1 22/17 23/5 53/13
my [13] 5/19 6/4 15/7 15/11 28/3 37/10 38/22

**M**

my... [6] 56/25 59/8 62/11 62/13 64/19 64/19

**N**

name [8] 8/10 8/11 24/8 34/15 34/16 61/20 61/20 61/21
named [2] 9/16 24/9
namely [1] 38/21
names [2] 64/5 64/25
Natalie [15] 9/15 21/6 21/11 21/14 21/21 33/22 34/7 35/2 35/5 37/5 48/3 48/10 48/12 48/17 48/19
near [2] 10/6 52/13
necessarily [9] 25/23 26/11 26/13 35/10 40/9 40/13 40/17 41/11 42/20
necessary [2] 26/8 56/6
need [11] 20/23 22/19 25/24 26/1 56/11 62/20 66/11 66/24 67/5 67/8 69/14
needed [2] 44/24 58/1
needs [2] 14/23 67/11
negotiations [1] 7/1
net [7] 40/23 41/10 41/12 41/15 42/5 42/14 58/4
never [3] 22/20 34/25 37/5
new [8] 9/22 10/15 10/18 40/14 43/9 44/10 45/4 52/9
newer [1] 59/15
next [6] 8/8 44/19 45/21 45/21 61/11 69/20
Ninety [2] 23/23 24/1
Ninety-one [2] 23/23 24/1
no [54] 1/10 5/5 10/22 10/22 11/1 11/7 11/12 13/16 16/18 18/4 22/5 23/11 23/20 23/22 25/1 25/20 26/16 36/1 36/5 36/17 36/20 37/6 37/8 37/11 38/17 39/11 39/14 41/11 42/19 42/21 43/25 44/3 44/6 44/20 45/13 48/11 48/17 48/20 48/21 52/23 52/23 53/12 54/2 54/18 55/25 58/5 60/8 62/7 62/14 65/4 68/6 68/9 70/5 72/13
No. [10] 9/6 9/13 9/16 12/7 22/4 38/1 43/16 64/8 64/16 64/17
No. 12 [3] 9/13 9/16 22/4
No. 15 [2] 9/6 43/16
No. 2 [1] 38/1
No. 3 [1] 12/7
No. 9 [3] 64/8 64/16 64/17
none [1] 47/20
nonoccupant [1] 44/5
nonrecourse [2] 18/1 18/3
normally [1] 64/12
North [2] 1/24 2/8
not [79]
notarization [2] 65/6 66/24
notarize [3] 63/12 64/1 64/12
notarized [4] 62/20 63/22 64/18 69/13
notarizing [3] 63/15 64/23 67/15
notary [11] 36/3 36/6 36/12 62/9 62/9 62/12 62/16 62/18 63/4 63/5 63/11
notes [1] 43/12
nothing [9] 7/12 7/18 8/2 21/22 36/24 49/19 58/20 60/9 68/15
notice [4] 25/9 45/24 52/4 52/17
November [1] 68/4
now [44] 8/15 9/5 9/13 9/24 11/17 12/5 12/20 13/7 15/7 16/12 25/4 27/8 29/13 30/13 31/9 35/22 37/13 39/15 40/1 40/21 41/1 42/17 42/24 44/19 45/16 46/24 47/8 47/23 48/6 48/22 50/14 55/1 58/5 59/25 62/16 62/21 63/4 63/11 64/1 64/12 64/15 65/2 65/5 65/13 number [15] 24/23 27/23 28/2 28/5 31/3 33/8 37/15 39/22 41/7 51/15 56/18 59/1 60/10 60/11 60/23
numbered [1] 12/22

**O**

o'clock [3] 70/15 70/20 71/12
oath [2] 8/10
objection [22] 16/22 16/23 18/7 18/8 19/5 19/6 21/24 21/25 23/20 23/22 28/16 28/18 34/10 34/11 36/21 36/23 37/16 37/17 51/2 51/3 59/4 59/5
objective [4] 19/20 19/20 19/25 20/3
obligated [2] 18/24 19/15
obligation [1] 60/16
obtain [5] 20/1 21/18 26/1 56/9 57/16
occasion [1] 63/12
occasions [1] 63/15
occupancy [3] 51/13 56/21 56/23
occupied [1] 38/24
occupy [5] 38/17 44/20 45/4 45/9 45/13
occupying [5] 9/8 10/18 43/19 44/7 44/9
occurred [1] 6/21
occurs [1] 17/16
off [1] 20/12
offered [1] 6/14
office [1] 39/13
officer [7] 9/17 21/3 21/6 21/12 33/24 62/25 63/2
Offices [3] 2/15 2/22 3/6
official [1] 6/21
Okay [14] 15/18 19/11 27/21 29/22 30/4 30/21 30/25 31/20 37/24 38/25 41/18 42/12 62/15 65/22
Olympic [1] 2/16
omissions [1] 37/15
omitted [1] 25/23
on [128]
once [3] 8/22 20/19 49/9
one [35] 12/17 13/3 13/14 14/19 15/4 16/2 17/2 21/17 23/23 24/1 24/23 33/10 38/4 38/12 38/12 38/12 38/16 40/21 43/5 43/15 44/1 44/12 44/23 46/15 47/19 47/19 49/1 49/18 50/8 51/8 53/2 53/21 55/2 55/20 55/21
ones [3] 14/12 36/7 36/13
only [8] 7/10 10/21 20/5 25/25 26/7 34/19 56/5 69/2
open [6] 5/4 8/3 66/12 70/10
operating [1] 15/17
opinion [3] 36/22 68/21 70/18
or [63] 7/18 8/8 8/21 8/25 10/11 12/12 13/3 14/15 14/22 17/23 21/1 21/3 23/10 23/16 24/13 25/4 26/2 26/7 26/8 28/8 28/12 28/14 28/24 29/19 30/1 30/10 32/5 33/7 33/23 35/14 37/5 37/7 37/15 37/25 39/3 39/12 39/22 40/5 41/2 48/3 49/5 49/13 51/20 52/4 52/18 57/17 57/18 58/2 58/7 58/7 61/5 63/6 64/2 68/19 68/19 68/21 69/11 70/16 70/16 70/18 71/12 71/5 71/6
order [8] 13/25 14/21 19/14 19/23 25/24 35/12 35/16 63/5
organization [1] 48/9
original [3] 12/13 18/5 49/4
other [26] 10/19 10/23 11/8 14/11 14/18 15/3 17/3 20/6 23/10 26/2 28/23 32/17 41/15 44/13 45/18 49/3 50/14 52/21 52/24 54/6 59/19 63/12 65/13 65/15 68/13
otherwise [2] 18/19 70/16
our [18] 6/25 15/16 20/12 21/19 25/12 25/24 26/4 34/20 35/17 48/7 48/7 49/6 51/12 51/12 53/8 54/9 56/8 69/5
out [19] 23/8 34/7 34/15 35/25 40/3 45/21 57/17 58/25 67/10
outlines [1] 9/2
outside [1] 28/25 70/22
outstanding [2] 18/12 22/10
overall [3] 10/10 24/10 33/14

**O** (continued at top right)

overruled [9] 16/23 18/8 19/6 21/25 28/18 34/11 36/23 37/17 59/5
overstated [1] 51/15
owed [1] 18/5
own [4] 29/19 35/15 44/4 47/2
owned [16] 9/22 16/8 17/7 18/20 18/21 29/24 35/9 46/19 47/3 50/9 50/19 50/25 51/6 53/15 53/18 56/17
ownership [4] 17/20 45/22 46/12 46/16
owning [1] 9/10
owns [1] 32/18

**P**

p.m [3] 1/20 5/1 71/13
package [17] 28/7 28/9 28/15 29/2 29/3 30/13 31/9 31/14 31/17 31/17 31/22 34/8 34/22 35/23 35/25 52/19 55/8
packaged [1] 67/14
packages [1] 27/13
page [49] 8/15 9/5 9/19 10/4 10/5 11/18 11/19 11/19 11/20 11/20 11/20 11/21 11/21 12/6 12/21 15/24 16/4 16/13 16/17 24/14 24/20 27/9 27/14 27/22 27/25 28/1 28/2 28/8 28/8 29/5 29/10 30/5 30/13 31/24 32/10 32/11 32/12 32/22 32/23 34/3 34/8 38/23 43/23 44/1 50/11 50/12 64/9 64/15 72/6
pages [9] 1/21 27/18 28/13 28/23 31/18 31/25 32/3 32/7 59/19
papers [1] 67/8
paperwork [1] 39/5
paragraph [2] 12/7 12/22
pardon [2] 42/2 51/17
Park [1] 2/23
part [6] 25/24 51/25 63/16 63/22 64/13 65/10
partially [1] 23/10
particular [2] 38/16 45/19 65/4
particularly [1] 7/13
parties [2] 6/12 26/21
pass [1] 63/7
past [2] 52/7 62/21
pay [5] 17/17 17/19 19/8 57/22 58/18
paying [1] 10/24
payments [4] 11/10 19/2 52/4 60/7
penalties [1] 13/12
people [5] 39/5 64/4 64/6 70/24 71/5
percent [3] 28/21 28/23 32/7
percentage [2] 28/13 32/3
performing [1] 60/4
perhaps [2] 10/11 19/8
period [1] 63/1
permitted [1] 36/16
persist [1] 49/14
person [6] 37/7 38/21 39/1 39/2 66/25 67/5
personnel [1] 13/23
pertain [1] 5/18
pertains [2] 7/10 29/3
Phan [2] 37/7 48/3
phone [1] 39/22
picture [1] 37/20
place [7] 8/14 24/19 34/16 34/23 39/15 64/7 64/15
placed [2] 24/1 42/11
places [3] 8/5 33/16 70/12
Plaintiff [2] 1/9 2/3
plausible [2] 36/9 36/18
play [1] 56/21
please [8] 5/7 8/10 24/3 40/3 61/19 61/20 67/22 68/6
plus [1] 41/15
point [10] 6/4 6/5 11/13 11/25 18/23 28/1 49/8 53/7 55/23 67/10
pointing [1] 28/3
poor [1] 33/12

**P**

portion [2]  8/16 13/4
position [1]  62/24
possibility [1]  48/10
possible [3]  20/3 48/2 48/6
potential [5]  13/12 14/1 21/9 55/17 56/12
potentially [3]  40/15 51/17 52/14
prejudiced [1]  5/25
prejudicial [1]  5/23
prepare [2]  55/6 55/6
prepared [5]  7/20 15/12 25/16 35/23 47/24
prepares [2]  55/5 56/5
preparing [1]  56/4
presence [2]  68/25 70/22
present [22]  2/10 5/4 5/13 5/15 5/17 8/3 8/5
8/5 29/15 29/18 29/24 40/17 41/7 41/9 41/12
52/20 53/1 53/9 69/11 70/10 70/12 70/12
presented [2]  55/2 66/15
presents [1]  53/8
PRESIDING [1]  1/6
pretty [1]  31/17
previous [1]  51/10
previously [1]  61/16
price [1]  20/1
Primarily [1]  54/5
primary [12]  38/6 38/22 38/24 40/14 40/14
43/1 43/7 43/24 43/25 44/2 44/16 57/18
print [1]  35/24
prior [2]  18/23 59/4
probably [2]  39/20 71/1
proceeded [2]  51/21 52/16
proceedings [7]  1/16 66/4 66/12 68/25 70/22
71/13 72/5
process [7]  11/13 11/25 35/1 49/6 63/16
66/24 67/16
program [1]  10/12
programs [2]  23/8 23/10
proper [3]  6/7 8/5 70/12
properly [2]  14/21 64/4
properties [2]  35/12 35/14
property [97]
proposed [3]  5/20 40/7 40/17
prosecutor [1]  55/1
prospective [1]  8/25
prove [4]  6/11 6/18 6/19 7/3
provide [2]  9/7 9/9
provided [2]  13/11 38/14
provides [1]  39/1
providing [2]  62/8 62/12
public [8]  6/3 62/9 62/12 62/16 62/18 63/4
63/5 63/11
publish [2]  30/5 32/9
publishing [11]  8/15 9/5 10/4 11/18 11/18
11/19 12/6 12/21 28/1 29/14 32/11
purchase [2]  38/6 40/13
purchases [1]  40/7
purchasing [5]  9/9 10/18 40/14 43/25 44/2
purpose [1]  38/1
purposes [2]  34/20 34/21
pursuant [2]  26/20 72/3
put [7]  15/20 22/20 23/17 26/4 26/18 49/9
67/5
puts [1]  57/19

**Q**

qualification [1]  56/20
qualifications [1]  63/5
qualify [1]  44/3
question [7]  36/10 37/21 52/6 52/15 62/10
62/11 70/24
questions [8]  13/16 26/16 33/22 35/11 35/22
54/2 54/25 66/17

quote [1]  60/19

**R**

rather [2]  57/13 61/1
reach [1]  6/16
reached [1]  26/20
read [1]  43/12
readily [3]  22/25 59/13 59/22
reads [1]  35/9
real [20]  1/5 9/16 18/21 33/23 33/24 34/14
34/22 41/23 46/19 50/9 50/19 50/25 51/6
53/15 53/17 56/21 62/13 63/13 67/4 67/15
really [7]  6/4 7/10 33/14 43/6 43/13 53/13
58/1
reason [3]  14/21 58/1 69/2
recall [10]  15/10 22/3 27/11 30/22 33/25 50/3
50/5 50/21 53/8 58/14
receive [4]  9/20 10/19 62/8 62/11
received [7]  10/2 10/6 23/24 27/1 44/8 49/5
51/20
recess [3]  68/18 69/16 69/17
recognize [6]  12/18 12/23 13/8 31/15 64/10
64/20
recollection [1]  65/2
record [5]  8/4 8/11 61/21 62/20 70/11
recoup [1]  18/4
recover [1]  20/3
RECROSS [3]  4/3 54/23 57/9 57/10 58/22
RECROSS-EXAMINATION [3]  54/23
57/10 58/22
redacted [4]  5/20 5/23 6/10 6/18
REDIRECT [3]  4/3 49/20 49/22
reduced [2]  40/8 58/8
reference [1]  7/22
refinance [1]  40/12
reflect [1]  40/18
reflected [1]  33/1
reflective [1]  47/10
regarding [5]  7/1 9/7 9/21 10/15 51/6
regardless [2]  18/12 51/10
regards [1]  47/8
regulations [1]  72/7
related [3]  6/3 66/18 68/12
relates [1]  55/16
relationship [2]  9/7 9/18
relevance [1]  16/22
relevant [1]  7/8
relying [1]  57/21
remain [3]  68/23 69/4 70/21
remember [6]  14/6 42/3 47/12 47/17 47/21
68/5
remind [2]  68/18 70/15
reminded [1]  8/9
remove [1]  25/24
rent [1]  29/19
rental [1]  57/18
rep [1]  48/13
repay [1]  52/6
repayment [2]  51/12 52/10
repeat [3]  36/10 46/14 62/10
rephrase [3]  15/1 19/24 51/17
reported [2]  25/10 72/5
REPORTER'S [1]  1/16
reporting [1]  25/20
represent [2]  10/14 31/13
representation [1]  55/20
representations [2]  50/24 51/5
representative [1]  48/18
representing [2]  21/2 64/2
republic [1]  62/9
request [1]  34/7
requested [1]  43/6
requests [1]  35/5

require [1]  28/20
required [8]  11/14 12/1 14/1 28/14 32/4
32/17 53/7 57/16
requirements [1]  34/15
resale [2]  18/22 18/23
reside [1]  10/15
residence [19]  9/22 38/7 38/22 38/24 40/14
40/15 41/8 41/9 42/25 43/1 43/7 43/24 43/25
44/2 44/10 44/13 44/16 45/4 57/18
residential [5]  29/4 29/13 30/14 32/13 32/22
residing [1]  43/8
resold [1]  18/24
resolved [1]  22/3
respect [1]  29/2
respond [1]  6/19
responsible [1]  22/24
result [1]  5/25
resumed [1]  66/12
retain [1]  40/15
retirement [1]  26/2
review [5]  28/12 29/22 30/18 40/20 43/22
reviewed [3]  27/8 48/23 53/11
reviewing [3]  35/2 37/13 48/7
right [17]  7/25 8/8 14/8 20/20 23/1 24/12
32/8 49/17 54/21 60/10 60/16 60/20 61/8
66/19 68/17 69/15 70/23
rights [4]  5/21 7/14 7/15 7/16
risk [10]  10/10 17/5 17/6 33/14 50/20 50/23
51/12 52/10 53/8 56/7
road [1]  21/19
Room [1]  1/24
roughly [1]  63/1
RPR [1]  1/23
rule [1]  7/23
ruling [1]  59/4

**S**

said [4]  7/11 17/10 43/19 59/25
sale [16]  11/5 22/9 22/9 22/11 22/13 22/20
22/23 23/5 48/10 48/12 48/18 48/20 52/13
58/7 58/7 70/4
sales [1]  22/7
same [10]  14/5 14/9 14/12 14/16 25/7 32/6
40/1 40/21 45/8 49/2
Santa [1]  3/7
say [17]  18/19 20/13 22/9 22/13 22/19 23/4
28/21 29/22 31/5 33/13 41/22 41/22 51/25
57/21 63/3 66/2 67/16
saying [5]  26/5 37/19 38/22 44/15 64/2
says [8]  38/19 40/10 40/10 40/22 43/23 44/20
44/20 45/22
schedule [5]  46/19 50/9 50/19 50/25 53/17
schedules [2]  51/6 53/14
scope [4]  7/15 18/7 19/5 43/11
screen [2]  15/20 21/9
seal [2]  64/19 64/20
seat [1]  61/19
Seated [1]  5/10
second [7]  11/18 24/18 32/22 38/1 42/23
46/24 50/11
section [11]  29/13 29/16 38/1 38/14 38/18
40/19 40/23 46/18 47/10 56/14 72/3
sections [1]  32/17
Security [1]  11/23
see [21]  5/21 5/24 16/5 16/15 21/9 24/16
24/22 24/22 24/24 27/22 28/2 28/2 29/16 30/16
34/5 39/8 44/21 45/10 45/14 46/20 50/10
64/25
seeking [2]  6/9 10/16
seems [3]  7/3 36/9 36/18
sell [4]  19/21 19/23 22/14 22/25
selling [2]  19/25 21/11
send [2]  69/18 70/5

**S**

separate [2] 14/12 14/15
series [2] 27/9 27/14
service [1] 49/9
services [3] 62/8 62/12 63/4
session [3] 1/20 68/24 70/21
set [2] 8/24 51/6
seven [1] 64/15
seventh [1] 11/21
several [1] 20/11
she [17] 33/23 34/9 37/11 37/12 39/3 48/12
55/1 66/6 66/7 68/11 69/2 69/4 69/9 69/9
69/9 69/11 69/13
sheriff [3] 6/3 39/12 39/20
Sheriff's [1] 39/6
short [17] 11/4 22/7 22/9 22/11 22/13 22/14
22/20 22/23 23/5 48/10 48/12 48/18 48/20
52/13 58/7 66/6 70/3
short-sale [1] 23/5
shortly [1] 52/2
should [13] 26/13 33/6 33/16 33/19 33/21
37/21 42/9 46/5 47/1 47/3 47/10 59/14 65/19
show [7] 8/4 16/12 20/16 24/20 33/6 37/24
70/11
showed [1] 51/11
sic [2] 21/14 70/25
side [1] 24/22
sidebar [1] 66/4
sign [8] 12/1 28/14 32/4 34/9 64/24 66/5 66/7
71/5
signature [7] 34/8 64/2 64/19 64/20 67/10
67/12 68/15
signatures [4] 66/14 66/18 69/2 69/14
signed [13] 12/12 13/2 13/3 13/5 13/14 15/11
27/14 28/7 28/21 28/24 36/3 65/14 67/8
significant [2] 57/13 58/2
signing [7] 36/8 62/19 64/6 65/3 66/25 67/5
67/17
similarly [1] 33/7
simple [1] 22/11
simply [3] 34/15 34/23 49/15
since [2] 25/7 62/17
single [1] 56/12
sir [4] 8/9 54/12 60/8 61/4
sit [1] 67/10
situation [5] 22/23 23/5 23/5 23/6 52/8
six [2] 40/23 47/10
sixth [1] 11/20
so [39] 15/17 17/2 18/11 20/13 22/24 23/4
23/11 26/5 28/7 28/23 29/5 29/10 30/10 31/5
32/7 33/15 33/18 35/5 39/2 39/18 40/17
41/19 43/14 46/9 46/11 47/23 48/19 51/10
53/4 54/18 55/7 55/20 56/10 56/17 60/10
61/1 65/10 71/1 71/8
so-called [1] 71/1
Social [1] 11/22
software [1] 15/19
sold [2] 19/12 54/16
some [16] 11/13 11/25 14/8 19/15 20/24 23/7
24/9 25/25 28/20 34/18 37/18 37/21 52/14
57/23 59/15 63/15
somebody [8] 39/18 39/23 44/2 44/5 45/12
48/19 52/8 60/3
somebody's [2] 41/20 42/18
something [8] 6/6 22/10 23/13 36/9 36/15
36/18 47/1 69/6
sometimes [1] 14/4 14/25 15/3 20/22 56/11
67/13 67/13
somewhat [2] 18/18 20/14
sorry [10] 28/8 36/10 45/21 46/14 48/15
50/12 51/25 62/9 65/6 67/22
sort [1] 28/20

source [1] 62/14
sources [1] 59/15
Southern [1] 39/10
speak [1] 7/10
speaks [1] 28/16
SPECIAL [2] 2/10 5/10
specifically [3] 47/14 57/1 71/9
speculation [2] 21/24 34/10
spell [2] 8/11 61/21
sponsored [1] 57/17
spots [2] 37/21 67/12
Spring [2] 1/24 2/8
staff [2] 35/3 35/6
stamp [1] 64/3
stand [2] 51/1 48/24
standpoint [2] 51/13 56/20
stands [1] 9/12
Star [1] 21/14
state [4] 5/7 8/10 61/20 63/8
stated [1] 10/20
statement [7] 24/14 25/1 25/4 25/16 25/21
48/14 48/15
statements [6] 6/14 12/2 13/13 24/7 24/10
24/11 25/10 69/9 70/25
states [10] 1/1 1/8 1/23 2/5 2/7 2/7 5/5 37/16
72/4 72/8
stating [2] 10/23 53/22
stay [2] 10/20 45/4
staying [1] 44/12
stenographically [1] 72/5
step [6] 61/9 66/16 67/21 68/7 68/10 68/11
STEPHANIE [1] 2/5
still [5] 8/10 49/14 51/11 54/15 62/13
stipulate [2] 6/15 66/7
stipulated [6] 66/14 68/11 68/13 69/1 69/13
69/14
stipulation [3] 6/16 7/1 26/20
stop [1] 11/9
Street [2] 1/24 2/8
struggling [1] 52/8
stuck [1] 18/3
subject [4] 35/13 52/12 68/20 70/17
submission [2] 21/12 52/18
submitted [8] 7/21 11/23 15/8 37/25 40/22
41/25 68/22 70/19
subordinate [1] 34/23
Subpoena [1] 69/6
subsequent [1] 45/7
such [3] 26/2 49/1 71/10
sued [1] 6/21
sufficient [1] 15/4
suggested [1] 52/20
Suite [2] 2/16 2/23 3/7
summarized [1] 6/15
supervise [1] 13/22
supervisor [1] 17/11
supposed [1] 6/5
sure [4] 15/23 36/11 50/10 54/16
sustained [1] 51/3
sworn [2] 61/17 62/1
system [2] 15/17 41/21
systems [1] 48/7

**T**

table [1] 5/10
take [20] 17/24 24/3 24/5 27/22 28/11 31/2
36/2 37/5 42/9 46/9 48/23 50/23 51/5 59/13
61/19 63/7 65/20 68/18 69/22 69/24
taken [2] 12/12 66/11
takes [2] 17/20 67/17
Taking [1] 41/4
talk [1] 5/22
talked [4] 14/3 48/19 55/1 55/1

talking [3] 38/14 54/4 57/25
talks [4] 21/11
tax [2] 19/2 59/10
team [1] 17/11
tell [3] 48/8 67/12 71/5
telling [2] 37/14 40/4
tells [1] 38/1
ten [4] 69/16 70/15 70/20 71/12
ten o'clock [3] 70/15 70/20 71/12
term [2] 7/13 17/25
terms [1] 9/2 54/10
testified [6] 43/5 53/14 62/1 69/10 69/10
69/11
testify [3] 70/2 70/3 71/4
testimony [5] 14/6 15/10 35/8 51/10 56/10
than [9] 17/25 22/10 22/15 23/6 51/16 52/21
53/10 57/13 60/21
thank [13] 8/7 8/8 22/19 26/15 26/25 36/4
54/22 57/8 61/10 61/19 62/5 66/16 67/20
that [425]
that's [19] 14/8 18/5 20/23 22/4 38/5 38/20
41/3 43/21 46/16 55/4 56/1 57/5 61/3 63/8
69/2 69/2 69/14 70/1 71/1
their [25] 6/21 6/22 6/23 8/5 8/6 11/10 12/2
25/8 29/15 29/18 29/24 30/8 34/15 34/16
35/19 38/24 38/24 39/19 44/4 50/15 58/8
64/5 67/2 70/12 70/13
them [19] 6/23 26/3 26/4 26/4 36/3 36/8
36/15 46/9 51/9 56/5 58/6 58/17 64/4 65/21
66/7 66/15 67/12 69/19 70/5
themselves [2] 35/25 66/18
then [13] 10/4 27/10 36/14 39/1 40/8 40/12
40/15 44/23 45/2 45/7 46/11 47/3 49/15
there [47] 6/2 10/22 10/23 11/3 11/8 12/17
15/2 15/3 18/15 20/6 20/22 23/7 23/8 23/8
23/11 24/19 25/20 30/14 30/15 33/2 37/14
39/18 41/2 41/25 43/8 44/12 46/15 47/1 47/5
52/17 52/20 52/23 53/13 53/13 53/17 54/6
55/20 57/17 59/3 59/15 59/19 60/7 63/5
64/25 65/13 67/7 67/10
there's [18] 8/1 16/18 18/4 20/10 20/10 20/10
20/11 23/10 25/11 27/16 29/13 31/24 38/11
38/17 45/18 47/24 59/1 65/15
therefore [3] 22/23 46/18 53/6
these [23] 6/20 7/19 10/1 10/6 10/9 10/14
11/3 12/10 12/11 12/12 12/18 19/7 37/14 37/15
39/5 47/2 47/23 55/5 56/4 56/17 67/7 69/1
70/24 71/5
they [31] 6/12 9/22 10/15 10/18 11/5 11/10
14/12 16/20 17/7 19/2 19/15 20/4 20/19
21/23 22/17 29/19 29/24 37/21 39/15 40/17
44/4 44/24 46/13 49/15 55/13 58/11 58/16
59/24 64/6 66/5 67/14
they're [4] 19/15 29/18 38/6 46/7
thing [2] 5/21 71/2
things [5] 46/7 49/1 59/22 63/9 69/15
think [5] 5/22 6/7 16/11 24/13 69/23
third [3] 5/24 11/19 24/13
this [104]
those [25] 9/3 15/16 20/5 20/9 20/24 21/14
22/24 26/1 26/7 37/9 47/20 47/25 49/15
50/18 55/7 55/10 59/22 63/9 63/15 65/2
65/16 65/20 65/23 71/6 71/11
though [3] 23/13 38/20 43/23
thousands [1] 71/1
three [16] 6/13 12/17 12/22 13/5 13/14 25/13
28/10 38/11 38/23 47/2 47/3 47/4 50/25 51/9
55/17 64/25
through [8] 8/14 12/5 12/8 49/6 51/7 52/7
58/6 67/14
time [7] 7/19 7/23 11/1 12/12 13/2 13/11
13/16 23/14 26/20 29/14 30/6 32/10 43/5
47/1 49/10 53/6 54/2 56/21 60/2 61/12 63/1

**T**

time... [1] 70/8
times [4] 14/11 25/24 63/21 63/23
title [3] 38/19 44/16 72/4
Title 18 [1] 72/4
today [3] 54/16 54/19 56/11
together [1] 46/1
told [3] 41/5 71/5 71/7
tomorrow [4] 69/19 70/14 70/20 71/12
tonight [1] 69/19
too [1] 8/1
took [4] 20/4 36/8 36/14 48/24
tools [1] 59/1
top [2] 8/16 38/18
tops [1] 10/7
Total [1] 40/10
touching [2] 68/20 70/17
training [2] 28/12 46/3
Tran [16] 9/15 21/6 21/11 21/21 22/3 33/22
 34/7 35/2 35/5 37/5 48/3 48/10 48/12 48/17
 48/19 71/4
transaction [13] 9/17 10/11 10/12 21/16
 40/12 40/13 43/11 44/6 49/8 51/21 52/16
 63/19 67/16
transactions [3] 62/22 63/13 67/4
transcript [3] 1/16 72/5 72/6
trial [6] 1/16 6/19 7/3 55/18 68/20 70/17
trouble [1] 10/24
true [11] 8/10 17/16 20/7 23/8 25/9 55/5
 61/20 66/24 67/4 67/7 72/4
trust [4] 64/11 64/17 64/24 65/13
try [2] 11/4 49/11
trying [1] 38/6
turn [10] 12/5 12/20 18/21 24/13 29/3 31/9
 31/24 32/9 34/2 34/3
two [11] 6/11 7/16 8/8 9/5 21/14 24/20 46/15
 47/23 48/23 50/14 54/4
type [1] 9/3
typed [1] 43/21
types [1] 20/11
typical [1] 65/16
typically [3] 35/12 35/24 65/18

**U**

U.S [1] 1/5
ultimately [2] 18/24 22/3
Umberto [1] 5/16
unable [1] 6/16
unaware [1] 22/1
under [5] 6/17 8/10 40/7 41/17 53/1
underlying [1] 5/18
understand [4] 26/5 43/11 71/9 71/11
understanding [3] 37/13 41/5 45/16
understood [3] 16/7 21/5 56/10
underwater [1] 53/23
underwriter [6] 8/22 9/15 37/10 43/12 43/21
 44/24
underwriters [1] 48/5
underwriting [3] 11/2 49/6 53/7
Uniform [4] 29/4 29/13 32/13 32/22
Union [3] 33/7 33/10 33/18
UNITED [9] 1/1 1/8 1/23 2/5 2/7 2/7 5/5
 72/4 72/8
unless [3] 69/19 71/4 71/4
until [7] 7/23 59/25 68/21 68/23 70/14 70/18
 70/20
untrue [2] 48/14 48/16
unusual [1] 6/2
up [14] 5/25 6/18 7/23 15/20 18/23 20/12
 20/23 24/14 31/21 41/17 46/6 51/11 57/12
 69/15
upon [4] 7/23 60/15 68/19 70/16

**URLA [4]** 29/3 29/10 50/5 58/11
us [2] 37/14 38/1
use [2] 5/22 57/22
used [2] 10/9 62/13
using [1] 61/15
usual [1] 56/9
utilizing [1] 56/9

**V**

VA [2] 34/15 34/18
vague [2] 36/21 51/2
value [21] 7/10 35/9 41/7 41/9 41/12 51/15
 52/20 52/24 53/1 53/9 53/21 57/19 57/23
 58/24 59/1 59/11 59/12 60/19 60/23 61/3
 61/6
various [1] 35/18
vast [1] 28/19
verbal [1] 49/7
verdict [2] 68/22 70/19
verification [1] 49/7
verify [4] 11/14 30/11 39/2 57/23
version [1] 6/15
versus [1] 53/10 53/12
very [6] 5/20 6/10 43/23 44/19 66/6 67/23
vesting [1] 38/20
view [3] 6/4 6/6 55/23
viewed [3] 35/19 57/12 58/2
violations [2] 5/22 7/14
virtually [1] 13/1
VOLUME [1] 1/20

**W**

want [8] 16/10 21/8 24/20 35/11 54/25 57/23
 59/11 70/23
wanted [3] 9/21 10/20 71/2
warned [1] 33/23
warnings [1] 12/1
was [89]
wasn't [2] 17/4 58/1
way [10] 18/4 24/15 34/12 38/17 39/24 47/6
 48/17 49/12 57/23 59/10
we [67] 6/16 6/24 9/23 11/1 12/11 16/4 16/4
 16/24 18/21 20/12 21/15 21/16 21/17 25/12
 25/24 25/25 26/1 26/3 26/3 33/13 33/14
 34/20 35/16 37/19 42/9 43/11 43/14 44/4
 46/6 46/8 46/9 49/6 49/8 49/9 49/15
 51/10 51/11 51/17 51/18 51/20 51/20 52/4
 52/6 52/7 52/9 52/14 52/16 53/5 53/6 53/7
 54/3 54/8 54/9 54/16 55/6 55/6 56/8 56/8
 56/21 57/1 57/19 61/6 62/19 66/11 66/17
 69/14
we'll [5] 42/23 68/17 69/16 70/5 70/9
we're [3] 37/19 57/16 57/25
we've [1] 35/1
web [1] 59/19
websites [1] 59/19
week [2] 14/3 15/10
weigh [1] 61/6
well [18] 6/22 7/21 9/3 9/17 24/9 24/22 33/24
 37/24 41/14 41/25 46/2 48/22 50/18 51/12
 52/4 60/22 61/6 64/25
were [43] 6/12 6/16 6/21 7/20 10/6 10/9
 10/16 10/18 10/23 11/1 11/4 11/8 11/9 11/15
 11/25 17/10 17/23 17/23 21/6 21/15 21/16
 25/10 27/14 31/1 33/22 34/22 35/5 36/7
 36/13 45/3 47/9 47/14 50/1 50/18 53/15
 57/21 63/1 63/24 64/25 67/14 68/3 69/9 71/6
West [1] 2/16
WESTERN [1] 1/3
what [56] 5/19 6/19 7/2 7/11 7/13 8/20 9/11
 10/14 12/10 13/10 18/16 19/17 20/23 21/13
 26/5 28/5 32/2 33/14 38/1 39/3 40/18 40/24
 41/12 42/5 42/8 42/14 43/13 43/25 44/4

46/18 48/15 49/4 51/5 51/18 52/5 52/6 54/3
 56/6 56/14 57/1 57/18 57/19 58/11 58/25
 61/13 61/6 62/10 62/24 63/1 64/1 64/2 64/7
 65/25 69/10 70/2 71/7
what's [3] 7/2 12/25 63/18
when [18] 7/5 9/22 15/2 17/17 18/11 19/19
 22/13 33/13 44/3 44/19 50/23 53/14 55/20
 63/23 64/1 65/21 66/2 69/9
where [16] 18/24 23/7 23/10 29/10 29/14
 34/9 39/2 39/15 40/10 40/22 45/22 48/4
 49/15 52/8 55/1 67/10
whether [18] 7/10 10/12 14/14 14/22 19/15
 26/8 29/19 30/1 32/18 33/12 38/23 39/12
 48/2 48/5 48/9 50/18 58/6 69/11
which [12] 6/20 9/7 12/1 21/18 24/21 31/10
 32/23 35/12 38/4 60/20 61/15 71/6
while [3] 9/10 19/12 62/14
whiting [2] 34/7 34/15
who [19] 5/15 5/17 10/15 11/14 11/14 12/18
 37/9 38/17 39/1 43/13 44/5 44/12 45/3 56/23
 56/25 57/3 64/23 64/24 69/10
who's [2] 21/1 38/21
whole [3] 23/10 23/10 40/20
whom [1] 69/20
whose [1] 51/11
why [5] 9/14 9/21 40/19 57/14 58/1
will [24] 7/23 8/4 8/8 8/22 23/9 25/24 25/25
 26/7 35/16 37/25 38/19 39/12 41/17 41/22
 44/16 49/9 52/9 61/15 68/23 69/20 69/22
 70/11 70/21 71/10
willingness [1] 52/6
Wilshire [1] 3/7
within [3] 7/15 10/11 53/6
Without [1] 48/7
witness [16] 5/11 5/11 8/14 23/18 24/1 26/19
 42/11 61/11 61/14 61/17 62/1 62/19 64/6
 66/18 69/8 69/20
WITNESSES [1] 4/3
words [4] 14/18 15/3 28/23 45/18
work [4] 15/23 18/18 30/8 32/20
working [2] 19/13 21/6
works [1] 39/3
worth [10] 17/25 40/23 41/6 41/10 41/12
 41/15 42/5 42/14 57/19 58/4
would [88]
wouldn't [4] 26/3 46/9 46/9 48/8
write [2] 20/12 34/16
wrong [1] 37/19

**Y**

yeah [2] 48/4 57/1
year [1] 26/22
years [1] 49/2
yes [137]
yet [1] 23/20
YONEKURA [1] 2/5
you [229]
you're [7] 17/25 24/14 26/5 35/13 40/14
 68/21 70/18
you've [2] 38/14 63/21 65/21
your [110]
yourself [2] 24/4 59/7
yourselves [2] 68/19 70/16

**Z**

Zillow [1] 59/17
Zoom [1] 15/25